**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| FT GLOBAL CAPITAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> FUTURE FINTECH GROUP, INC., <br><br> Defendant. | Case No. 1:21-cv-00594-JPB |

**PLAINTIFF FT GLOBAL CAPITAL, INC.'S RESPONSE TO
DEFENDANT'S STATEMENT OF UNDISPUTED FACTS
AND STATEMENT OF ADDITIONAL FACTS**

Pursuant to Local Rule 56.1 of the United States District Court for the

Northern District of Georgia, FT Global Capital, Inc. ("Plaintiff"), by its attorneys,

Lang Legal Group LLC and Olshan Frome Wolosky LLP, hereby submits the

following responses to Defendant's Statement of Undisputed Facts in Support of its

Motion for Summary Judgment (the "Undisputed Facts"):

## Responses

Undisputed Fact No. 1:   Future FinTech is a blockchain technology R&D
application company incorporated in Florida, publicly-traded on NASDAQ under
the ticker symbol "FTFT." (Ex. A at ¶ 2)

Response:   Undisputed for the purposes of the present motion.

<u>Undisputed Fact No. 2:</u>   On or about July 28, 2020, FT Global Capital, Inc. ("Plaintiff" or "FT Global") and Future FinTech executed a Placement Agent Agreement ("PAA") in connection with the engagement of FT Global as Future FinTech's placement agent. (Ex. A at ¶ 3; Doc. 1 – Ex. A to Compl.)

<u>Response:</u>   Undisputed.

<u>Undisputed Fact No. 3:</u>   The PAA's term was for the earlier of three months or the completion of the placement. (Doc. 1 – Ex. A to Compl.)

<u>Response:</u>   Undisputed for the purposes of the present motion.

<u>Undisputed Fact No. 4:</u>   As Future FinTech's placement agent, FT Global agreed to introduce investors to Future FinTech and to facilitate that investment for Future FinTech. (*Id.*)

<u>Response:</u>   Disputed insofar as the statement purports to be a complete description of the PAA.  Plaintiff refers to the document for a complete account of its contents.  ECF No. 34-4.

<u>Undisputed Fact No. 5:</u>   To be entitled to the "Placement Agent Fee" of 10% per aggregate investment, FT Global had to use its "best efforts" to secure an investment for Future FinTech. (*Id.*)

<u>Response:</u>   Disputed insofar as the statement purports to be a complete description of Plaintiff's duties under the PAA.  The PAA states the Plaintiff shall use "reasonable best efforts," and Plaintiff otherwise refers to the document for a complete account of its contents.  ECF No. 34-4.

<u>Undisputed Fact No. 6:</u>   FT Global introduced only one potential investor (L1 Capital) to Future FinTech during the three-month term of the PPA; however, such investor was unable to make any investment in Future FinTech. (Ex. A at ¶ 6)

2

<u>Response:</u>   Disputed.  FT Global introduced several investors to Future Fintech during the three-month term of the PAA.  Ko Decl. at ¶ 13.  Second, L1 Capital did not make any investment in Future Fintech because the Company and L1 could not come to an agreement regarding the economic terms of the investment. (Huang Dep. at 36-37.)

<u>Undisputed Fact No. 7:</u>   The PAA expired on October 28, 2020. (Doc. 1 – Ex. A to Compl.)

<u>Response:</u>   Undisputed with respect to the term of the PAA, but certain contractual obligations, including the obligation during the "Tail Period," continued past the term.    Plaintiff otherwise refers to the document for a complete account of the parties' continuing obligations.  ECF No. 34-4.

<u>Undisputed Fact No. 8:</u>   FT Global was entitled to certain "Tail Financing" compensation with respect to:

> any public or private offering or other financing or capital-raising transaction of any kind ('Tail Financing') to the extent that such financing or capital is provided to the Company by investors whom the Placement Agent had introduced to the Company during the Term or investors 'wall-crossed' by the Placement Agent in connection with the Placement, if such Tail Financing is consummated at any time within the 12-month period following the termination of this Agreement (the 'Tail Period') provided that, at the request of the Company or within 10 days after termination of this Agreement, Placement Agent shall provide a written list of such investors Placement Agent had introduced or 'wall-crossed' to the Company during the Term.

(*Id.*)

Response:    Undisputed for purposes of summary judgment.

Undisputed Fact No. 9:    On November 2, 2020, FT Global emailed a purported "Tail List" to Future FinTech, identifying twelve named entities and, for each entity "its affiliates," whom FT Global claimed to have "introduced or contacted on behalf of FTFT":

> [T]the following list of potential investors whom FT Global Capital, Inc. has introduced or contacted on behalf of FTFT with regards to its capital-raising activity ("Placement") […]
>
> The above investors are in talk with FTFT through FT Global Capital exclusively in regards to a potential financing as defined in Section 1A, B and C of the signed placement agent agreement. This list will be updated as additional investors are introduced to the Company.

(Ex. C)

Response:    Plaintiff does not dispute that it emailed the "Tail List" to Future Fintech on November 2, 2020.  Plaintiff otherwise disputes this statement insofar as it purports to be a complete description of the correspondence and attached Tail List, and refers to the documents for a complete description of their contents.  See ECF No. 34-4.

Undisputed Fact No. 10:  The Tail List named known and unknown entities whom FT Global claimed to have "introduced or contacted" or "introduced to the Company." (*Id.*)

Response:   Disputed.   Plaintiff refers to the Tail List for its complete contents. The entities on the Tail List are investment advisors and/or hedge fund families that FT Global either introduced to Future Fintech or wall-crossed.

Undisputed Fact No. 11:  However, instead of just listing specific entities that FT Global believed that it had introduced to the Company, FT Global wrote "and its affiliates" next to each identified entity on the Tail List. (*Id.*)

Response:   Disputed.   Plaintiff refers to the Tail List for its complete contents. The designation "and its affiliates" was proper in light of the investment advisor/hedge fund structure of the introduced/wall-crossed parties.

Undisputed Fact No. 12:  FT Global's PAA contained a clause that prevented any change or amendment to the PAA without Future FinTech's written signed agreement accepting such change or amendment. (Doc. 1 - Ex. A to Compl.)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 13:  Future FinTech did not agree to expand "investor" to include unnamed entities such as "affiliates." (Ex. A at ¶ 10)

Response:   Disputed. This purported "fact" improperly embeds a legal conclusion, LR 56.1(B)(2)(a)(2) and LR 56.1 (B)(1)—that "affiliates" of investment managers are not themselves investors, and their inclusion would "expand" the meaning of the term investor or otherwise amend the PAA.   Furthermore, the cited evidence does not support Defendant's "fact," as it cites only the clause regarding amendment to the PAA.

<u>Undisputed Fact No. 14:</u>  From October 28, 2020, until December 13, 2020, Future FinTech did not engage a placement agent. (Ex. A at ¶ 11)

<u>Response:</u>   Disputed.   While there was no formal engagement between Plaintiff and Defendant, Defendant stated to Plaintiff multiple times in October and November 2020 that it was interested in renewing or extending its PAA with Plaintiff.  Ko Decl. ¶ 22 and Ex. L.  On this basis, Plaintiff made efforts on behalf of Defendant to continue soliciting investments, and obtained term sheets from L1 and Ayrton.  Ko Decl. Exs. F and G.

<u>Undisputed Fact No. 15:</u>  On December 13, 2020, Future FinTech negotiated a new placement agent agreement with Alliance Global Partners ("AGP"). (Ex. D)

<u>Response:</u>   Undisputed for the purposes of summary judgment.

<u>Undisputed Fact No. 16:</u>  To alert AGP to avoid those entities on FT Global's Tail List, Future FinTech emailed the information on the Tail List to AGP and asked that it avoid those entities. (Id.)

<u>Response:</u>   Disputed. Plaintiff refers to the document for its complete contents. The document referenced by Defendant further does not state Defendant's intent, and does not support this "fact."

<u>Undisputed Fact No. 17:</u>  AGP responded "Confirmed." (*Id.*)

<u>Response:</u>   Undisputed for the purposes of summary judgment.

<u>Undisputed Fact No. 18:</u>  That email exchange occurred on a Sunday afternoon. (*Id.*)

<u>Response:</u>   Undisputed for the purposes of summary judgment.

6

Undisputed Fact No. 19: The first investment closed on December 29, 2020. (Ex. G)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 20: The investors were A&T SPV, LLC ("A&T SPV"), and Tech Opportunities, LLC ("Tech Opportunities"). (*Id*.)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 21: AGP served as the sole placement agent and maintained secrecy over the two investors until shortly before the first SPA was executed. (Ex. A at ¶ 15)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 22: AGP handled all negotiations for the first, second, third, and fourth investments. (*Id*. at ¶ 16)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 23: Neither of the two entities who invested in Future FinTech were identified on FT Global's Tail List. (Compare Ex. G with Ex. C)

Response:   Disputed.  The two entities were identified on FT Global's Tail List.  When FT Global introduced or wall-crossed Anson Funds Management and Hudson Bay Capital Management, both investment managers, it also introduced and/or wall-crossed each of their affiliates. The two entities are both affiliates. Ko Decl. ¶¶ 24, 48; Opp. Ex. 1, HBCM Dep. at 26:19-28:16.  Also disputed insofar as this statement calls for a legal conclusion.

Undisputed Fact No. 24: On December 29, 2020, Mr. Huang received an e-mail from Mr. Ko, alleging that the SPA had been consummated as a result of FT Global's services, asserting that the two investors were "explicitly identified" on the

Tail List, and demanding payment in the amount of $880,000 pursuant to Section 1(A) of the expired PAA. (Ex. A at ¶ 19)

Response:   Disputed to the extent Defendant seeks to summarize the relevant email.  Plaintiff refers to the document for a complete description of its contents. *See* Ko Decl. Ex. S.

Undisputed Fact No. 25:  Future FinTech rejected that demand. (Ex. A at ¶ 20)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 26:  Mr. Ko later called Mr. Huang and complained that the investors are on the Tail List. (Ex. A at ¶ 21)

Response:   Disputed insofar as it characterizes Mr. Ko's statements.  Mr. Ko and Mr. Huang spoke over the phone and Mr. Ko informed him that the investors in the recent placement were on the Tail List. Ko Decl. ¶  37.

Undisputed Fact No. 27:  Mr. Huang asked Mr. Ko to be more specific and explain what he meant given that the investors were not named on the Tail List, but Mr. Ko refused. (*Id*. at ¶ 22)

Response:   Disputed.  Mr. Ko does not recall these statements, and in any case would not have refused.  *Id.*

Undisputed Fact No. 28:  He told Mr. Huang that he would not identify the specific investors on the Tail List whom he thought matched the actual investors. (*Id*. at ¶ 23)

Response:   Disputed. Mr. Ko does not recall Mr. Huang asking the identity of the investors, and in any case, would not have refused to answer. *Id.*

Undisputed Fact No. 29: Mr. Ko emailed Mr. Huang: "Furthermore, the purchasers in this transaction is explicitly identified in FTGC's Protected Investors List." (Ex. B)

Response:   Disputed to the extent Defendant purports to summarize the relevant communication. Plaintiff refers to the document for a complete description of its contents.  See Ko Decl. Ex. B.

Undisputed Fact No. 30: Mr. Ko again refused to identify any specific investors. (*Id.*)

Response:   Disputed.  Mr. Ko does not remember Mr. Huang asking him to identify the investors, and in any case, would not have refused.  Ko Decl. ¶ 37.

Undisputed Fact No. 31: FT Global filed this lawsuit seeking millions of dollars in unearned commission on January 14, 2021. (Doc. 1)

Response:   Disputed.  FT Global filed this lawsuit on January 14, 2021 seeking damages for breach of contract.  The remainder is a legal conclusion.

Undisputed Fact No. 32: FT Global's breach of contract claim is based entirely on FT Global's theory that it "introduced" the two investors to Future FinTech. (Doc. 1)

Response:   Disputed.  FT Global asserted a claim for breach of provision 1(C) of the PAA.  Both parties proceeded through discovery under the theory that FT Global had to prove whether it had "introduced or 'wall-crossed'" the investors in Future Fintech's four transactions.  *See* Opp. Ex. 12, FT Global's Amended Initial Disclosures, at (1) and Opp. Ex. 14, Future Fintech's First Interrogatories and

9

Requests for Production to Plaintiff.   Further disputed insofar as this statement calls for a legal conclusion regarding FT Global's "theory."

Undisputed Fact No. 33: FT Global did not introduce A&T SPV or Tech Opportunities to Future FinTech. (Ex. A at ¶¶ 26-31)

Response:   Disputed.  FT Global introduced Amin Nathoo of A&T SPV to Future Fintech in August 2020. Ko Decl. ¶ 39. FT Global further introduced Richard Allison and George Antonopoulos of Tech Opportunities to Future Fintech on October 24, 2020.  *Id.* ¶ 40.

Undisputed Fact No. 34: FT Global does not plead breach of contract based on "wall-crossing" – only "introduction." (Doc. 1)

Response:   Disputed. FT Global refers the Court to the Complaint for a complete description of its contents, and states further that this statement calls for a legal conclusion.  Both parties proceeded through discovery with notice that wall-crossing was at issue. *See* Opp. Ex. 12-14.

Undisputed Fact No. 35: There is no match between who was "wall-crossed" to the Company and who invested as A&T SPV and Tech Opportunities were not "wall-crossed" to the Company. (Ex. A at ¶¶ 26-31; Ex. C; Ex. G)

Response:   Disputed.  Plaintiff introduced/wall-crossed Rick Allison and George Antonopoulos of Hudson and Amin Nathoo of Anson to Future Fintech.  Ko Decl. Exs. J and K.  Once Messrs. Allison and Nathoo were introduced or wall-crossed, the firms and their affiliates were wall-crossed.  *Id.*  Hudson invested

through Tech Opportunities, with Antonopoulos signing on behalf of Tech Opportunities. Opp. Ex. 4 at FTFT0005363. Anson invested through A&T, with Nathoo handling the investment. Ex. Opp. Ex. 5, A&T Dep. at 8:06-8:17, 21:19-22:04; Opp. Ex. 3, AGP Dep. 73:10-78:23.

Undisputed Fact No. 36: Future FinTech did not know the names of the investors until shortly before the first securities purchase agreement was signed. (Ex. A at ¶ 15)

Response:   Undisputed for the purposes of summary judgment.

Undisputed Fact No. 37: AGP, as the placement agent, handled all efforts to find investors, fielded all communications and negotiation of deal terms, and facilitated the closings with the investors. (Id. at ¶ 16)

Response:   Undisputed for the purposes of summary judgment.

## Plaintiff's Statement of Additional Facts

1.   On July 27, 2020, FT Global and Future Fintech executed the PAA. The PAA had been negotiated between FT Global and Future Fintech and their respective counsel. See Ko Decl. at ¶ 4.

2.   The PAA provided that FT Global would use its "reasonable best efforts" to raise capital for Future Fintech. ECF No. 34-4 at 1.

3.   Future Fintech Group is a publicly-traded corporation incorporated in the State of Florida. Its stock is traded on the NASDAQ Stock Market under the ticker FTFT. Ko Decl. Ex. B at 1.

11876863-1

4.    Future Fintech's business headquarters is, and was at the time of the underlying events, located at 1177 Avenue of the Americas, Suite 5100, New York, New York, 10036.  Ko Decl. Ex. B at 1.

5.    Mr. Shanchun Huang is Future Fintech's Chief Executive Officer.  Ko Decl. ¶ 3.

6.    Historically, Future Fintech engaged in the production and sale of fruit juice concentrates and fruit juice in the People's Republic of China under the corporate name "SkyPeople Fruit Juice, Inc."  Ko Decl. Ex. B at 1.

7.    In 2017, Defendant changed its name to Future Fintech Group, Inc. Ko Decl. Ex. C at 2.

8.    Defendant's Form 10-K as of fiscal year 2020 states that the Company is "a real-name blockchain based e-commerce platform, supply chain financing services and trading business and financial technology business."  Ko Decl. Ex. B at 1.

9.    As of fiscal year 2019, Defendant reported nominal annual revenues of $449,989 and a net loss of over $27 million.  (*Id.* at F-4.)

10.    Defendant had filed a shelf Registration Statement to raise equity capital with the SEC in May 2018, and at the time FT Global was engaged in July 2020, the SEC had still not declared the filing effective.  Ko Decl. Ex. D.

11.  As a result, FT Global could only raise capital by placing unregistered securities with sophisticated investors, often hedge funds, in what is commonly referred to as a Private Investment in Public Equity, or "PIPE," financing.  Ko Decl. ¶ 10.

12.  A PIPE financing refers to a placement in which investment funds buy unregistered securities, i.e., shares that cannot be sold in the public markets, with the expectation that the company will later register them.  Ko Decl. ¶ 11.

13.  At the time of the PAA, Defendant had been largely unable to raise equity capital since changing its name in 2017.  Ko Decl. ¶ 9.

14.  The Placement Agent Fee under the PAA is computed as follows:

> As compensation for the Placement Agent's services hereunder, the Company shall pay to the Placement Agent a cash placement fee upon each Closing, in an amount equal to ten percent (10%) of the aggregate offering price of the total amount of capital received by the Company from the sale of its Securities during the term of this Agreement (the "Placement Agent Fee").

Ko Ex. A (PAA ¶ I (A)).

15.  Under the PAA, FT Global might also be entitled to a Placement Agent Fee from a financing during the twelve months after the conclusion of the PAA's term:

> The Placement Agent shall be entitled to a Placement Agent Fee, calculated in the manner provided in

13

Section 1(A), with respect to any public or private offering or other financing or capital-raising transaction of any kind ("Tail Financing") to the extent that such financing or capital is provided to the Company by investors whom the Placement Agent had introduced to the Company during the Term or investors "wall-crossed" by the Placement Agent in connection with the Placement, if such Tail Financing is consummated at any time within the 12-month period following the termination of this Agreement (the "Tail Period"), provided that, at the request of the Company or within 10 days after termination of this Agreement. Placement Agent shall provide a written list of such investors Placement Agent had introduced or "wall-crossed" to the Company during the Term.

*Id.* (PAA ¶ I (C)).

16.  FT Global's task under the PAA was to serve as placement agent. Ko Decl. ¶ 6.

17.  FT Global's principal responsibility was to seek to raise capital for Future Fintech using its network of institutional investors.  *Id.*

18.  FT Global has served as placement agent in many transactions, including both registered direct offerings and PIPE transactions.   Ko Decl. ¶ 12.

19.  Under the PAA, the identities of the investors that FT Global introduced to the Company was confidential and proprietary information.   Ko Decl. ¶ 7.

20.  Between July 28 and October 28, 2020, FT Global spoke with many hedge funds about Future Fintech, introducing them to its new blockchain business. Ko Decl. ¶ 13.

21.  FT Global also "wall-crossed" several institutional regarding a potential transaction with Future Fintech. ¶ 13.

22.  In each case, FT Global communicated with an investment manager empowered to make investment decisions for one or more funds under its control. Ko Decl. ¶ 47.

23.  "Introduce" and "wall cross" have specific meanings in the securities placement trade. Ko Decl. ¶ 14.

24.  "Introduce" means to show a company seeking an investment to a potential investor. Ko Decl. ¶ 14.

25.  "Wall-cross" means to share material non-public information about a company, commonly known as "MNPI," with an investor, as a result of which the investor becomes unable to buy and sell shares of that company in the public markets before the transaction becomes public.  Ko Decl. ¶¶ 14-15.

26. The MNPI that FT Global typically shares with potential investors, whether for a PIPE transaction or a registered direct transaction, consists of details

regarding a potential investment, such as amounts, timing, and price points.   Ko Decl. ¶ 15.

27.   Under the PAA, "wall-cross[ing] to the Company" means to provide MNPI regarding a potential investment in Future Fintech, as a result of which the potential investor commits not to trade in Future Fintech's securities.   Ko Decl. ¶ 20.

28.   During the engagement, FT Global spent many hours negotiating possible term sheets. Ko Decl. ¶ 17.

29.   FT Global submitted to Future Fintech a $5 million term sheet from L1 Capital.  Ko Decl. ¶ 17 and Ex. E.

30.   After the PAA concluded, FT Global submitted a $5 million term sheet from Ayrton Capital and a $6 million term sheet from L1 Capital. Both term sheets involved notes convertible into common stock, which would be registered at a later time.   Ko Decl. Exs. F and G.

31.   Future Fintech declined to pursue these offers.  Ko Decl. ¶ 17.

32.   FT Global brought Future Fintech to the attention of both Amin Nathoo of Anson Funds Management ("Anson") and Richard Allison of Hudson Bay Capital Management ("Hudson Bay") during FT Global's engagement.  Ko Decl. ¶ 18.

16

33. FT Global wall-crossed Hudson Bay and Anson to Future Fintech within the term of the engagement. Ko Decl. ¶¶ 21, 39-40 , Exhs H-K; Opp. Ex. 1, HBCM Dep. 35:15-35:25.

34. FT Global sent Anson an inquiry to wall-cross Mr. Nathoo about Future Fintech, and wall-crossed him over the phone shortly thereafter, sometime in August 2020.  Ko Decl. ¶ 39, and Exs. H and I.

35. On October 24, 2020, FT Global sent Hudson Bay an email memorializing the wall-cross and a sample term sheet with proposed terms for an investment into Future Fintech.  Ko Decl. Exs. J and K.

36. On November 2, 2020, four days after the engagement ended, FT Global sent Future Fintech a "Tail List" pursuant to Section 1(C) of the PAA.   Ko Decl. ¶ 23.

37. The Tail List identified the investors by reference to an investment manager and "its affiliates," i.e., the family of investment vehicles that it managed. Many of the potential investors that FT Global contacted for Future Fintech operated a family of hedge funds, all managed by the same investment advisor.  Ko Decl. ¶ 24.

38.  The Tail List included "Anson Funds Management and its affiliates" and "Hudson Bay Capital Management and its affiliates."  Ko Decl. ¶ 24; ECF No. 34-4 at FTFT0000500.

39.  Hudson Bay Capital Management is, according to its public filings, a registered investment advisor with more than $5 billion in assets held in a variety of private investment entities, all of which it controls.   Ko Decl. ¶ 26.

40.  According to its public filings, Anson Funds Management manages over $1 billion through a family of three or more private investment funds.  Ko Decl. ¶ 27.

41.  Future Fintech accepted FT Global's Tail List without challenge or dispute.

42.  Future Fintech has never stated to FT Global that it rejected the use of the term "affiliates."  Ko Decl. ¶ 28; Opp Ex. 10, Huang Dep. 25:21-28:04.

43.  Future Fintech never sent FT Global any written communication challenging the Tail List.  (Opp. Ex. 10, Huang Dep. 44:05-44:10)

44.  On December 11, 2020, the SEC declared Future Fintech's shelf registration statement effective, enabling it to sell up to $80 million of its shares in the public markets.  Ko. Decl. Ex. D.

45.  On December 13, 2020, Future Fintech sent the entire contents of the Tail List to Alliance Global Partners ("AGP"), asking it not to obtain investments from the listed investors.   Future Fintech's email contained no instruction to disregard "and its affiliates."  ECF No. 35-5.

46.  The next day, Future Fintech engaged AGP as a placement agent. Opp. Ex. 2.

47.  AGP testified that it only solicited three potential investors.  Opp. Ex. 3, AGP Dep. 74:13-74:23.

48.  Two of these solicitations were to representatives of Anson and Hudson Bay.  Opp. Ex. 3, AGP Dep. 74:13-74:23; Ko Decl. ¶ 19.

49.  With Alliance Global Partners ("AGP") acting as placement agent, Future Fintech signed a Securities Purchase Agreement (a "Subscription Agreement") on December 24, 2020. Opp. Ex. 4.

50.  The placement was announced December 28, 2020 on a Form 8-K filed with the SEC.  Ko Decl. ¶ 29.

51.  The names of the investors were not publicly disclosed in any SEC filing or elsewhere.  Ko Decl. ¶ 29.

11876863-1

52. The subscribing entities in this transaction were A&T SPV LLC ("A&T SPV") and Tech Opportunities LLC ("Tech Opportunities"). Ko Decl. ¶ 31; Opp. Ex. 4 at FTFT0005362-63.

53. Future Fintech and its lawyers received an email on December 29, 2020, from AGP indicating that its two investors were "Anson" and "Hudson." Opp. Ex. 6 (AGP0006819 and -821).

54. Defendant executed three additional Subscription Agreements with A&T SPV and Tech Opportunities. Opp. Exs. 7-9.

55. The names of the subscribing entities were not publicly disclosed, in any SEC filing or elsewhere. Ko Decl. ¶ 30.

56. The three additional transactions closed January 14, 2021, February 11, 2021, and April 1, 2021. Ko Decl. Exs. M-O (last two pages).

57. FT Global only learned the identity of the subscribing entities, A&T SPV and Tech Opportunities, through discovery in this action. Ko Decl. ¶ 31.

58. The address on the subscription page for A&T SPV was also the address for Anson at the time. Opp. Ex. 5, A&T Dep. 20:02-20:15; Ko Decl. ¶¶ 33, 34.

59.   The signatory on the Subscription Agreement for A&T SPV was Bruce Winson, the founder and Chairman of Anson; the contact email given was that of Amin Nathoo.  See Opp. Ex. 4 at -5362; Opp. Ex. 5 at 12:21-13:11.

60.   Mr. Nathoo appears as a "principal" on Anson's webpage.  See Ko Decl. ¶ Q.

61.   Mr. Winson and Mr. Nathoo made the decision for A&T to invest in Future Fintech.  Opp. Ex. 5 at 13:12-13:15

62.   A&T SPV is a wholly-owned subsidiary of Anson Investment Master Fund, the flagship investment fund managed by Anson.  Opp. Ex. 5 at 8:06-8:17; 21:19-22:04.

63.   The signatory for Tech Opportunities was George Antonopoulos, a managing partner and portfolio manager at Hudson Bay.  See Opp. Ex. 4 at -5363.

64.   A simple internet search would have identified him as a principal at Hudson Bay. See Ko. Decl. ¶ 34 and Ex. R.

65.   The address for Tech Opportunities is also the address for Hudson Bay's New York City office.  Ko Decl. ¶ 34.  Compare addresses in Opp. Ex. 4 at -5363 and Ko Ex. J at HBCM000096.

66. Hudson Bay made the decision for Tech Opportunities to invest in Future Fintech, and Hudson Bay controls Tech Opportunities.  Opp. Ex. 1, HBCM Dep. 18:24-19:15.

67. Hudson Bay confirmed that "Hudson Bay or its affiliate" invested in Future Fintech.  Opp. Ex. 1, 26:23-30:14.

68. AGP negotiated the investment with Richard Allison at Hudson Bay. Opp. Ex. 1, 44:21-45:05.

69. AGP asked Hudson Bay to invest through an entity that did not reveal Hudson Bay's name.  Opp Ex. 1, HBCM Dep. 44:08-44:23.

70. AGP negotiated the investment with Amin Nathoo.  Opp. Ex. 3, AGP Dep. 73:10-73:23.

71. A simple internet or LinkedIn search would have identified Mr. Natho as a principal at Anson.  Ko Decl. ¶ 33, Ex. Q.

72. Mr. Ko spoke to Mr. Nathoo in August 2020, introducing him Future Fintech's new business to Anson and seeking to wall-cross him.  Ko Decl. ¶ 39, Exs. H and I.

73. AGP asked Anson to invest through an entity that did not reveal Anson's name and to keep Anson's name off deal documentation. Opp. Ex. 5, A& T Dep. 33:10-34:09.

74. Mr. Nathoo decided to use A&T SPV as the vehicle for that reason. Id. 26:07-26:12.

75. FT Global learned through contacts in the industry that the investors on the Tail List were subscribing for Future Fintech shares using names intended to disguise their affiliation with the investment advisor. Ko Decl. ¶ 36.

76. After the first transaction was announced, Mr. Ko and Mr. Huang spoke over the phone. *Id.* ¶ 39.

77. Mr. Ko told Mr. Huang that certain investors in his recent transaction had been on the Tail List. *Id.*

78. Mr. Ko does not remember Mr. Huang asking him about the identities of the investors. *Id.*

79. On January 12, 2021 Mr. Ko sent AGP a cease and desist letter. Ko Decl. Ex. 38 and Ex. T.

80. The letter advised that "FTFT and your organization deliberately conspired to undertake surreptitious measure to purposefully conceal the fact that FTFT was consummating the subject transactions with protected investors in a bad faith and fraudulent effort to circumvent FTFT's contractual duty to pay FT Global the Placement Agent Fee under the transaction."

81. FTFT was aware of this letter through its attorneys. Opp. Ex. 15.

82. FTFT did nothing other than looking at the names of the two subscribing entities to determine whether they were on the Tail List.  Opp. Ex. 10, Huang Dep. 46:12-47:19.

83. FT Global would never have agreed to serve as placement agent if "investors" under the PAA meant only one entity and could not include that entity's affiliates.  Ko Decl. ¶ 43.

Dated:   Atlanta, Georgia
         November 2, 2022

LANG LEGAL GROUP LLC

By:     */s/ Eric C. Lang*
        Eric C. Lang
        Georgia Bar No. 435515
        2566 Shallowford Road, Suite
        104, No. 230
        Atlanta, Georgia 30345
        (404) 384-2591
        elang@langlegal.com


OLSHAN FROME WOLOSKY LLP

By:     */s/ Thomas J. Fleming*
        Thomas J. Fleming, *pro hac vice*
        Jacqueline Y. Ma, *pro hac vice*
        1325 Avenue of the Americas
        New York, New York 10019
        (212) 451-2300
        TFleming@olshanlaw.com
        JMa@olshanlaw.com

        *Attorneys for Plaintiff Future
        Fintech Group, Inc.*

11876863-1

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FT GLOBAL CAPITAL, INC.,

       Plaintiff,

   v.          Case No. 1:21-cv-00594-JPB

FUTURE FINTECH GROUP, INC.,

       Defendant.

## LR 7.1(D) CERTIFICATE OF FONT COMPLIANCE

I hereby certify that the foregoing Response to Defendant's Statement of Undisputed Facts and Statement of Additional Facts has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C), Northern District of Georgia, specifically Times New Roman 14 point.

           */s/ Jacqueline Y. Ma*
           Jacqueline Y. Ma, *pro hac vice*

26

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Defendant Future FinTech Group, Inc.'s Response to Defendant's Response to Defendant's Statement of Undisputed Facts and Statement of Additional Facts was filed electronically on November 2, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system upon the following counsel of record:

William J. Akins
FisherBroyles, LLP -TX
Suite 2000
100 Congress Avenue
Austin, TX 78701
214-924-9504

Edmund Fitzgerald Brown
FisherBroyles, LLP -OH
20 S. 3rd Street
P.O. Box 1066
Columbus, OH 43215
614-245-8418

Vincent C. Bushnell
FisherBroyles, LLP - Atl
Suite 2000
945 East Paces Ferry Rd., N.E.
Atlanta, GA 30326
678-902-7190

11876863-1

Diem N. Kaelber
FisherBroyles, LLP
21081 Canyon View Drive
Saratoga, CA 95070
408-898-3170
866-414-5083 (fax)
diem.kaelber@fisherbroyles.com

This 2nd of November, 2022.

Respectfully submitted,

OLSHAN FROME WOLOSKY LLP

*/s/ Jacqueline Y. Ma*

Jacqueline Y. Ma, *pro hac vice*

*Attorneys for Plaintiff FT Global Capital, Inc.*

28