# In the Matter Of:

## *FT GLOBAL CAPITAL vs*

### *FUTURE FINTECH GROUP*

---

## *CARMELO CATAUDELLA*

## *September 13, 2022*

---



1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3 FT GLOBAL CAPITAL, INC.,   )
                              )
 4       Plaintiff,           )
                              )
 5 vs.                        )  CASE NO. 1:21-cv-00594-JP
                              )
 6 FUTURE FINTECH GROUP,      )
   INC.,                      )
 7                            )
         Defendant.           )
 8

 9                      ORAL DEPOSITION

10                    CARMELO CATAUDELLA

11                    SEPTEMBER 13, 2022

12

13       ORAL DEPOSITION OF CARMELO CATAUDELLA, via Zoom,

14 produced as a witness at the instance of the Defendant

15 and duly sworn, was taken in the above-styled and

16 numbered cause on the 13th day of September, 2022, from

17 10:07 a.m. to 1:17 p.m., before Melinda Barre, Certified

18 Shorthand Reporter in and for the State of Texas,

19 reported by computerized stenotype machine, all parties

20 appearing remotely via web videoconference, pursuant to

21 the rules of procedure and the provisions stated on the

22 record or attached hereto.

23

24

25
```

2

```
 1                           APPEARANCES
           (ALL APPEARED VIA ZOOM VIDEO CONFERENCE.)
 2

 3  FOR PLAINTIFF:

 4       Mr. Thomas Fleming
         Ms. Jacqueline Ma
 5       OLSHAN FROME WOLOSKY LLP
         1325 Avenue of the Americas
 6       New York, New York 10019

 7       Telephone: 212.451.2219
         E-mail: tfleming@olshanlaw.com
 8

 9  FOR DEFENDANT:

10       Mr. William Akins
         FISHER BROYLES
11       4514 Cole Avenue, Suite 600
         Dallas, Texas 75205
12
         Telephone: 214.924.9504
13       E-mail: william.akins@fisherbroyles.com

14
    FOR ALLIANCE GLOBAL PARTNERS CORPORATION AND THE
15  WITNESS:

16       Mr. Scott Furst
         SICHENZIA ROSS FERENCE LLP
17       1185 Avenue of the Americas, 31st Floor
         New York, New York 10036
18
         Telephone: 212.930.9700
19       E-mail: sfurst@srf.law

20

21

22

23

24

25
```

3

1

2                              INDEX

3                                                    PAGE

4  Examination by Mr. Akins .........................5
   Examination by Mr. Fleming ......................61
5  Re-Examination by Mr. Akins ....................104
   Signature Page  ................................110
6  Court Reporter's Certificate ...................112

7

8                             EXHIBITS

9  EXHIBIT              DESCRIPTION                 PAGE

10

11 Exhibit 1      Notice of Deposition              7

12 Exhibit 2      12-13-20 Email String Between     14
                  Jeffrey Li and Carmelo
13                Cataudella

14 Exhibit 3      Email String Ending in 1-12-21    39
                  Email from Zach Grodko to Amin
15                Nathoo

16 Exhibit 4      1-12-21 Email from Amin Nathoo    41
                  to Amin Nathoo, Brandon
17                Wildfong and Daniel Kim with
                  Message Summary Table
18
   Exhibit 5      Email String Ending in 12-24-20   42
19                Email from Zach Grodko to
                  Shilpi Shah
20
   Exhibit 6      Alliance Global Partners          50
21                Confidential Terms Of
                  engagement, Follow-On Offering
22                Document Dated December 14,
                  2020
23

24

25

FT GLOBAL CAPITAL vs
FUTURE FINTECH GROUP

Carmelo Cataudella
September 13, 2022

4

1                    EXHIBITS (cont.)

2  EXHIBIT            DESCRIPTION                    PAGE

3  Exhibit 7     Commitment Committee               62
               Information for Future FinTech
4                Group Inc.

5  Exhibit 8     SEC Company Search Results for      65
               Future FinTech Group Inc.
6
   Exhibit 9     Securities Purchase Agreement       68
7
   Exhibit 10    Email String Ending in 12-29-20     78
8                Email from Zach Grodko to
                 Shilpi Shah
9
   Exhibit 11    Email String Ending in 12-29-20     81
10               Email from Zach Grodko to
                 Daniel Kim and Harry Ioannou
11
   Exhibit 12    Email String Ending in 12-29-20     84
12               Email from Zach Grodko to
                 Jeffrey Li, Carmelo Cataudella
13               and Gao Lu

14 Exhibit 13    1-11-21 Securities Placement        96
                 Agreement
15
   Exhibit 14    1-12-21 Email from Patrick Ko       97
16               to Phil Michals and John
                 Venezia with Attachment
17
   Exhibit 15    12-29-20 Email from Zach Grodko     106
18               to Jeffrey Li, et al

19 Exhibit 16    Excerpt from the Deposition of      107
                 Rick Allison

20

21

22

23

24

25

5

1                    CARMELO CATAUDELLA,

2 having been first duly sworn, testified as follows:

3                       EXAMINATION

4 QUESTIONS BY MR. AKINS:

5      Q.   Mr. Cataudella, my name is William Akins.   I

6 represent the defendant in the lawsuit in which you're

7 here to testify as a part of.   My client is Future

8 FinTech.   If I just call them Future FinTech or FTFT,

9 will you know who I'm talking about?

10     A.   Yes.

11     Q.   Okay.   Where are you located right now?

12     A.   New York City.

13     Q.   Are you in your attorney's office?

14     A.   Yes.   It's the offices of SRF.

15     Q.   Is there anyone in that room with you other

16 than you and your attorney?

17     A.   No.

18     Q.   Do you have a desktop or a laptop in front of

19 you in which you're participating in this deposition?

20     A.   Yes.

21     Q.   What do you have up on that screen?

22     A.   The SRF website.

23     Q.   Do you have any documents on the screen in

24 front of you?

25     A.   No.

6

1    Q.   Do you have any documents physically with you?

2    A.   Physically, yes, but not in sight.

3    Q.   How many documents page-wise do you have with

4 you?

5         MR. FURST:  He's looking across the table

6 at my binder.

7         MR. AKINS:  I'm sorry, Scott.

8         MR. FURST:  I'm sorry.  That was Scott

9 Furst.  I think he's referring to the binder in front of

10 me.

11        MR. AKINS:  Okay.

12 BY MR. AKINS:

13   Q.   And, Mr. Cataudella, did you review those

14 documents that Mr. Furst just showed in preparation for

15 your deposition today?

16   A.   I did.

17   Q.   Do you understand that you're here to testify

18 as a corporate representative for Alliance Global

19 Partners?

20   A.   Yes.

21   Q.   If I call Alliance Global Partners A.G.P., will

22 you know who I'm talking about?

23   A.   Yes.

24   Q.   Have you ever testified as a corporate

25 representative before?

7

1      A.   No.

2      Q.   Do you understand that testifying as a

3 corporate representative, you're testifying on behalf of

4 the corporation?

5      A.   Yes.  It's understood.

6      Q.   Do you understand that your testimony binds the

7 corporation to the questions that are asked?

8      A.   Yes.

9      Q.   Have you ever testified at all before?

10     A.   Deposition, yes, once before.

11     Q.   And that one deposition, what year was that?

12     A.   A few years ago.  I don't remember the exact

13 year.

14     Q.   What was the subject matter of the deposition?

15     A.   It was a motor vehicle accident.

16     Q.   Is it fair to say it did not involve A.G.P.?

17     A.   Correct.

18     Q.   Now, I'm going to share my screen and show you

19 what I've marked as Exhibit No. 1.

20          (Exhibit 1 marked)

21 BY MR. AKINS:

22     Q.   Mr. Cataudella, do you see that I'm showing you

23 a document that's entitled "Notice of Subpoena"?

24     A.   Yes.

25     Q.   And have you seen this document before?

8

1      A.   I have.

2      Q.   Did you review the topics that are listed in

3 Exhibit A?

4      A.   I have, yes.

5      Q.   Do you feel that you're comfortable to testify

6 on behalf of A.G.P. to each of the topics listed in

7 Exhibit A?

8      A.   Yes.

9      Q.   I'm going to stop sharing screen.

10          Do you know generally what this lawsuit is

11 about?

12     A.   Yes.

13     Q.   And have you read the complaint that was filed

14 by FT Global?

15     A.   I have not read the complaint.

16     Q.   What is your understanding of what the lawsuit

17 regards?

18     A.   There's a remaining item.  FT Global is

19 claiming a breach of contract by Future FinTech.

20     Q.   And do you have an understanding as to what

21 that breach of contract is based on?

22     A.   Yes.

23     Q.   And what's your understanding?

24     A.   There was an introduction made or an account

25 brought over the wall that FT Global is claiming was

9

1  used by Future FinTech on a financing, and FT Global

2  wants to get paid and compensated for that account.

3      Q.   Okay.  Do you have an opinion as a

4  representative of A.G.P. as to whether FT Global is

5  right or not in its allegations?

6      A.   I do not express an opinion.

7      Q.   Okay.  And who all did you talk to in order to

8  prepare for your deposition today?

9      A.   I spoke to my counsel as well as reviewed

10 documentation and various items.

11     Q.   Did you talk to any employees within A.G.P.?

12     A.   In the discussions with our counsel, A.G.P.'s

13 counsel, SRF.  Also included on those calls were Phil

14 Michals, chairman of A.G.P., as well as David Bocchi,

15 head of investment banking, also a principal of the

16 firm.

17     Q.   Other than Mr. Michals and Mr. Bocchi, is there

18 anyone employed by A.G.P. or formerly employed by A.G.P.

19 who you talked to to prepare for your deposition?

20     A.   No, not directly.

21     Q.   And I said talk, but let me perhaps be broader.

22 Is there anyone you communicated with via e-mail, text,

23 things of that sort in preparation for your deposition

24 that's either an employee of A.G.P. or used to be an

25 employee of A.G.P.?

10

1     A.    No.

2     Q.    Did you talk to Zachary Grodko, if I'm saying

3 his name correctly?

4     A.    Zachary Grodko, no.

5     Q.    Is he still employed by A.G.P.?

6     A.    He is, yes.

7     Q.    And what is your title at A.G.P.?

8     A.    I'm currently the vice-president of investment

9 banking.

10    Q.    And how long have you had that title?

11    A.    I'd say a number of years now.

12    Q.    Have you had that title since you joined

13 A.G.P.?

14    A.    No, I have not.

15    Q.    What was your title immediately prior to the

16 current one?

17    A.    Associate.

18    Q.    And was that your starting title at A.G.P.?

19    A.    It was, correct.

20    Q.    How long were you an associate?

21    A.    I'd say a little over two years, if I recall

22 correctly.

23    Q.    In the fall of 2020 and the winter of 2020/

24 spring of 2021, in that time frame what was your title

25 at A.G.P.?

11

1    A.    Fall of 2021, winter of 2020 and the spring of

2  2021 I believe I was the VP of investment banking.

3    Q.    When did you start work at A.G.P.?

4    A.    It was beginning of 2018.

5    Q.    And where did you work before that?

6    A.    There's another investment bank called Aegis

7  Capital.

8    Q.    How long were you at -- is it A-e-g-i-s?

9    A.    Correct.

10    Q.    And how long were you at Aegis Capital?

11    A.    Under a year.

12    Q.    And where did you work before Aegis Capital?

13    A.    Before Aegis Capital -- directly before Aegis

14  Capital there was a venture I tried to start called

15  Unicore, and I was at Unicore prior to Aegis.

16    Q.    Is Unicore U-n-i-c-o-r-p?

17    A.    C-o-r-e as in Edward.

18    Q.    What was the business of Unicore, the venture

19  you tried to start?

20    A.    It was an advisory firm out of college, which

21  was unsuccessful.

22    Q.    And how long were you in the process of trying

23  to get Unicore up and running?

24    A.    Say from 2015 to the end of 2016, so under two

25  years.

12

1     Q.   And you said that was right out of college.  So

2 where did you go to college?

3     A.   I went first year to Manhattan College and the

4 remaining years were at Queens College.

5     Q.   I take it you graduated college?

6     A.   I did.

7     Q.   What's your degree in?

8     A.   I have a bachelor's.  My focus at the time was

9 accounting.

10     Q.   Are you a certified public accountant?

11     A.   I am not.

12     Q.   Do you hold any accounting certifications?

13     A.   I do not currently.

14     Q.   So let's go back to the current.  So what do

15 you do at A.G.P.?

16     A.   At Alliance my roles are to source new business

17 for the investment banking team.

18     Q.   What does "source new business" mean?

19     A.   This means to originate, to bring about, to

20 find.

21     Q.   How do you go about originating new business

22 for the investment banking team?

23     A.   One example is referrals, law firms, accounting

24 firms knowing that I'm in the business.  They could have

25 clients that they know and need to raise capital that

13

1  they refer.

2          Also companies' issuers that are public

3  file their financials with the SEC.  This is public

4  record.  So a lot of my work is cold e-mails and cold

5  calls.

6      Q.   Who's your immediate supervisor?

7      A.   The supervisor of our team is Thomas Higgins.

8      Q.   Was Thomas Higgins your supervisor in winter of

9  2020/spring of 2021?

10     A.   Winter of 2020 and spring of 2021, yes.

11     Q.   And who does Mr. Higgins report to?

12     A.   I'm not sure.

13     Q.   Is Mr. Higgins your only supervisor?

14     A.   I mean, I've worked on the investment banking

15  team.  So there is a head of investment banking, David

16  Bocchi, who also oversees the investment banking

17  practice.

18     Q.   Would it be fair to say that David Bocchi is a

19  supervisor or oversees Mr. Higgins' roles?

20     A.   I'm not a hundred percent familiar with how the

21  flow lines of the organization work.

22     Q.   And maybe it's the same answer to this

23  question.  Who does Mr. Bocchi report to?

24     A.   Mr. Bocchi is a partner, a principal and the

25  head of investment banking.  So I think it's the same

14

1 situation.

2     Q.   Now, have you read any deposition transcripts

3 of depositions that were taken in this case?

4     A.   I have not.

5     Q.   I'm going to go back to here on my screen and

6 show you what I've marked as Exhibit No. 2.

7             (Exhibit 2 marked)

8 BY MR. AKINS:

9     Q.   Okay, Mr. Cataudella.  I'm showing you an

10 e-mail exchange from December 13th, 2020.  The first

11 question is have you reviewed this e-mail in preparing

12 for your deposition today?

13     A.   I have.

14     Q.   Okay.  Other than your attorney, have you

15 talked to anybody else regarding this e-mail?

16     A.   In preparation of my deposition, no.

17     Q.   Before preparing for your deposition have you

18 talked to anyone other than your attorney regarding this

19 e-mail exchange?

20     A.   As I mentioned previously, there have been

21 discussions between our attorney, as well as Phil

22 Michals and David Bocchi collectively, in regards to the

23 facts of the case; and this e-mail, I can say, has been

24 brought up.

25     Q.   Have any of those discussions happened outside

15

1 of the presence of A.G.P.'s legal counsel?

2    A.    No.

3    Q.    All right.  I want to go down -- and I'm saying

4 this for the record so the transcript reflects what

5 we're looking at.

6              On page 2 of Exhibit No. 2 there's an

7 e-mail on December 13th, 2020 from Jeffrey Li, last name

8 spelled L-i.  "Carmelo, please find a few track changes

9 from the company and let us know if you are okay with

10 them."

11             Do you see that?

12   A.    I see that, yes.

13   Q.    Carmelo is you, right?

14   A.    Correct.

15   Q.    And then you responded on the same day -- and

16 this is a Sunday, December 13, 2020 -- response that

17 your -- well, A.G.P. is okay with the changes, right?

18   A.    Correct.

19   Q.    That leads to another e-mail from Jeffrey Li.

20 Mr. Li states, "Also, could you please confirm that it

21 will not involve any of the investors in the tail list

22 below, thanks," and then there's a number of entities

23 listed, right?

24   A.    Correct.

25   Q.    And then you responded same day, "Confirmed,"

16

1 right?

2    A.   Correct.

3    Q.   Did you take this e-mail to mean that A.G.P.

4 was supposed to avoid certain entities as potential

5 investors into Future FinTech?

6    A.   No.

7    Q.   What did you take this e-mail to mean?

8    A.   At the time -- I mean, the limited information

9 that company counsel gives us or gives me in the e-mail

10 is, you know, for me to confirm a list of accounts and

11 their affiliates will not be included because of a tail

12 list, some tail list.

13    Q.   And let's talk about a tail list for a minute.

14 Do you understand what a tail list is?

15    A.   Yes, generally.

16    Q.   Okay.  Is it fair to say that A.G.P.

17 understands what a tail list is?

18    A.   Yes.

19    Q.   What is A.G.P.'s understanding of what a tail

20 list is?

21    A.   A tail list generally is a group of investors

22 that have been -- some process has been done with those

23 investors to -- by another bank for the benefit of an

24 issuer, and that bank has included these investors on a

25 fee tail so they could possibly get compensated at a

17

1 future date depending on the terms of the agreement.

2     Q.    How many times has A.G.P. been involved in

3 securing investments in which a tail list existed before

4 A.G.P.'s engagement?

5     A.    I don't know the exact amount of times.  I

6 could tell you that there have been times in the past

7 where certain investors are carved out of A.G.P.'s

8 engagement, but I don't know exactly how many times

9 we've raised money for issuers with a potential tail

10 list.

11     Q.    Has A.G.P. ever raised money for an issuer from

12 an investor that was on a prior placement agent's tail

13 list?

14     A.    Not that I recall specifically.  But if there's

15 an example that you want to show, I'm happy to shed some

16 light on it.

17     Q.    Okay.  So with respect to a tail list, does

18 A.G.P. have any policies or procedures that it follows

19 in the event that a tail list is in play?

20     A.    I mean, we have the normal WSPs of a firm.  I

21 have not reviewed those in light of preparing for this

22 deposition.  And I know that what governs our engagement

23 with issuers would be an engagement agreement generally

24 as the first step.

25             So if there was anything in regards to a

18

1  fee tail in a prospective engagement for another issuer,

2  generally speaking, those terms would be outlined in the

3  engagement agreement with that issuer with the

4  respective banker.

5      Q.   If the engagement agreement does not outline a

6  fee tail or a tail list, does that mean that A.G.P. is

7  free to solicit investors that are on a tail list of

8  which it already has knowledge?

9      A.   Can you rephrase the question, please.

10     Q.   Sure.  And maybe I'll break it down into a

11 couple of things.

12     A.   Yeah, please.

13     Q.   If A.G.P. is shown a tail list and asked by the

14 issuer to stay away from those investors, is that

15 sufficient for A.G.P. to avoid those potential

16 investors; or does it also have to be spelled out in the

17 engagement agreement?

18     A.   I mean, as A.G.P. as an organization, we rely

19 on our documents and negotiations with our issuers that

20 guide our roles and responsibilities and obligations to

21 those issuers.

22          So an engagement agreement, if there was a

23 fee tail, in an instance where the issuer did not want

24 A.G.P. contacting those investors, that is explicitly

25 laid out in the engagement agreement and the related

19

1 transaction documents.

2   Q.   All right.  And in this situation, this e-mail

3 exchange, this was sufficient to advise A.G.P. to stay

4 away from the investors listed in this tail list, right?

5           MR. FURST:  Objection as to form.  Scott

6 Furst.  You can answer.

7   A.   No.

8 BY MR. AKINS:

9   Q.   Well, what did you mean when you said

10 "confirmed"?

11   A.   Here there's an e-mail from Jeffrey with a list

12 of investors saying that the transaction would not

13 involve them, and I'm confirming that the transaction

14 would not involve them.

15   Q.   Okay.  So you confirmed that the investment in

16 Future FinTech would not involve any of the investors

17 listed in Jeffrey's e-mail, right?

18   A.   Per the e-mail, that's what it says.

19   Q.   Well, okay.  So A.G.P. confirmed that none of

20 the entities listed in Jeffrey's December 13th e-mail

21 would be investors in Future FinTech, right?

22   A.   Correct.

23   Q.   Okay.  And I want to go back just to clarify

24 for the record.  So you mentioned WSP.  Can you provide

25 what that stands for.

20

1    A.   I don't know the exact.  I know the

2 abbreviation.  I don't know the exact legal definition

3 or terms.

4    Q.   Do you know if A.G.P. has a written policy or

5 procedure regarding how to handle a tail list?

6    A.   I have not reviewed any policies or procedures

7 of A.G.P. in handling a tail list moreover than

8 reviewing the actual agreements that we sign with our

9 issuers, which would include a tail list.

10    Q.   Okay.  And I'm going to ask a specific

11 question.  Whether or not you've reviewed it, do you

12 know if A.G.P. has those policies and procedures?

13    A.   I am not aware.

14    Q.   Is it A.G.P.'s responsibility as the placement

15 agent to avoid entities that are identified on a tail

16 list?

17    A.   It's A.G.P.'s responsibility to follow the -- I

18 mean, if there's a specific example, I'm happy to go

19 through it; but it's A.G.P.'s responsibility to follow

20 the contracts that it signs.

21    Q.   Was it A.G.P.'s responsibility to avoid the

22 investors listed in Jeffrey's e-mail?

23    A.   Our agreement supersedes, right -- per the

24 terms of that agreement supersedes this e-mail and the

25 responsibilities that would be implied via this e-mail.

21

1              So the agreement that was signed on

2 December 14th, the engagement agreement, outlines those

3 terms that A.G.P. is to follow.

4    Q.   When did A.G.P. decide to ignore Jeffrey's

5 e-mail about the tail list?

6              MR. FURST:  Objection as to form.  Scott

7 Furst.

8    A.   I'm sorry.  Can you repeat the question.

9 BY MR. AKINS:

10   Q.   Yeah.  I mean, isn't that what you're saying is

11 that once the placement agreement was signed with Future

12 FinTech, you could ignore Jeffrey Li's December 13th

13 e-mail?

14             MR. FURST:  Objection as to form.  Scott

15 Furst.

16   A.   No.  That's not what I'm saying.

17 BY MR. AKINS:

18   Q.   All right.  Well, you either followed it or you

19 ignored it.  So did A.G.P. follow the confirmation that

20 none of the entities would be investors in Future

21 FinTech, or did A.G.P. decide to ignore that

22 confirmation because it was not spelled out in the

23 placement agent agreement?

24             MR. FURST:  Objection as to form.  Scott

25 Furst.  You can answer.

22

1    A.   There was no ignoring of anything.  The

2 engagement agreement outlined specifically our roles and

3 responsibilities.  And should, you know, we be obligated

4 to follow this tail list in Jeffrey's e-mail, that would

5 be explicitly laid out in the engagement agreement as

6 well as the placement agency agreement, which is signed

7 prior to pricing.

8 BY MR. AKINS:

9    Q.   Well, but this e-mail confirms that the

10 placement agent agreement was already settled between

11 A.G.P. and Future FinTech, right?  I mean, you said that

12 A.G.P. was okay with the changes to it?

13             MR. FURST:  Objection as to form.  Scott

14 Furst.

15    A.   So there's two agreements for this first

16 transaction that we're referencing here in these

17 e-mails, the December 2020 transactions.  The first

18 agreement is the engagement agreement, and this is when

19 A.G.P. is engaged by company counsel and the company to

20 act as exclusive placement agent on a placement.

21             This is December 13th agreement, then

22 signed December 14th.  The placement agency agreement is

23 a different agreement.

24 BY MR. AKINS:

25    Q.   And just so we're clear, Exhibit 2 refers to

23

1 which of those two agreements?

2    A.   Exhibit 2 refers to the engagement agreement.

3    Q.   Okay.  And when you're referring to the

4 agreement signed between A.G.P. and Future FinTech, is

5 that what we're calling the engagement agreement?

6            MR. FURST:  Objection as to form.  You can

7 answer.

8    A.   I think we need to be specific here as there

9 were multiple agreements not only for each transaction,

10 but also for the same transactions.

11 BY MR. AKINS:

12   Q.   All right.  To be specific, what agreement is

13 Exhibit 2 referring to when you say, "Jeffrey, A.G.P. is

14 okay with these changes"?

15   A.   This is referring to the engagement agreement.

16   Q.   And is the engagement agreement the agreement

17 that you're saying should have set out the tail list?

18   A.   Generally if there are terms that an issuer or

19 issuer counsel would like included when engaging a bank,

20 those would be explicitly laid out in the engagement

21 agreement, correct.

22   Q.   Okay.  And did you respond back to Jeffrey Li

23 when he sent the e-mail and said, Well, if you want

24 A.G.P. to avoid these investors, you need to put it in

25 the engagement agreement?

24

1      A.   I did not.

2      Q.   In fact, you said "confirmed" that the

3  investment would not involve any of the investors on the

4  tail list that was provided by Jeffrey Li, right?

5           MR. FURST:  Objection as to form.

6      A.   Can you rephrase the question.

7  BY MR. AKINS:

8      Q.   Yeah.  You didn't refer back to any engagement

9  agreement.  You just said "confirmed" in response to

10  Jeffrey Li's request to avoid investors on the tail

11  list.

12      A.   That's what it says, correct.

13      Q.   Is A.G.P.'s testimony that because the

14  engagement agreement with Future FinTech did not include

15  this tail list, it was free to solicit investors on this

16  tail list?

17           MR. FURST:  Objection as to form.  Scott

18  Furst.

19      A.   No.  A.G.P. has specific agreements, five to be

20  specific, the engagement agreement which is referenced

21  in this Exhibit 2 as well as placement agent agreements

22  which further outline more specifically A.G.P.'s roles,

23  responsibilities and compensation for the transactions

24  of which there were four.

25           So A.G.P. has an engagement agreement

25

1 signed December 14th and then placement agency

2 agreements for each of the four placements that we did

3 for Future FinTech.

4 BY MR. AKINS:

5    Q.   Each of the placement agent agreements did not

6 include this tail list, right?

7    A.   That's correct.

8    Q.   Is it A.G.P.'s testimony that because each of

9 the placement agents did not include this tail list, it

10 was free to solicit from the investors on this tail

11 list?

12    A.   That's not what I'm saying.

13    Q.   Well, you either can't solicit from them or you

14 can.

15         So throughout the entire engagement with

16 Future FinTech was A.G.P. free to solicit from the

17 investors on the tail list in Exhibit 2?

18         MR. FURST:  Objection as to form.  Scott

19 Furst.

20    A.   Can you rephrase the question.

21 BY MR. AKINS:

22    Q.   Sure.  Throughout the entire engagement between

23 A.G.P. and Future FinTech, was A.G.P. ever permitted to

24 solicit from this list of investors in Jeffrey Li's

25 e-mail?

26

1      A.    A.G.P. was not prohibited from -- per the

2   engagement agreement signed the day after this exhibit,

3   A.G.P. was not prohibited from soliciting any accounts

4   in particular.

5      Q.    Who made that decision?

6      A.    This is based on a negotiation between Jeffrey

7   Li, who was my liaison as lead banker on the

8   transaction, and company counsel, Jeffrey Li and my

9   team, A.G.P., in negotiation of the engagement agreement

10  and the four specific placement agency agreements.

11     Q.    Did A.G.P. ever make the decision to go after

12  any of the investors identified by Jeffrey Li in his

13  December 13, 2020 e-mail?

14          MR. FURST:   Objection as to form.   Scott

15  Furst.

16     A.    Can you repeat the question, please.

17  BY MR. AKINS:

18     Q.    Yep.   Did A.G.P. ever make a decision to go

19  after any of the investors listed on Jeffrey Li's

20  December 13, 2020 e-mail?

21          MR. FURST:   Restating my objection.   You

22  can answer.

23     A.    Based on my review of all of the discovery --

24  right, discovery, yeah -- all of the discovery that we

25  provided and e-mail correspondence and agreements in

1 preparation for this deposition, there was nothing to

2 that effect where that decision was made.

3 BY MR. AKINS:

4     Q.   Well, okay.  So A.G.P. never made the decision

5 whether to avoid investors listed on Jeffrey Li's

6 December 13th e-mail?

7              MR. FURST:  Objection as to form.  Scott

8 Furst.  You can answer.

9     A.   Could you rephrase the question kindly.

10 BY MR. AKINS:

11    Q.   Did A.G.P. solicit investment from any of the

12 investors listed in Jeffrey Li's December 13, 2020

13 e-mail?

14    A.   A.G.P. solicited investment from individuals,

15 and those individuals ended up investing via funds.

16    Q.   Were any of those individuals employed by the

17 entities listed in Jeffrey Li's December 13, 2020

18 e-mail?

19    A.   I don't know the employment status of these

20 funds or the individuals that worked there nor their

21 affiliates.

22    Q.   Sorry about that.

23    A.   No problem.

24    Q.   Did any of the investors -- well, were any of

25 the investors who invested in Future FinTech listed in

28

1 Jeffrey Li's December 13, 2020 e-mail?

2    A.   The two investors that invested were Tech

3 Opportunity Funds and A&T SPV.

4    Q.   Were those two investors associated with any of

5 the entities listed on Jeffrey Li's December 13, 2020

6 e-mail?

7             MR. FURST:  Objection as to form.  Scott

8 Furst.  You can answer.

9    A.   Can you rephrase the question.  Sorry.

10 BY MR. AKINS:

11    Q.   Were any of the two investors you just

12 identified affiliated with any of the entities who were

13 listed in Jeffrey Li's December 13, 2020 e-mail?

14             MR. FURST:  Objection as to form.  You can

15 answer.

16    A.   Can you define "affiliate" in this question.

17 BY MR. AKINS:

18    Q.   You bet.  What is your definition of affiliate?

19             MR. FURST:  Objection as to form.  You can

20 answer.

21    A.   You asked me a question with a word and then I

22 asked you to define it and now you're asking me to

23 define it.

24 BY MR. AKINS:

25    Q.   I am.  When A.G.P. responded "confirmed" to an

29

1 e-mail that has the word "affiliate," what did it

2 understand affiliates to mean?

3     A.    I mean, each fund files a form ADV, to my

4 understanding, with the SEC; and that would potentially

5 list out any affiliates of these groups here.

6     Q.    What was the name of the form?

7     A.    ADV.

8     Q.    What does that stand for?

9     A.    Again, I don't -- I don't know the legal

10 definition there.  I know the acronym.

11     Q.    Did A.G.P. pull the ADV forms for Anson Funds

12 Management LLP, for instance?

13     A.    That was not outlined in our engagement

14 agreement to -- nor the placement agency agreement to do

15 so.

16     Q.    So then A.G.P. didn't do it?

17     A.    Yeah.  To my knowledge, A.G.P. did not do that,

18 correct.

19     Q.    Did anyone at A.G.P. ask Jeffrey Li, What do

20 you mean by "affiliates"?

21     A.    I was the liaison between -- with Jeffrey.

22 Jeffrey was my point of contact as Jeffrey brought me

23 the transaction.  So I did not ask Jeffrey what he meant

24 by "affiliate."

25     Q.    What action did A.G.P. take or not take as a

30

1  result of confirming Jeffrey Li's request in this

2  Exhibit 2?

3      A.   I don't recall what specific action I took

4  before sending this confirmation e-mail.

5      Q.   Who did you send this confirmation e-mail to

6  inside A.G.P.?

7      A.   By the looks of it, it looks like -- could you

8  scroll up, please.

9      Q.   Sure.

10      A.   It looks like the e-mail was sent from myself

11  to Jeffrey Li.

12      Q.   Did you send this e-mail to anybody else inside

13  A.G.P. or to anybody inside A.G.P.?

14      A.   Not to my knowledge.

15      Q.   Did you talk to anybody in A.G.P. regarding

16  this e-mail?

17      A.   At what point in time because we reviewed this

18  a bit earlier?

19      Q.   Okay.  During the period of time in which

20  A.G.P. was engaged by Future FinTech, did you talk to

21  anyone inside A.G.P. regarding this e-mail exchange on

22  Exhibit 2?

23      A.   Based on my review of the documents and the

24  discovery and the correspondence and the various

25  e-mails, I do not see anything to that effect.

31

1      Q.   And just to be clear, is A.G.P.'s testimony

2 that because the placement agent agreements themselves

3 did not encompass this tail list, that A.G.P. was free

4 to solicit investors on this tail list?

5              MR. FURST:  Objection as to form.  Scott

6 Furst.  You can answer.

7      A.   I don't know what -- that's not what I'm saying

8 as to A.G.P.'s testimony.

9 BY MR. AKINS:

10     Q.   Well, but I'm asking a yes or no question.  Is

11 it A.G.P.'s testimony that because this tail list was

12 not incorporated into the placement agent agreements,

13 that A.G.P. was not bound by it and they could solicit

14 investment from these entities?

15             MR. FURST:  Objection as to form.  You can

16 answer.

17     A.   A.G.P.'s duties are outlined always

18 specifically in the agreements we sign, and it's

19 A.G.P.'s reliance on those documents and need to rely on

20 those documents from which we operate.  And those

21 documents include the placement agency agreements, as

22 you specify, and also the engagement agreement that was

23 signed with the company the day after this e-mail

24 exchange with Jeffrey Li.

25 BY MR. AKINS:

1    Q.   Because those agreements did not incorporate

2 this tail list, A.G.P. was free to solicit investments

3 from the entities identified here?

4              MR. FURST:  Objection as to form.  You can

5 answer.

6    A.   A.G.P. was free to conduct its roles and

7 responsibilities per those agreements in which case this

8 tail list that Jeffrey mentions was not included in.

9 BY MR. AKINS:

10   Q.   And if it was not included, then A.G.P. could

11 solicit investment from Anson Fund Management, for

12 instance, right?

13   A.   A.G.P. could follow the course of operating as

14 it does based on the agreements that it has in place.

15   Q.   When did you tell Jeffrey Li that you no

16 longer -- that A.G.P. no longer had to follow this tail

17 list?

18              MR. FURST:  Objection as to form.  Scott

19 Furst.  You can answer.

20   A.   That conversation never occurred.

21 BY MR. AKINS:

22   Q.   When did you tell -- meaning when did A.G.P.

23 tell Jeffrey Li that unless these investors are included

24 in the placement agreement, we can solicit investment

25 from them?

33

1    A.   That's not a discussion that was had with

2 Jeffrey Li.

3    Q.   When did you, A.G.P., tell Jeffrey Li that the

4 "confirmed" no longer meant anything because this tail

5 list was not in the placement agent agreement?

6         MR. FURST:  Objection as to form.  Scott

7 Furst.

8    A.   Can you repeat the question, please.

9 BY MR. AKINS:

10   Q.   Yeah.  When did A.G.P. tell Jeffrey Li or

11 anybody at Future FinTech that it could ignore this

12 placement -- excuse me.

13        When did A.G.P. tell anybody at Future

14 FinTech or Jeffrey Li that A.G.P. could ignore this tail

15 list because it was not replicated in the placement

16 agent agreement?

17   A.   Again, that conversation did not happen.

18   Q.   How would Future FinTech have known that A.G.P.

19 felt that it was okay to solicit from investors on the

20 tail list?

21        MR. FURST:  Objection as to form.  Scott

22 Furst.

23   A.   Presumably the company through Jeffrey Li, who

24 here is in discussions with myself and A.G.P., would

25 have reviewed the terms of the engagement agreement and

1 the placement agency agreements and the relevant terms

2 as it relates to A.G.P.'s role in the transactions.

3 BY MR. AKINS:

4    Q.   And you're saying because those terms did not

5 specifically include this tail list, that all of these

6 investors were fair game?

7               MR. FURST:  Objection as to form, Scott

8 Furst, and misstates testimony.

9    A.   No.  That is not what I am saying.

10 BY MR. AKINS:

11    Q.   Were these investors fair game, or were they on

12 a prohibited list?

13               MR. FURST:  Objection as to form.  Scott

14 Furst.

15    A.   These investors were not on a prohibited list

16 as outlined in the agreement that was signed with the

17 company the day after this e-mail was sent to me.

18 BY MR. AKINS:

19    Q.   So they were fair game, right?

20               MR. FURST:  Objection as to form.  You can

21 answer.

22    A.   That's not what I am saying.

23 BY MR. AKINS:

24    Q.   Well, which is it?  You could either invest

25 with them or not.

35

1          MR. FURST:  Is there a question?

2          MR. AKINS:  Yeah.

3 BY MR. AKINS:

4     Q.   Which is it?  Are they available to solicit for

5 investment, or are they not?

6     A.   We'd have to look at the placement agency

7 agreement and see what roles and responsibilities -- or,

8 for that matter, the engagement agreement because that's

9 the next relevant document after this e-mail -- to see

10 what our role is as A.G.P.

11    Q.   Well, you looked at those in preparing for your

12 deposition today.  So what did they say with respect to

13 these tail list investors?

14    A.   Well, if there's something specifically you

15 want to show me, I'm happy to go through it.  I did

16 review, but I do not have a verbatim understanding or

17 recollection of those agreements.

18    Q.   Was A.G.P. permitted to solicit investors from

19 the entities listed in Jeffrey Li's December 13, 2020

20 e-mail?

21    A.   Again, what we are permitted to do

22 solicitation-wise, deal-wise, anything related to the

23 transaction is outlined very specifically in all of our

24 agreements.  And A.G.P. relies on those agreements to

25 conduct its operations.

36

1     Q.   You responded to Jeffrey Li as the point person

2  for A.G.P. and confirmed that the investment would not

3  include any of the investors on the tail list, right?

4              MR. FURST:  Objection as to form.  You can

5  answer.

6     A.   That is what the e-mail says, yes.

7  BY MR. AKINS:

8     Q.   All right.  And then you're saying that because

9  the placement agent agreement did not confirm that, your

10 confirmation, what, evaporated, went away, had no

11 effect?

12             MR. FURST:  Objection as to form.  Scott

13 Furst.

14    A.   I'm going to use the engagement agreement first

15 since the placement agency agreement is dated after the

16 engagement agreement.

17             The engagement agreement outlines

18 specifically that correspondence, and any agreements not

19 included in that engagement agreement prior to are

20 superseded by the engagement agreement that we signed

21 the very next day.

22 BY MR. AKINS:

23    Q.   So the very next day you went back against

24 "confirmed" and superseded what you said to Jeffrey Li?

25             MR. FURST:  Objection as to form.  Scott

1 Furst.

2    A.    The very next day we signed an agreement with

3 the company that outlined the terms of what we were

4 supposed to do, and that was on December 14th.

5 BY MR. AKINS:

6    Q.    And because those terms did not include this

7 tail list, what you told Jeffrey Li was confirmed was

8 actually no longer confirmed, right?

9              MR. FURST:  Objection as to form.  Scott

10 Furst.  You can answer.

11    A.    If these investors were to be omitted from

12 A.G.P.'s solicitation, then they would have been

13 included in the engagement agreement between A.G.P. and

14 the company.

15 BY MR. AKINS:

16    Q.    So at that point what you said was confirmed is

17 no longer confirmed?

18    A.    I know that as A.G.P. we can confirm what was

19 said the next day based on the agreements we signed.

20    Q.    And that agreement meant that what you said

21 just a day prior as confirmed no longer had any value.

22 Is that correct?

23              MR. FURST:  Objection as to form.  Scott

24 Furst.  You can answer.

25    A.    Well, if we can pull up that agreement, I'm

1 happy to go through it and see those exact terms that I

2 reference.  But any communications verbally, orally,

3 correspondence prior to the signing of that engagement

4 agreement is superseded and explicitly written out in

5 that engagement agreement.

6 BY MR. AKINS:

7    Q.   So you respond "confirmed" on Sunday; and by

8 the end of Monday what you confirmed no longer has any

9 value because it was not in the agreement, correct?

10        MR. FURST:  Objection as to form.  Scott

11 Furst.  You can answer.

12    A.   I e-mailed "confirmed" on Sunday, again, not

13 the placement agency agreement.  On Monday,

14 December 14th, the engagement agreement is signed; and

15 those outlay the terms, correct.

16 BY MR. AKINS:

17    Q.   So if A.G.P. was free to solicit investment

18 from the entities listed on this tail list because they

19 were not part of the engagement agreement, why did it

20 have Anson Funds change its name or hide its name as one

21 of the investors?

22        MR. FURST:  Objection as to form, Scott

23 Furst, and lack of foundation.

24    A.   There's no -- in my review there is no

25 documents as provided in discovery or anything to that

39

1  effect that had A.G.P. do that.

2              (Exhibit 3 marked)

3  BY MR. AKINS:

4      Q.   I'm going to show you Exhibit No. 3.  Zach

5  Grodko says on January 12, 2021 to Amin Nathoo at Anson

6  Funds.com, "Just make sure notice says A&T and incoming

7  wire doesn't mention any name."

8              Now, you didn't talk to Zach Grodko in

9  preparing for your deposition, did you?

10     A.   I did not.

11     Q.   Okay.  So does A.G.P. understand why its

12  employee, Zach Grodko, wanted to make sure that the

13  notice referred to here says A&T?

14     A.   A&T is the fund that did the transaction.  So

15  if A&T in doing the transaction was issued warrants --

16  and it looks like, if you could scroll down, Amin

17  Nathoo, "Gents, looking to exercise our FTFT warrants

18  today.  Could you help facilitate."  And if Amin is

19  looking to exercise warrants in FTFT that were issued to

20  A&T, that notice would have A&T.

21     Q.   Now, I know Amin Nathoo is not an employee of

22  A.G.P.; but does A.G.P. have an understanding as to why

23  he said that he didn't want to reveal that the investor

24  was actually Anson?

25              MR. FURST:  Objection as to form.  Scott

40

1  Furst.

2      A.   I don't see that in this e-mail.

3  BY MR. AKINS:

4      Q.   All right.  Center of page 1 of Exhibit No. 3,

5  e-mail from Amin Nathoo at Anson Funds, "Can you guys

6  help facilitate this so that we don't reveal that it's

7  actually Anson as the investor, remember we used the

8  SPV."

9              What does that mean to you?

10     A.   This is Amin e-mailing -- I can't see who

11 here -- showing that it looks like he wants us to

12 facilitate his warrant exercise so that he and his team

13 don't reveal that Anson is the investor and reminding us

14 he used his SPV.

15     Q.   Why would he not want to reveal that Anson is

16 the investor?

17             MR. FURST:  Objection as to form, calls

18 for speculation.

19     A.   I am not sure what Amin was thinking when

20 writing this e-mail.

21 BY MR. AKINS:

22     Q.   Okay.  Zach Grodko, an A.G.P. employee, says,

23 "Yes, this makes most sense.  We will facilitate.  Just

24 make sure notice says A&T and we should be good."

25     A.   Uh-huh.

41

1      Q.   What did Zach Grodko mean when he sent this

2 e-mail by "we should be good"?

3      A.   A&T was the fund that did the deal.  A&T is

4 exercising warrants.  If the exercise notice was to

5 include A&T as the entity exercising its warrants on a

6 transaction for which A&T was a purchaser, then I

7 presume we should be good as well.

8      Q.   How do you say Harry's last name who's cc'd on

9 this e-mail?

10     A.   Harry Ioannou.

11     Q.   Ioannou.  Did you talk to Harry Ioannou in

12 preparing for your deposition today?

13     A.   I did not.

14     Q.   Is he still employed by A.G.P.?

15     A.   Harry is still employed by A.G.P. currently,

16 yes.

17     Q.   Let me show you Exhibit No. 4.

18               (Exhibit 4 marked)

19 BY MR. AKINS:

20     Q.   Exhibit No. 4 is a message summary from persons

21 inside Anson Funds.  About halfway down on page 1 Amin

22 Nathoo says, "Please send FTFT wire from A&T SPV.

23 Hopefully that wire doesn't say Anson anywhere."

24               Do you see that?

25     A.   I do see that, yeah.

42

1    Q.   Did you have any discussions -- did A.G.P. have

2 any discussions with Anson Funds about using a different

3 investment name or investor name other than Anson?

4    A.   Not to my knowledge.

5    Q.   Did A.G.P. have any discussions with Tech

6 Opportunities or Hudson Bay about using a different

7 entity name than Hudson Bay to invest in Future FinTech?

8    A.   The investment of Future FinTech was via Tech

9 Opportunities Fund.

10           (Exhibit 5 marked)

11 BY MR. AKINS:

12    Q.   I'm going to refer to Exhibit No. 5.  Okay.

13 Exhibit No. 5 is a December 24, 2020 e-mail from Zach

14 Grodko to Shilpi Shah at Hudson Bay Capital.com where

15 Zach says, "You can say for behalf of Tech Opportunity."

16           Did you talk to Zach Grodko about this

17 e-mail?

18    A.   I did not.  Can we review this exhibit so I

19 have context?

20    Q.   Sure.  In fact, because it's an e-mail string,

21 I will start at the bottom.  Page 4 it has very little

22 substantive information other than the stock symbol and

23 then warrant details above that.

24           Who is George -- and I'm not sure how to

25 say his last name -- Anagnostou?

43

1     A.   It's George Anagnostou, and George is the head

2 of institutional sales.

3     Q.   Did you talk to George Anagnostou in preparing

4 for your deposition today?

5     A.   I did not.

6     Q.   Is he still employed by A.G.P.?

7     A.   George is employed by A.G.P., yes.

8     Q.   You see the subject matter -- the subject line

9 of the e-mail says "FTFT settlement terms."  What does

10 settlement terms mean?

11     A.   I'm not the one that typed this e-mail.  So I'm

12 unsure of what -- I'm not sure who said this.  Was it

13 Zachary?

14     Q.   It's a back and forth between Shilpi Shah at

15 Hudson Bay and Zachary Grodko.

16     A.   Yeah.

17     Q.   Why was there a need to make a distinction

18 between Hudson Bay Capital and Tech Opportunity with

19 respect to FTFT settlement terms?

20             MR. FURST:  Objection as to form.  Scott

21 Furst.

22     A.   Here's an e-mail from Shilpi asking what looks

23 like to be Zach to ignore the prior details as they

24 provided the wrong fund.  So that's what I see here.

25 BY MR. AKINS:

44

1    Q.   Does A.G.P. consider Tech Opportunity to be a

2 separate investment fund from Hudson Bay Capital?

3    A.   Tech Opportunities is not the same fund as

4 Hudson Bay Capital.  It's a different entity.

5    Q.   Does A.G.P. consider Tech Opportunities to be

6 an affiliate of Hudson Bay Capital?

7              MR. FURST:  Objection to form.  Scott

8 Furst.  You can answer.

9    A.   Tech Opportunity Funds, I mean, if they're not

10 listed as an affiliate for Hudson Bay, then A.G.P. would

11 not consider them to be an affiliate.

12 BY MR. AKINS:

13    Q.   And, again, when you are referring to "listed

14 as an affiliate," you're referring to form ADV?

15    A.   Yes.  That's what I'm referring to.

16    Q.   Did A.G.P. pull form ADV for Hudson Bay Capital

17 in any of the engagement period with respect to Future

18 FinTech?

19              MR. FURST:  Objection as to form.  Scott

20 Furst.

21    A.   I reviewed in my preparation and looked at the

22 form ADV for Hudson Bay.

23 BY MR. AKINS:

24    Q.   Did you see Tech Opportunity listed in that

25 form?

45

1      A.   I did not to my knowledge, no.

2      Q.   Did A.G.P. pull the form ADV for Anson Funds?

3      A.   I did not see -- I mean, we had a big

4  production of documents for discovery.  Nowhere in my

5  review or preparation for this deposition did I see a

6  form ADV for Anson Funds.

7      Q.   Does A.G.P. have any opinion as to whether

8  Anson Funds is affiliated with A&T SPV?

9           MR. FURST:  Objection as to form.  You can

10  answer.

11      A.   Not to my knowledge.

12  BY MR. AKINS:

13      Q.   Did A.G.P. undertake any efforts to determine

14  whether or not there was an affiliation between Anson

15  Funds and A&T SPV?

16      A.   A.G.P.'s duties and responsibilities when doing

17  these placements is outlined specifically in the

18  agreements we discussed.  So if it's not in that

19  agreement to determine who's an affiliate of whom, then

20  I can tell you that A.G.P. would stick by the agreements

21  and not to their own devices.

22      Q.   Did you ever talk to Jeffrey Li and tell him

23  that his request to not involve any of the investors on

24  the tail list in Exhibit 2 had to be in the placement

25  agent agreement in order for A.G.P. to give it any

46

1  value?

2              MR. FURST:  Objection as to form.  Scott

3  Furst.

4      A.  A.G.P. is -- sorry.  Jeffrey Li is company

5  counsel and securities counsel.  And these agreements,

6  both the engagement agreement and the placement agency

7  agreement, was negotiated before signed specifically

8  with Jeffrey Li.

9              So there was no discussion, to my

10 knowledge; but there was an exchange back and forth on

11 the engagement terms and the roles and responsibilities

12 for the engagement.

13 BY MR. AKINS:

14     Q.  After the first placement agent agreement was

15 signed was A.G.P. bound in any way to what you confirmed

16 to Jeffrey Li in the December 13, 2020 e-mail exchange?

17             MR. FURST:  Objection as to form.  Scott

18 Furst.  You can answer.

19     A.  A.G.P. is bound by its negotiated agreement at

20 the time; and, again, not the placement agency agreement

21 at this point, as you mention, the engagement agreement,

22 as the placement agency agreement was fairly later in

23 time than the -- this e-mail and the engagement

24 agreement, which was signed December 14th, the day after

25 this e-mail.  A.G.P. is bound by the terms of that

47

1  agreement specifically.

2  BY MR. AKINS:

3      Q.    And if that agreement doesn't include this tail

4  list, A.G.P. doesn't have to adhere to it, right?

5              MR. FURST:   Objection as to form.   You can

6  answer.

7      A.    Could you repeat the question or rephrase the

8  question.

9  BY MR. AKINS:

10     Q.    If the engagement agreement does not include

11 this tail list, then it has no effect -- this tail list

12 has no effect after signing the engagement agreement?

13     A.    I can tell you that A.G.P. will stick by the

14 terms of its agreements with the company and

15 specifically the engagement agreement, which has a

16 clause and it was signed a day after this e-mail,

17 specifically that correspondence, et al, for and in

18 regards to this engagement.   The full agreement is

19 embodied -- the full agreement between the parties is

20 embodied in that agreement we signed the next day.

21             So A.G.P. would follow the entire

22 agreement in its entirety and any provisions that are

23 included in that agreement and any dos and don'ts.

24     Q.    Did you know at the time that you signed the

25 engagement agreement that it superseded your

48

1 confirmation in this e-mail?

2          MR. FURST:  Objection to form, Scott

3 Furst, and lack of foundation.

4     A.   Can you repeat the question, William.

5 BY MR. AKINS:

6     Q.   The very next day, Monday, December 14th, when

7 A.G.P. signed the engagement agreement --

8     A.   Uh-huh.

9     Q.   -- was A.G.P. aware that it eliminated the

10 confirmation just from the day prior regarding the tail

11 list?

12    A.   A.G.P. understands that the entirety of the

13 agreement with the other party is embodied -- before

14 it's signed is reviewed by the A.G.P. team and

15 understand that the entire agreement between the parties

16 is embodied between the pages of the engagement

17 agreement.  They do understand that, yes, which is a

18 term of the engagement agreement.

19    Q.   When you confirmed to Jeffrey Li on the

20 afternoon of December 13, 2020 that the investors would

21 not involve any of the investors on the tail list, that

22 confirmation had been eliminated the very next day,

23 right?

24          MR. FURST:  Objection as to form.  Scott

25 Furst.

49

1    A.    I think a better term is superseded as it

2 mentions in the engagement agreement.

3 BY MR. AKINS:

4    Q.    And did you tell Jeffrey Li that this

5 supersedes my confirmation to you to stay away from the

6 tail list?

7    A.    Jeffrey Li, based on this e-mail

8 correspondence, had been negotiating the engagement

9 agreement and the terms thereof.  So on behalf of his

10 client and then his client signing this engagement

11 agreement, it is understood that they are, in essence,

12 agreeing to the terms and provisions of that engagement

13 agreement with A.G.P.

14    Q.    Did you tell Jeffrey Li that what I confirmed

15 to you on Sunday no longer has any effect on Monday?

16    A.    To my knowledge, that conversation between

17 myself and Jeffrey Li did not happen.

18    Q.    Did the conversation between anybody at A.G.P.

19 and Jeffrey Li along those lines ever happen?

20    A.    Not to my knowledge, and I was the point of

21 contact for Jeffrey Li.

22              MR. FURST:  Before you ask another

23 question, Bill, within five minutes or so I'm going to

24 need to take a restroom break.

25              MR. AKINS:  Okay.  This is a good point.

50

1  Let's just go ahead.

2              MR. FURST:  I didn't mean to interrupt

3  your flow.

4              MR. AKINS:  No, no, no.  That's fine.

5  Good timing.  I was going to change topics.  So I will

6  stop sharing screen, and we'll go off the record for

7  five minutes.

8              (Recess taken)

9              (Exhibit 6 marked)

10  BY MR. AKINS:

11     Q.   Mr. Cataudella, we're going to continue after

12  the short break.  I'm going to show you what I've marked

13  as Exhibit No. 6, which is one the court reporter

14  doesn't have.  It is an Alliance Global Partners

15  confidential terms of engagement follow-on offering

16  document; and it's dated December 14, 2020.

17              Is this the engagement agreement that you

18  were referring to earlier in your testimony?

19     A.   Can you scroll up?

20     Q.   Sure.  Tell me if you need me to go slower or

21  faster.

22     A.   Yeah.  This looks like the engagement

23  agreement.

24     Q.   Okay.  So this document is dated December 14,

25  2020.  Is this the document -- I'm going to go back to

1  Exhibit No. 2.  Is this the document that was referred

2  to in Exhibit No. 2 as the document with track changes

3  and then that A.G.P. was okay with the changes?

4      A.   There may have been an iteration -- I mean, I

5  don't see the e-mail where Jeffrey is sending it to us

6  signed.  So it could be that Monday there was a comment.

7  It's unclear here.

8      Q.   Okay.  And even if there were future changes to

9  it, this is --

10     A.   It referenced the same document, correct.

11     Q.   Okay.  Back to Exhibit No. 6, now, you had

12 testified that Exhibit 6 superseded the Sunday e-mail

13 regarding the tail list.  Are you referring to a

14 provision in this paragraph L, Miscellaneous?

15     A.   Give me a moment to read it.

16     Q.   Sure.

17     A.   Correct.

18     Q.   Okay.  If you had told Future FinTech that this

19 agreement superseded your e-mail with Jeffrey, your

20 confirmation e-mail with Jeffrey from the day before, do

21 you think that Future FinTech would have entered into

22 this engagement agreement?

23         MR. FURST:  Objection as to form.  Scott

24 Furst.  You can answer.

25     A.   I'm unsure what Future FinTech would have done.

52

1  I cannot opine on that.

2  BY MR. AKINS:

3     Q.   So A.G.P.'s position is that the sentence in

4  paragraph L, Miscellaneous, that states, "This agreement

5  constitutes the entire agreement of A.G.P. and the

6  company, supersedes any prior agreements with respect to

7  the subject matter hereof," A.G.P.'s position is that

8  that sentence eliminated the confirmation in Exhibit

9  No. 2?

10          MR. FURST:   Objection as to form.   Scott

11  Furst.   You can answer.

12     A.   Could we go back to the engagement agreement?

13  BY MR. AKINS:

14     Q.   Sure.

15     A.   This agreement encompasses everything that we

16  agreed to.   I'll also make a note -- and I saw you

17  scroll past it, if we can scroll up here.

18     Q.   Okay.

19     A.   I'm not sure if it's 3 or 2, somewhere in

20  there, but pretty comprehensive agreement.   If you could

21  go up further.   I can't see what page this is.   Zoom is

22  in the way.

23     Q.   3 is at the top.

24     A.   Okay.   Then if you can scroll up further, it's

25  either on 3 or 2.   Nope.   It has to be on 2.   Keep

53

1 going.  Right here.

2             Section 4, Tail Fee.  This is also in

3 addition to the last paragraph, which encompasses the

4 entire agreement between the parties.  You also have

5 here section 4 outlining a tail fee is intentionally

6 omitted.

7    Q.   Wasn't section 4 intended, if there was to be a

8 tail fee, to be a tail fee that would be payable to

9 A.G.P.?  For instance, it would represent A.G.P.'s tail

10 period?

11    A.   It states what it states.  I mean, it's a

12 section of the agreement.  And presumably Jeffrey Li as

13 counsel -- as securities counsel, for that matter, could

14 have added something in here in regards to any fee tail

15 as it's not specifically stated.  It just says

16 "intentionally omitted."

17    Q.   Who originally drafted this agreement?  Is this

18 agreement typically used by A.G.P.?

19    A.   This is a -- depending on the offering, this is

20 a typical engagement agreement.

21    Q.   Drafted and provided by A.G.P., right?

22    A.   Correct.  This is A.G.P.'s form.

23    Q.   Okay.  In A.G.P.'s form what does section A,

24 subsection 4 usually say?

25    A.   It usually says "intentionally omitted."  In

54

1 any instance I can recall or any client I've dealt with

2 we don't have fee tails nor do I think that, to my

3 recollection, the company I dealt with has included a

4 fee tail that they've had outside of A.G.P. in this

5 section.

6    Q.   Okay.  Let's scroll back down to paragraph L.

7 Forgive me if I've asked this.  But if A.G.P. would have

8 told Future FinTech that this agreement supersedes the

9 confirmation from the day before, would Future FinTech

10 have entered into this agreement?

11             MR. FURST:  Objection as to form.  You can

12 answer.

13    A.    Well, Future FinTech, as well as their counsel,

14 is well aware that this -- I would presume is well aware

15 that the correspondence from prior, being that that is

16 prior communications to the signing of this agreement,

17 that this agreement would supersede, presuming he read

18 as company counsel the terms of this engagement.

19 BY MR. AKINS:

20    Q.   Did you when you responded "confirmed" on

21 December 13th and had in front of you a draft of the

22 engagement agreement have an understanding that your

23 confirmation would be superseded?

24             MR. FURST:  Objection as to form.  Scott

25 Furst.  And I don't believe that fact's been

55

1  substantiated.

2      A.   Can you repeat the question.

3  BY MR. AKINS:

4      Q.   Let me ask it a different way.  When did you

5  know that your confirmation had been superseded?

6      A.   When we signed the agreement, the agreement

7  outlines all of the terms of the engagement.  So when we

8  signed that agreement, A.G.P. as the organization -- I

9  assume the question is coming as A.G.P. and not myself?

10     Q.   Right.

11     A.   A.G.P. is aware at that time that it signs the

12 agreement that that is the entirety of the agreement

13 between the two parties.

14     Q.   And at the time that you responded "confirmed,"

15 you had at least a tentative agreement as to the terms

16 of the engagement agreement that had this superseding

17 clause in it, right?

18              MR. FURST:  Objection as to form and

19 foundation.

20     A.   I presume that the engagement agreement the day

21 before, December 13th, that was going -- that is being

22 discussed in this e-mail did have clause L in it.

23 BY MR. AKINS:

24     Q.   Do you see your confirmation on December 13th

25 as an inducement to Future FinTech to enter into the

56

1  engagement agreement?

2          MR. FURST:  Objection as to form and calls

3  for a legal conclusion.

4      A.  I do not see that.

5  BY MR. AKINS:

6      Q.  Do you understand that your confirmation on

7  December 13th was an inducement for Future FinTech to

8  enter into the engagement agreement?

9          MR. FURST:  Objection as to form.

10     A.  I don't know what induced Future FinTech.

11 BY MR. AKINS:

12     Q.  Do you think that it was reasonable for Future

13 FinTech to have relied upon your December 13th

14 confirmation in entering into the engagement agreement?

15         MR. FURST:  Objection as to form.  It

16 calls on the deponent to speculate as to Future

17 FinTech's belief as to the reasonableness.

18 BY MR. AKINS:

19     Q.  Do you want me to restate the question?

20     A.  Please.  Thank you.

21     Q.  Okay.  Do you think that it was reasonable for

22 Future FinTech to have relied upon this confirmation in

23 entering into the engagement agreement?

24     A.  No.  I think it's reasonable for Future FinTech

25 to rely on the terms of the engagement agreement in

1 entering into that agreement with A.G.P.

2     Q.   Did A.G.P. ever advise Future FinTech that any

3 of the investors on this tail list would be investing in

4 A.G.P. -- excuse me.  Let me restate that.

5            Did A.G.P. ever advise Future FinTech that

6 the two investors who invested in Future FinTech were

7 associated with funds in this tail list?

8     A.   There's no discussion in my review or

9 recollection that I can remember that.  I do know that

10 on, I believe it was, December 29th -- in my review of

11 the discovery there's a December 29th e-mail which is

12 prior to the first closing of the first placement.

13            So after the signing of the placement

14 agency agreement, the first placement agency agreement

15 in December, and prior to the first closing of the

16 transaction there is e-mail correspondence between my

17 team and Jeffrey Li, outside securities counsel for the

18 company, as well as representatives of the company, many

19 in number, more than four, on an e-mail with Hudson,

20 Tech Opportunities, Anson and A&T SPV being named.

21     Q.   Other than the December 29th e-mail, was there

22 any other discussion with anyone associated with Future

23 FinTech regarding Anson or Hudson Bay?

24     A.   Not based on my review of the discovery nor in

25 my recollection.

58

1    Q.   Do you recall -- well, not recall.

2         Do you have any -- does A.G.P. have any

3  understanding as to whether Hudson Bay's representatives

4  believed that the use of Tech Opportunities was A.G.P.'s

5  idea?

6         MR. FURST:  Objection as to form.  Scott

7  Furst.  You can answer.

8    A.   A.G.P. does not have any knowledge whether -- I

9  forget which fund was it that you mentioned?

10 BY MR. AKINS:

11   Q.   Hudson Bay and Tech Opportunities.

12   A.   Yeah.  To my knowledge, A.G.P. does not have

13 any knowledge.

14   Q.   Did A.G.P. tell Hudson Bay to use a name other

15 than Hudson Bay to invest in Future FinTech?

16   A.   Based on my review of discovery, the e-mails

17 and correspondence and my preparation of this

18 deposition, I'm not aware of anything like that.

19   Q.   Did A.G.P. tell anyone at Anson Funds to use

20 another name other than Anson Funds to invest in Future

21 FinTech?

22   A.   Based on my review of discovery and my

23 preparation for this deposition, I am not aware of

24 anything to that effect.

25   Q.   If Hudson Bay's representative had testified

59

1 that the use of Tech Opportunities was A.G.P.'s idea, to

2 A.G.P. would that testimony be truthful or untruthful?

3     A.   You're calling on me to make an assumption

4 based on hypothetical testimony by another party?

5     Q.   Yeah.  Well, one of the investors is saying

6 that A.G.P. gave them the idea to use a name other than

7 Hudson Bay; and I'm asking A.G.P. if that's correct.

8     A.   Not to my knowledge.

9     Q.   Did A.G.P. at some point have a discussion with

10 Patrick Ko at FT Global?

11     A.   I believe that there was a discussion between

12 Patrick Ko and David Bocchi at some point.  I know that.

13 Unsure as to the exact time.

14     Q.   What was the discussion regarding?

15     A.   I'm not sure.  I wasn't involved in the

16 discussion, but I know David did connect with him.

17     Q.   How did A.G.P. go about collecting the

18 documents to respond to the subpoena from FT Global?

19     A.   How did A.G.P. go about collecting the

20 documents.  So we have an IT team and a compliance team.

21 And the compliance team pulled -- or gave to the IT

22 team, from my understanding, a list of key terms

23 including "FTFT," "the company," "Jeffrey Li" as well as

24 the keywords of the transaction.

25                Each one of the transactions was done on a

60

1 confidential basis.  So they had code names and project

2 names.  So each of those were used as key search terms

3 when compiling e-mails and various correspondence.

4    Q.   So that probably answers my other question.

5 Was an outside service used, or was it all an inside

6 search?

7    A.   I did see an invoice go from my counsel to my

8 team on -- I believe an outside service was used to

9 organize the information, but I'm unaware beyond that.

10    Q.   Have you seen any evidence that Future FinTech

11 was aware that any of the investors on the tail list had

12 invested in it?

13    A.   As I mentioned earlier, there's an e-mail -- if

14 I recall correctly, it's December 29th -- post signing

15 of the placement agency agreement with A.G.P. as well as

16 the securities purchase agreements with Tech

17 Opportunities and A&T where Jeffrey Li and a number of

18 representatives from Future FinTech, the company, are --

19 and their securities counsel are on e-mails with my team

20 where the names Tech Opportunities, A&T, Hudson and

21 Anson are all mentioned.

22    Q.   And what was the point of that e-mail, if you

23 recall?

24    A.   I don't have a specific recollection.  Perhaps

25 we can bring it up as an exhibit if you'd like.

61

1    Q.   Okay.  Yeah.  I'll search for it after I pass

2 the witness.

3    A.   Okay.

4    Q.   And I'll pass for right now.

5         MR. FLEMING:  Are you through, Bill?  Do

6 you want me to begin examining?

7         MR. AKINS:  Yeah.  Well, it's up to you

8 guys if you want to break for lunch.  I said I'd take

9 about 30 minutes.  It's a little under that.

10         MR. FLEMING:  That's fine.  Scott, it's up

11 to you and Carmelo, whatever you want to do.  I'll

12 proceed or I'll let you guys get a bite to eat and the

13 court reporter.

14         THE WITNESS:  I'm prepared.

15         MR. FURST:  Let's go forward.

16         MR. FLEMING:  You want to proceed?

17         THE WITNESS:  Yeah.

18                   EXAMINATION

19 QUESTIONS BY MR. FLEMING:

20    A.   Who's questioning?

21    Q.   I will do the questioning.  Thank you,

22 Mr. Cataudella.

23         My name is Thomas Fleming.  I represent

24 FT Global.  I'm going to ask you some questions to

25 follow up on some of Mr. Akins' questions.

62

 1     A.   Sure.

 2              (Exhibit 7 marked)

 3   BY MR. FLEMING:

 4     Q.   I'd first like to show you as Exhibit 7 to the

 5   deposition something called Commitment Committee

 6   Information for Future FinTech Group.  It's a document

 7   produced by A.G.P. with the Bates stamp 427.  Let's see

 8   if we can get that up.

 9              All right.  Mr. Cataudella, do you see

10   this document on the screen?

11     A.   I do see the document, yes.

12     Q.   And is this a form that is used at A.G.P. by

13   its commitment committee?

14     A.   With the knowledge I have it does look to be

15   that way.  I'm not on the committee nor do I fill out

16   these forms.  So I'm not a hundred percent.

17     Q.   That's fine.  I'd like to call your attention

18   to the first page of the form.

19     A.   Sure.

20     Q.   You'll see there under Offering Overview --

21     A.   Could you scroll down?  I want to get a bit of

22   an idea of the form.

23     Q.   Yeah.  So that's the first page.

24     A.   Next page.

25     Q.   Let's go to the next page.  Seems to be a form

63

1 with various subjects listed, and then there's a

2 signature line and date.

3    A.    Yeah.  Could you stay here for one second?

4    Q.    Sure.

5            MR. FURST:  Just scroll up a little bit so

6 we can see the top of the page, please.  Perfect.

7    A.    Okay.  Is there a signed form?  This looks to

8 be unsigned.

9 BY MR. FLEMING:

10    Q.    Yeah.  This is the form that we received in

11 discovery.

12            MS. MA:  We can look for a signed form if

13 necessary.

14 BY MR. FLEMING:

15    Q.    Yeah.  I have a very simple question on page 1,

16 if we can go there, the offering overview.

17    A.    Sure.

18    Q.    You'll see the lead banker.  That's your name

19 there as the lead banker?

20    A.    That is my name, yes.

21    Q.    And were you, in fact, the lead banker on this

22 placement?

23    A.    On which placement?

24    Q.    The FTFT placement that took place in December

25 of 2020.

64

1    A.   Yes.  I was the lead banker.

2    Q.   And you'll see the "date/time banker was made

3 aware of offering"; and there's a date 12-11-2020 at

4 12:00 p.m., referral from law firm.  Is that what the

5 form says?

6    A.   That's what the form says, yes, correct.

7    Q.   And are you the banker who was contacted by a

8 law firm about the possible placement, and did that take

9 place on December 11, 2020 at around 12:00 p.m.?

10    A.   I was the banker that was made aware of the

11 transaction via the company's securities attorney.

12    Q.   Uh-huh.

13    A.   Jeffrey Li.  Whether or not the date -- as I

14 said, this isn't something I filled out myself to my

15 recollection.  So whether I was made aware of the

16 offering at that time I'm not fully certain on.

17    Q.   Your recollection is that you were contacted by

18 Mr. Li, perhaps on a Friday, and that the engagement

19 agreement was executed the following Monday?

20         MR. FURST:  Objection as to form.  You can

21 answer.

22    A.   That's an assumption.  I'd be making an

23 assumption as to when he contacted me.

24 BY MR. FLEMING:

25    Q.   Did the contact with Mr. Li occur shortly

65

1 before the engagement agreement was signed, in other

2 words, a matter of a few days as opposed to weeks or

3 longer?

4    A.   Again, it would cause me to make an assumption.

5    Q.   I don't want you to make an assumption or to

6 guess.

7            I'd like to show you -- do you recall at

8 the time the engagement agreement was signed, was there

9 an effective registration statement for FTFT shares of

10 stock?

11   A.   Can you define an effective registration

12 statement or show me the exhibit to such?

13   Q.   Had the FTFT had shares of common stock on

14 form S3?  Had a registration statement for those years

15 been declared effective by the SEC?

16   A.   I'm not a hundred percent certain.

17   Q.   Let me put up on the screen -- I'm going to

18 show you what we'll mark as Exhibit 8.

19   A.   Sure.

20           (Exhibit 8 marked)

21 BY MR. FLEMING:

22   Q.   This is a screenshot we've taken from the SEC

23 website for Future FinTech Group.

24           Do you in the course of your work from

25 time to time go to the SEC and go to the website?

66

1    A.   Yeah.  If you hit "classic view" on the top

2  right of the page, it might help everyone.  This new

3  form that they use is pretty convoluted.

4    Q.   Unfortunately this is a screenshot, so I can't

5  hit anything.

6          My question for you was simply, looking at

7  this, does this refresh your recollection that on or

8  about December 11 a registration statement for shares of

9  FTFT common stock had become effective?

10   A.   I mean, this is what it says on 12-11, notice

11  of effectiveness.  That in my business is an

12  effectiveness notice by the SEC of some type of

13  registration statement, correct.

14   Q.   And in the ordinary course of your work as the

15  lead banker on the deal, before the engagement agreement

16  was signed would you have gone to the SEC website to

17  look and see what the status of the company's reporting

18  was?

19   A.   Not necessarily.  As the lead banker, it's a

20  potential.  But if I was discussing with the company's

21  securities counsel and if he were to tell me on 12-11

22  the company has gone effective on a registration

23  statement, I would go off that assumption being that

24  he's company counsel.

25   Q.   And if you recall, did the engagement agreement

67

1  that was originally signed, the one on about

2  December 14, was that about a possible registered direct

3  offering?

4      A.   Could we pull that up?  I know it's a follow-on

5  offering based on the previous review.  Can we pull that

6  up again, and I can give you more specifics?

7      Q.   I'll pull it up again if I need to.

8            Did you understand at that point that FTFT

9  had the ability to offer registered free trading shares

10 when the engagement agreement was signed?

11     A.   When the engagement agreement was signed,

12 typically our review starts when I get my team involved

13 and there's an execution team at the firm and they start

14 going into various documents and diligence on the

15 company.

16            So to negotiate an agreement back and

17 forth with either the company or their outside counsel

18 does not necessarily mean I would have checked whether

19 their securities or registration statement for possible

20 sale of securities would have been effectuated or not.

21     Q.   Specifically do you recall whether you

22 understood at the time that there was an effective

23 registration statement in place?

24     A.   I do not.  But if the engagement agreement

25 indicates that it's a registered direct specifically,

68

1 then that would have to be for registered securities

2 being that it's a registered direct.

3     Q.   And while I have you up here, you'll see that

4 there are four separate prospectuses that are listed for

5 this particular registration statement file number.  Do

6 you see that?

7     A.   I do see that.

8     Q.   And would that correspond -- would each

9 correspond -- I'm sorry.

10             Would each prospectus correspond to one of

11 the placements that A.G.P. did for FTFT?

12     A.   I know that through my line of work that after

13 you do a transaction, you need to file a prospectus.

14 Whether or not this screenshot is showing me the four

15 prospectuses filed, it's unclear.

16     Q.   Thank you.  I'd like to show you the next

17 exhibit.  We'll call it -- I guess we're up to

18 Exhibit 9.

19             (Exhibit 9 marked)

20 BY MR. FLEMING:

21     Q.   This is a securities purchase agreement that's

22 dated December 24, 2020.

23     A.   Okay.

24     Q.   Mr. Cataudella, I'm showing you what we're

25 marking as Exhibit 9.  This is the securities purchase

69

1 agreement.  Do you recognize this as the securities

2 purchase agreement that was executed in connection with

3 the first placement that was done for FTFT by A.G.P.?

4      A.   I mean, this is a pretty long document.

5      Q.   Why don't we just go to the signature pages.

6 That might help.

7      A.   Sure, understanding I haven't just read the

8 entirety of what you just scrolled through.

9      Q.   Yeah.  I'm not going to quiz you on the

10 agreement.  Don't worry.

11     A.   Okay.

12     Q.   I'm showing you a signature page.

13     A.   You can zoom out if it's helpful.  It's a

14 bit --

15               THE WITNESS:  Is it okay if we zoom out,

16 Scott?

17               MR. FURST:  Yeah.

18     A.   It's a bit close.  There's the minus sign right

19 there.

20               MS. MA:  It's blocked by my Zoom.

21               THE WITNESS:  That's perfect.  Thank you.

22     A.   Okay.

23 BY MR. FLEMING:

24     Q.   I'm showing you a signature page here for Tech

25 Opportunities LLC.  Do you recall testifying in response

70

1 to Mr. Akins' questions that Tech Opportunities LLC was

2 one of the investors that participated in the financings

3 that A.G.P. did for FTFT?

4     A.   I'm sorry, Thomas.  What's the question?

5     Q.   Right.  Tech Opportunities LLC is one of the

6 entities that invested in the first financing that

7 A.G.P. did for FTFT, correct?

8     A.   That's correct, yes.

9     Q.   And the other one is an entity called A&T SPV,

10 LLC?

11     A.   That's correct as well, yes.

12     Q.   Looking at these security pages, it does

13 confirm to you that this is indeed the securities

14 purchase agreement that was the first one that A.G.P.

15 did for FTFT?

16     A.   It looks to be as such.

17     Q.   Right.  And is it consistent with your

18 recollection that it was approximately ten days between

19 when the first engagement agreement was signed and when

20 the placement occurred, the securities purchase

21 agreement was executed?

22     A.   I just want to see the date on this agreement.

23 If the engagement agreement was signed December 14th and

24 this is signed December 24th, your math would add up.

25     Q.   Right.  And is it consistent with your

1 recollection that this happened fairly quickly?

2          MR. FURST:  Objection as to form.  You can

3 answer.

4     A.   I mean, it's all relative to how you want to

5 look at quickly.  There's transactions in our business

6 that happen in a matter of two hours.  There's

7 transactions that happen over the course of two days.

8 There's transactions that happen over the course of one

9 week or ten days.  So this transaction looked to have

10 happened over ten days.

11 BY MR. FLEMING:

12     Q.   During the ten-day period between the

13 engagement agreement and the signing of the securities

14 purchase agreement, did A.G.P. personnel reach out to

15 personnel at Hudson Bay Capital Management?

16     A.   A.G.P. personnel reached out to -- I believe

17 the individual was Rick Allison.

18     Q.   Did Rick Allison use Hudson Bay Capital

19 Management on his e-mail?

20     A.   Based on the documents I've reviewed, there are

21 some e-mails with Rick with his Hudson Bay domain.

22     Q.   Had A.G.P. previously done business with Hudson

23 Bay Capital Management?

24     A.   A.G.P. has previously done business with Rick,

25 with Hudson Bay, with both individuals.

72

1    Q.   Right.  Well, Rick didn't ever invest

2 personally in any deals that A.G.P. brought to him, did

3 he?

4    A.   Not to my knowledge, no.

5    Q.   You understood that Rick worked for Hudson Bay

6 Capital Management; and to the extent he was being

7 solicited for investment, it would be through his

8 employer, didn't you?

9              MR. FURST:  Objection to form.  You can

10 answer.

11   A.   No.  That's not the assumption, no.

12 BY MR. FLEMING:

13   Q.   Had A.G.P. previously solicited investments

14 from Hudson Bay Capital Management?

15   A.   Over what period of time?

16   Q.   Over the prior two years.

17   A.   Sure, yeah.

18   Q.   And had A.G.P. previously obtained as a

19 placement agent investments from Hudson Bay Capital

20 Management on behalf of an A.G.P. client?

21   A.   Over what period of time?

22   Q.   How about the prior two years.

23   A.   Yes.

24   Q.   Approximately how many times had that occurred?

25   A.   I'm not sure exactly.  I mean, there's a number

73

1  of investors on the desk that my sales team deals with.

2      Q.   Hudson Bay Master Fund, are you familiar with

3  that fund?

4      A.   They have -- I know that some investors have

5  different funds, whether it's for warrants in a

6  transaction, whether it's for investments, whether it's

7  a GP, which is a general partner.  There's different

8  structures that a fund can use.  So I'm not sure exactly

9  what the master fund does or is.

10     Q.   Did A.G.P. reach out to anyone at the Anson

11 Funds during that ten-day period?

12     A.   A.G.P. reached out to Amin Nathoo.

13     Q.   Did A.G.P. understand that Amin Nathoo worked

14 for the Anson Funds?

15             MR. FURST:  Objection as to form, assumes

16 facts not in evidence.  Go ahead.

17     A.   Yeah.  I wouldn't say that that's an

18 assumption.

19 BY MR. FLEMING:

20     Q.   Did A.G.P. expect Mr. Nathoo to invest

21 personally when it contacted him?

22     A.   I don't know what A.G.P. expected, but I

23 presume it's not for Amin to invest personally.

24     Q.   Right.  Did you understand that Mr. Nathoo was

25 a principal for Anson Funds?

74

1    A.   I mean, Amin Nathoo, similar to Rick Allison

2 and many of, you know, the PMs on Wall Street, have

3 multiple funds that they could be affiliated or a part

4 of.  So I don't know if it was actually for Anson Funds

5 at the time A.G.P. made its outreach.

6    Q.   Have you ever heard the term "a family of

7 funds" or "a fund family"?

8    A.   In passing but not beyond that.

9    Q.   Okay.  So as you sit here today, you don't have

10 an understanding of what a family of funds is?

11    A.   I do not have a full conceptual understanding

12 but happy to be provided one.

13    Q.   Did A.G.P. reach out to any other investors

14 besides Mr. Allison during this ten-day period, besides

15 Mr. Allison at Hudson Bay Master Fund and Mr. Nathoo?

16         MR. FURST:  Objection as to form.  You can

17 answer.

18    A.   I believe there was another individual that was

19 contacted.  That individual was Keith Maher.

20 BY MR. FLEMING:

21    Q.   And where does Mr. Maher work?

22    A.   I mean, he has invested -- Keith Maher has

23 invested with us in the past through Armistice Capital.

24    Q.   Did Armistice Capital decline to make an

25 investment in FTFT?

75

1    A.    To my recollection, yes.  Armistice Capital

2 declined to invest.

3    Q.    Did anyone from A.G.P. suggest to Armistice

4 that it not use the name Armistice in connection with

5 any investment?

6    A.    Not to my knowledge or in my review of

7 discovery in preparation for the deposition.

8    Q.    I'd like to show you what we'll mark as

9 Exhibit 10.

10    A.    Uh-huh.

11 BY MR. FLEMING:

12    Q.    I'd like to show you Exhibit 5 again.

13          I'm showing what was previously marked as

14 Exhibit 5.  I just want to follow up with a few

15 questions on this document, Mr. Cataudella.

16          These are e-mails between Mr. Grodko and

17 Shilpi Shah, correct?

18    A.    Can you scroll down kindly?  You can scroll out

19 because I can't -- this computer's pretty small.  I

20 can't see.

21    Q.    Right.

22    A.    That's perfect.  Yep.  Could you scroll down.

23    Q.    I'm showing you the e-mail between Ms. Shah and

24 Mr. Grodko on December 24, 2020 at 1:24 p.m.

25          Can you tell me -- this references FTFT

76

1 settlement terms.  What does that phrase mean in your

2 business?

3     A.   I mean, it looks like Zach Grodko or Shilpi may

4 have wrote the e-mail.  So I'm not sure what they were

5 referencing by "settlement terms."

6     Q.   Is the phrase -- the word "settlement" or the

7 phrase "settlement terms" something you're familiar with

8 from your work?

9     A.   Settlement, yes, for sure.

10     Q.   Okay.  And what do you understand that to mean?

11     A.   Settlement is when a transaction is done and an

12 investor buys securities and pays a sum of money,

13 there's a certain period of time that you have to, let's

14 just say, exchange securities for dollars.  That process

15 is called the settlement process.

16     Q.   The e-mails that Mr. Grodko was sending are

17 with individuals who have a domain name at Hudson Bay

18 Capital.com, correct?

19     A.   That looks to be true, yes.

20     Q.   So it's fair to say that A.G.P. understood it

21 was dealing with Hudson Bay Capital when it was settling

22 this transaction, correct?

23          MR. FURST:  Objection as to form.  Scott

24 Furst.

25 BY MR. FLEMING:

1    Q.   Is that right?

2              MR. FURST:  Objection as to form.  Scott

3 Furst.

4    A.   Did you guys hear that?

5 BY MR. FLEMING:

6    Q.   You can answer the question.

7    A.   Yeah.  No.  We were dealing with Tech

8 Opportunity Funds or Tech Opportunities LLC, but I do

9 see here an e-mail is with a Hudson Bay Capital bill

10 name.

11    Q.   If you look further down in Ms. Shah's e-mail,

12 it says, "See below details for the new warrants."  And

13 then she has "registration Hudson Bay Master Fund,

14 Ltd."?

15    A.   If you'd could scroll up.  Yeah, I do see that.

16 If you can scroll up, I believe based on my review of

17 this -- if you could scroll up further.

18              MS. MA:  I'm sorry.

19              THE WITNESS:  Yeah.  Like earlier,

20 exactly.

21    A.   Based on my review of this, it looks like the

22 original instructions did include Hudson Bay.  Mr. or

23 Ms., I'm not sure, Shah then sends a follow-up e-mail

24 afterwards saying to please ignore as they sent the

25 details for the wrong fund.

78

1 BY MR. FLEMING:

2     Q.   Do you know if the contact information for Tech

3 Opportunities Fund was care of Mr. Antonopoulos?

4     A.   I typically don't handle settlement.  So I'm

5 happy to review and confirm if you have an exhibit or

6 something to the like, but not off the top of my head do

7 I know.

8     Q.   Okay.  Let me show you what we'll mark as --

9             MR. FLEMING:  I guess the next exhibit

10 we're up to is 11?

11             MS. MA:  Did you actually mark 10?

12             MR. FLEMING:  No, 10.  Up to Exhibit 10 --

13             MR. FURST:  I'm sorry.  This is Scott

14 Furst.  Are we marking this as Exhibit 10?

15             MR. FLEMING:  No.  That's previously

16 marked as Exhibit 5.  I showed you what Bill marked as

17 Exhibit 5.  I have another exhibit that I'm going to

18 show you as Exhibit 10.

19             MR. FURST:  Okay.  Fine.  Thank you.

20             (Exhibit 10 marked)

21 BY MR. FLEMING:

22     Q.   I'm showing you, Mr. Cataudella, as Exhibit 10

23 this is an e-mail between Mr. Grodko at A.G.P. and

24 Shilpi Shah and some other individuals on December 29,

25 2020.  Do you have that in front of you?

79

1     A.   I do, yes.

2     Q.   Right.  And the attachments reference the FTFT

3 warrant Tech Opportunities LLC.  Do you see that?

4     A.   That is the subject.  That's the attachment.

5 Excuse me.  That's the attachment, correct.

6               MR. FLEMING:  Could you scroll down.

7 BY MR. FLEMING:

8     Q.   You'll see that Ms. Shah sends here an e-mail.

9 Details for the new warrants and the registration is in

10 the name of Tech Opportunities LLC.  Do you see that?

11    A.   The registration, yes, I do see Tech

12 Opportunities LLC.

13    Q.   And that was the investor in the first

14 placement, correct?

15    A.   Correct.

16    Q.   And it was also the investor in each of the

17 subsequent placements, was it not?

18    A.   That's correct, yes.

19    Q.   Right.  You'll see the address is "care of

20 Hudson Bay Capital Management, attention George

21 Antonopoulos."  Do you see that?

22    A.   Yes, I do see that.

23    Q.   And did A.G.P. understand that the only way to

24 get in touch with Tech Opportunities LLC was through

25 personnel at Hudson Bay Capital Management?

80

1    A.    No.   That is not A.G.P.'s understanding.   From

2  here it looks like the registration of these warrants

3  and where the warrants are to be sent and any notices or

4  communications, that is then forwarded on to Jeffrey Li,

5  company counsel, as well as the company to make those

6  warrants is -- does have "care of Hudson Bay Capital

7  Management."

8    Q.    Right.   Well, isn't it true that every single

9  person A.G.P. spoke to about the financings for FTFT was

10 connected supposedly with Tech Opportunities LLC also

11 worked for Hudson Bay Capital Management, LP?

12           MR. FURST:   Objection as to form.   Scott

13 Furst.   You can answer.

14   A.    No.   I cannot make that representation.

15 BY MR. FLEMING:

16   Q.    Right.   Do you know of anybody who's allegedly

17 represented or spoke for Tech Opportunities LLC who was

18 not part of Hudson Bay Capital Management?

19           MR. FURST:   Objection as to form.   You can

20 answer.

21   A.    Not to my knowledge.   But I know that George

22 Antonopoulos, who I believe is on the signature page of

23 the securities purchase agreement, is signing on behalf

24 Tech Opportunities LLC.

25 BY MR. FLEMING:

81

1      Q.   And isn't Mr. Antonopoulos' office address the

2  office address of Hudson Bay Capital Management?

3      A.   Here it does not say the address of Hudson Bay.

4  It just says "care of."  So I'm not sure of the exact

5  address of Hudson Bay.

6      Q.   Internally did A.G.P. refer to Tech

7  Opportunities as Hudson?

8      A.   Internally?

9      Q.   Yes.

10     A.   I don't understand the question.

11     Q.   In internal communications among A.G.P.

12  personnel did they call Tech Opportunities "Hudson"?

13     A.   I know that if A.G.P. is referring to a

14  specific fund, as it is in this situation, and a fund is

15  investing in a transaction, we will refer to the

16  respective fund per their name.

17     Q.   And let me show you what we'll mark as

18  Exhibit 11.

19              (Exhibit 11 marked)

20  BY MR. FLEMING:

21     Q.   I'm showing you -- it's an e-mail

22  December 29th, the top e-mail, from Mr. Grodko to Daniel

23  Kim and Harry Ioannou with a cc to Mr. Nathoo and Anson

24  Operations.

25     A.   I see that.

82

1   Q.   It says, "Okay great.  Hudson is wiring this AM

2 and will keep you posted once we close today."

3            Did I read that correctly?

4   A.   Could you zoom out?  Half the e-mail is cut

5 off.

6   Q.   Sure.

7   A.   Could you read it again?

8   Q.   Sure.  The e-mail I'm referring to -- and we

9 can look at the rest of them if you'd like -- is from

10 Mr. Grodko on December 29, 2020 at 9:14 a.m. to Daniel

11 Kim at Anson Funds with a cc to Harry Ioannou -- I'm

12 sorry, to Daniel Kim and to Harry Ioannou and a cc to

13 Amin Nathoo and Anson Operations.

14            You'll see the e-mail reads, "Okay great.

15 Hudson is wiring this AM and will keep you posted once

16 we close today."

17            Did I read that correctly?

18   A.   You read the e-mail correctly, yes.

19   Q.   And is the entity that was wiring Tech

20 Opportunities LLC that's referred to as Hudson?

21   A.   I'm not sure what Zach is referring to when he

22 says that there's wiring this AM.  It looks like based

23 on the subject this is in regards to FTFT terms and

24 allocations in which Tech Opportunities was the

25 investor, correct.

83

1     Q.   Are you aware of any other investor besides

2 Tech Opportunities and A&T SPV, LLC in FTFT on or about

3 December 29th, 2020?

4     A.   I'm not aware of any other investor besides

5 those two funds.

6     Q.   So it's safe to conclude that when Mr. Grodko

7 used the name Hudson, he was referring to Tech

8 Opportunities LLC?

9     A.   No.   He mentions Hudson.   I know Tech

10 Opportunities did the placement with the company, but

11 this e-mail says Hudson.

12     Q.   Okay.   By the way, do you have any

13 understanding of how it came to be that Tech

14 Opportunities LLC was the vehicle for the investment in

15 FTFT?

16     A.   No.   Based on my review of the documents,

17 discovery, correspondence, e-mails, there is nothing to

18 that effect that I reviewed nor am I aware of.

19     Q.   Had A.G.P. ever done any prior placement for

20 any company with Tech Opportunities LLC?

21     A.   I'm not sure.   I don't recall.

22     Q.   You mentioned a December 29 e-mail.   Do you

23 recall mentioning that and referring to that in

24 connection with your testimony with Mr. Akins?

25     A.   Is this in regards to the e-mail where Jeffrey

84

1  Li and representatives of the company are on a chain

2  with myself and my team regarding the funds?

3      Q.   Yes.

4      A.   Yes, I do recall.

5      Q.   Let me show you that exhibit.

6      A.   Sure.

7              (Exhibit 12 marked)

8  BY MR. FLEMING:

9      Q.   Exhibit 12.  I'll mark that as Exhibit 12.

10     A.   Could we also zoom out, please.

11     Q.   Certainly, yeah.

12     A.   Thank you.

13     Q.   Do you want us to scroll down so you can

14  look --

15     A.   Sure.

16     Q.   Why don't we go back to the very beginning of

17  the chain.  It's on December 29th.

18     A.   Uh-huh.

19              MR. FURST:  28th.

20     A.   Can you scroll down?  There's a December 28th

21  e-mail that we can't see.

22  BY MR. FLEMING:

23     Q.   I'm going with the beginning of the chain here.

24  Do you see it's from Mr. Li to you and to Mr. Grodko and

25  other people, including people at the company?  The

85

1 subject is "Project Ford Certificates."  Do you see

2 that?

3      A.   I do.

4      Q.   Was Project Ford the name of the placement of

5 shares for FTFT in December 2020?

6      A.   I would assume so.

7      Q.   Is this e-mail part of a chain dealing with

8 some of the closing documentation for the placement?

9      A.   Officer's certificate, CFO certificates,

10 secretary certificate.  These seem to be closing

11 certificates, yes.

12      Q.   I want to go to the e-mail at the top of this

13 chain.  I can look at other e-mails if you like, but

14 that's the one I'd like to call your attention to.

15           Mr. Grodko sends an e-mail at 2:13 p.m. on

16 December 29 to Mr. Li, to you and other people,

17 including some at FTFT.  The e-mail reads, "The Anson

18 wire has hit escrow and is the only DWAC pending right

19 now.  Once Hudson sends wire/posts DWAC we can fully

20 break escrow per flow of funds and accept their DWAC as

21 well."

22           Did I read that correctly?

23      A.   You did, yes.

24      Q.   Can you explain to us what is being conveyed in

25 this e-mail.

1    A.   It looks like this is an e-mail from my

2  syndicate team, Zach Grodko, to Jeffrey Li, company

3  counsel, company securities counsel, to myself, Joan Wu,

4  who is from HTFL and is A.G.P.'s placement agent counsel

5  on the transaction, including Harry Ioannou and what

6  looks to be five members of the FTFT team going over an

7  Anson wire and respective DWAC and a Hudson wire and the

8  respective DWAC.

9    Q.   And the DWAC, is that the electronic delivery

10  of shares to the purchasers?

11    A.   From my understanding, yes.

12    Q.   And is this really the final step in the

13  transaction when the shares and money are exchanged?

14    A.   It depends on what you call final because

15  there's press releases that can go out.  This is a step

16  in the process of wiring the funds and accepting the

17  delivery of shares.

18    Q.   When Mr. Grodko here uses the word "Hudson," is

19  he referring to Tech Opportunities LLC?

20    A.   I'm not sure what he's referring to, but it

21  does say Hudson.

22    Q.   Well, is there anybody else he could be

23  referring to besides Tech Opportunities LLC?

24    A.   Well, Tech Opportunities LLC and A&T SPV were

25  the only two purchasers in the transaction.

87

1    Q.   Right.  So would it be your understanding that

2  a fair reading of this document is that Hudson is Tech

3  Opportunities LLC?

4    A.   When you say "your understanding," is this me

5  or the firm?

6    Q.   Well, you received this e-mail on December 29,

7  2020, correct?

8    A.   The e-mail is sent to me as well as others,

9  correct.

10    Q.   Did you understand that when Mr. Grodko

11  referred to Hudson, he was referring to Tech

12  Opportunities LLC?

13    A.   I'm not sure, to be honest.  I don't recall

14  this exact e-mail.  So I don't recall whether I

15  assimilated Hudson to be Tech Opportunities based on

16  Zach's e-mail to a group.

17    Q.   Let me ask you about Anson.  Did you understand

18  that when Mr. Grodko used the term "Anson," he's

19  referring to A&T, LLC?

20    A.   Again, I don't recall this exact e-mail.  Yeah.

21    Q.   Do you recall contacting Mr. Grodko and saying

22  to him that he was mistaken and that Hudson and Anson

23  were not investors and that there were two other funds

24  that were investors?

25    A.   I don't recall contacting Grodko at the time he

1 sent this e-mail.

2     Q.   If you didn't understand that Hudson was Tech

3 Opportunities LLC, would you expect FTFT to understand

4 that?

5              MR. FURST:  Objection as to form, calls

6 for speculation.  You can answer.

7     A.   I don't know what FTFT is to expect or not

8 expect.

9 BY MR. FLEMING:

10     Q.   Right.  And if you didn't understand that Anson

11 was A&T, would you expect FTFT to understand that Anson

12 referred to A&T?

13              MR. FURST:  Same objection as to form and

14 calls for speculation.  You can answer.

15     A.   I don't know what -- I'm not going to speculate

16 on what FTFT is to expect.

17 BY MR. FLEMING:

18     Q.   Is it A.G.P.'s position that this e-mail gave

19 notice to FTFT that Hudson and Anson affiliates were

20 investors in the placement?

21     A.   That's not A.G.P.'s position.  This is an

22 e-mail from a representative of A.G.P. with the company

23 counsel and the company on it that mentions the two

24 funds.

25     Q.   Right.  Is there anything that A.G.P. believes

89

1  that FTFT should have understood as a result of

2  receiving this e-mail besides the fact that escrows were

3  to be broken and DWACs were pending or about to be

4  issued?

5      A.   Could you rephrase the question.

6      Q.   Right.  I'll rephrase the question.  Thank you.

7           Is it A.G.P.'s position that this e-mail

8  gave any further or new or different information to FTFT

9  about the investors in the placement?

10      A.   Well, this seems to be an e-mail where the two

11  names, Anson and Hudson, appear.

12      Q.   But am I correct that A.G.P. internally did not

13  believe that Hudson and Anson were investors and that

14  instead it was A&T and Tech Opportunities LLC were the

15  investors?

16      A.   A.G.P. is aware that the two funds that

17  invested per the signature pages were Tech Opportunities

18  and A&T.

19      Q.   But A&T -- I'm sorry.

20           Am I correct that A.G.P. did not believe

21  that either of those funds had any affiliation with

22  Hudson and Anson?

23      A.   In regards to this particular transaction and

24  our duties in determining, you know, whether or not

25  someone is an affiliate or not, everything is outlined

90

1   in the placement agent agreement that we signed what

2   looks like shortly before this.

3            So I cannot opine on whether A.G.P. was

4   aware of the affiliate status of any of these funds or

5   the individuals.

6   Q.   Well, leaving aside affiliate status, were you

7   aware of any relationship at all between Tech

8   Opportunities LLC and Hudson?

9   A.   Could you repeat it or rephrase it.

10  Q.   Leaving aside affiliate status and whether or

11  not they were affiliates in any legal sense, were you

12  aware of any relationship at all between Tech

13  Opportunities LLC and Hudson Bay Capital Management?

14  A.   Well, based on the review we're aware that the

15  e-mails with Amin Nathoo, who is a PM, a portfolio

16  manager, and who invested -- or who was contacted to

17  invest in this transaction and who is affiliated with

18  A&T, there were e-mails with an Anson domain in

19  correspondence between A.G.P. and others with an Anson

20  domain, including Amin's.  And, likewise, for Hudson

21  there were e-mail exchanges in regards to Tech

22  Opportunities LLC with individuals that had Hudson Bay

23  Capital domain names.

24  Q.   Did anyone from A.G.P. ever inquire as to the

25  relationship between Tech Opportunities and Hudson or,

91

1  alternatively, A&T and Anson?

2    A.  Not to my knowledge.  I mean, A.G.P., strictly

3  my team, would abide by whatever agreements we have in

4  place and whatever roles and responsibilities we

5  collectively as a group, you know, agreed to enter into.

6    Q.  You were aware of the so-called tail list that

7  appeared on that e-mail where you responded "confirmed"

8  that was marked, I believe, as Exhibit 2.  You're aware

9  of that list, correct?

10           MR. FURST:  Objection as to form.  You can

11  answer.

12    A.  I don't understand specifically what's being

13  asked.

14  BY MR. FLEMING:

15    Q.  Okay.  Well, I'll show you the list.  Why don't

16  we go back to A.G.P.

17           I'm showing you, Mr. Cataudella, what's

18  been previously marked as Exhibit 2 to your deposition.

19  This is e-mail exchanges between you and Mr. Li on

20  December 13, 2020 in which Mr. Li sends to you a list of

21  investors in the, quote, tail list, closed quote.  Do

22  you see that?

23    A.  I do see that e-mail, yes.

24    Q.  And you'll see one of the investors is Hudson

25  Bay Capital Management and its affiliates.  Do you see

92

1  that?

2      A.   Yes.  I do see that.

3      Q.   Did A.G.P. have any view or understanding as to

4  whether or not Tech Opportunities LLC was an affiliate

5  of Hudson Bay Capital Management?

6           MR. FURST:  Objection as to form.  You can

7  answer.

8      A.   Sorry.  Can you repeat or rephrase the

9  question.

10 BY MR. FLEMING:

11     Q.   Let me rephrase.  At the time of the first

12 placement --

13     A.   Sure.

14     Q.   -- did A.G.P. have any understanding one way or

15 the other as to whether or not Tech Opportunities was an

16 affiliate of Hudson Bay Capital Management?

17     A.   An affiliate under what definition?

18     Q.   The definition you've been using throughout

19 when you use the term "affiliate."

20           MR. FURST:  Objection as to form.  You can

21 answer.

22     A.   I'm not aware.  I mean, the e-mail is between

23 myself and Jeffrey in regards to these accounts.  My

24 team may not be privy to all of the exchanges I have

25 individually sitting on the investment banking team; but

93

1 what they would have access to is the engagements, the

2 placement agency agreements and the securities purchase

3 agreements and the related transaction documents.

4 BY MR. FLEMING:

5    Q.   Let me ask this question for you individually.

6 At the time of the first placement did you have an

7 understanding one way or the other as to whether or not

8 Tech Opportunities LLC was an affiliate of Hudson Bay

9 Capital Management?

10    A.   Not necessarily.  And in my prep it's -- and in

11 my preparation it didn't come up.  I mean, all of my

12 duties are outlined in the engagement agreement and the

13 placement agency agreement; and they do not specify

14 to -- investigate to know specifically.

15    Q.   I'm not asking about what your duties were or

16 what you actually did.  I'm just going through your

17 understanding -- and maybe you had none; maybe you did.

18         So the question is did you have an

19 understanding one way or the other as to whether or not

20 Tech Opportunities LLC was an affiliate of Hudson Bay

21 Capital Management?

22    A.   At the time of the first placement?

23    Q.   Correct.

24    A.   I did not have -- I did not have knowledge

25 whether or not it's an affiliate per the definition

94

1 we've been using.

2     Q.    Right.  So it's fair to say that it's possible

3 it was an affiliate to your understanding or it's

4 possible it wasn't an affiliate; you just don't know

5 which of the two it was?

6               MR. FURST:  Objection as to form.  You can

7 answer.

8     A.    I mean, I didn't do the -- at the time of the

9 first placement I did not inquire as to what you're

10 asking regarding the affiliate status of either of those

11 funds.

12 BY MR. FLEMING:

13     Q.    Is the same true also for A&T, LLC?  You didn't

14 have an understanding one way or the other as to whether

15 or not it was an affiliate of Anson Funds Management?

16     A.    At the time of that placement, I did not

17 inquire whether -- nor was it my responsibility per the

18 engagement to inquire the affiliate status of any of

19 these funds.

20     Q.    Right.  Did you at any point make any inquiry

21 as to the affiliate status of either A&T or Tech

22 Opportunities LLC?

23     A.    At what point in time?

24     Q.    At any point in time.

25     A.    In my review and prep for this deposition, I've

95

1 reviewed form ADV and in discussions with my counsel --

2    Q.   No.  I'm not asking for discussions with your

3 counsel.

4    A.   Okay.

5    Q.   How about during the course of your

6 relationship or A.G.P.'s relationship with FTFT through

7 the four placements that it did, did you ever make any

8 inquiry as to whether or not Tech Opportunities or A&T

9 were affiliates of either Hudson or Anson?

10   A.   I mean, not specifically that I recall.  But I

11 can tell you whatever was in my engagement and whatever

12 we agreed to as a firm and individually as an

13 individual, I can say I've abided and I've kept to

14 those.

15   Q.   I'm not asking for what your responsibilities

16 were.  I'm just trying to get to what you understood.

17         So it's altogether possible that Tech

18 Opportunities was indeed an affiliate of Hudson and A&T

19 was indeed an affiliate of Anson?

20         MR. FURST:  Objection as to form.  You can

21 answer.

22   A.   Could you rephrase it?  Could you repeat it?

23         MR. FLEMING:  I can ask the court reporter

24 to read it back.

25         (Discussion off the record)

96

 1  BY MR. FLEMING:

 2      Q.   So during the course of the placements that

 3  A.G.P. did for FTFT, as far as A.G.P. is concerned, it's

 4  possible that Tech Opportunities was, in fact, an

 5  affiliate of Hudson Bay and A&T was, in fact, an

 6  affiliate of Anson?

 7              MR. FURST:  Objection as to form.

 8      A.   You're asking me for a possibility.  So I'm not

 9  really sure how to respond.

10  BY MR. FLEMING:

11      Q.   I'm asking for your understanding.  As far as

12  you understood, it's possible, isn't it, during that

13  period of time that they were --

14      A.   It's an assumption, correct.

15      Q.   Let me show you another placement agreement, a

16  securities placement agreement.  This one is dated

17  January 11, 2021.  We'll mark it as Exhibit 13.

18      A.   Sure.

19              (Exhibit 13 marked)

20              MR. FURST:  Before you ask a question,

21  just so you know, I am going to need a bathroom break in

22  about 10 or 15 minutes.

23              MR. FLEMING:  I may be finished in

24  10 minutes.

25              MR. FURST:  Okay.

97

1          MR. FLEMING:  What takes so long is

2 marking these darn exhibits.

3 BY MR. FLEMING:

4     Q.   I'm showing you another securities purchase

5 agreement.  This one's dated January 11, 2021.  And is

6 this the second placement that A.G.P. did for FTFT?

7     A.   The second placement was in January of '21,

8 correct.

9     Q.   Let me show you what we'll mark as Exhibit 14.

10          (Exhibit 14 marked)

11 BY MR. FLEMING:

12     Q.   I'm showing you Exhibit 14.  This is an e-mail

13 from Mr. Ko to pm@allianceg.com and

14 jvenezia@allianceg.com entitled "Cease and Desist

15 Letters."

16          Do you recognize those e-mail addresses as

17 those for Mr. Michals and Mr. Venezia at Alliance or

18 A.G.P.?

19     A.   Yes.

20     Q.   And who are those gentlemen?

21     A.   Phil Michals -- Michals is spelled incorrectly

22 here, but he's the chairman.  And then John Venezia, I'm

23 not sure his position.  I believe it's something with

24 compliance.

25     Q.   Did A.G.P., in fact, receive a demand letter

98

1  from FT Global on or about January 12, 2021?

2      A.   Is this what you're referring to?

3      Q.   Yes.

4      A.   Can I see it because I don't want to take

5  possession of these.

6      Q.   Sure.  Let me call your attention to the second

7  page of the letter.

8      A.   Uh-huh.

9      Q.   You'll see in the second paragraph it makes

10 reference to FTFT completing an offering on or about

11 December 30, 2020.  And the last sentence of the

12 paragraph reads, "Since the aforementioned securities

13 transactions occurred well within the tail period and

14 were consummated with entities identified in FT Global's

15 protected investor list, FTFT is obligated to pay

16 FT Global the placement agent fee in the aggregate

17 amount of $880,000."

18            Did I read that correctly?

19     A.   I see that, yeah.

20     Q.   And then if you look at the following

21 paragraph, that same sentence appears with a different

22 dollar amount referencing a placement on January 11,

23 2021.

24     A.   I see that.

25     Q.   Did A.G.P. share this demand letter with FTFT?

99

1     A.    I don't recall specifically whether this was --

2 this agreement specifically was sent to the company.

3     Q.    Did A.G.P. alert FTFT to the fact that

4 FT Global had sent the demand letter making the

5 allegation that investors and the offerings were taken

6 from FT Global's protected investor list?

7     A.    I know that there were discussions with Jeffrey

8 Li with myself and individuals of my team about, you

9 know, FT Global and their assertions in their

10 correspondence sent to us.

11     Q.    When did those discussions take place?

12     A.    I don't recall exactly nor do I have -- nor in

13 my review did I see any e-mail, to my recollection,

14 where we're sending it to Jeffrey Li or to the company.

15     Q.    Did it come to, I'm sorry, A.G.P.'s attention

16 that shortly after this demand letter FT Global brought

17 suit against FTFT?

18     A.    We were made aware of the lawsuit at some point

19 in time.  When exactly, I'm not familiar with the exact

20 dates, Thomas.

21     Q.    Do you know what, if anything, A.G.P. said to

22 FTFT about the assertion by FT Global that the investors

23 and the offerings were taken from the protected investor

24 list?

25     A.    I haven't seen any correspondence between

100

1 myself or my team or A.G.P. or anyone at A.G.P., for

2 that matter, corresponding in regards to the investors

3 and the purported tail list by FT Global.

4    Q.   Did anyone from FTFT ask A.G.P., Are these

5 investors from the protected investor list that

6 FT Global had?

7    A.   No one from FTFT asked A.G.P., to my

8 recollection.

9    Q.   Did A.G.P. tell FTFT that FT Global was wrong

10 in its claim that the investors were from the protected

11 investor list?

12   A.   There's nothing in writing that I've seen to

13 that effect.

14   Q.   Was there any -- I'm sorry.  I didn't mean to

15 cut you off.

16           Was anything conveyed orally?

17   A.   Not to my knowledge.

18   Q.   So is it to the best of your knowledge that

19 FTFT never inquired of A.G.P. as to the truth of

20 FT Global's assertions?

21   A.   Based on my review and my recollection in this

22 period -- when is this letter dated?

23   Q.   January 12, 2021.

24   A.   Right.  Okay.  So to my knowledge of this

25 period of January 2021, I don't recall.  And, like I

101

1  said, Jeffrey Li, company counsel, company securities

2  counsel, was -- he was in direct contact with me.  Don't

3  recall any correspondence I've seen or any discussions

4  regarding the investors.

5      Q.   So to the best of A.G.P.'s knowledge, in the

6  January/February 2021 time frame there were no

7  discussions between A.G.P. and FTFT about whether or not

8  FT Global was accurate in its claim that the investors

9  were from the protected investor list?

10     A.   Can you rephrase the question.

11             MR. FLEMING:  Can you read it back?

12             (The record was read as requested.)

13     A.   Not to my knowledge is there -- was there

14  discussions around that or not that I recall.

15  BY MR. FLEMING:

16     Q.   And after this demand letter was sent, am I

17  correct that there were two more investments, one in

18  February of 2021 and one in April of 2021?

19     A.   There were two deals, yeah, one in February of

20  2021 and one in April 2021.

21     Q.   In connection with neither deal did FTFT ever

22  inquire as to whether or not the investors were on the

23  protected investor list?

24             MR. FURST:  Objection as to form.  Did you

25  say either or neither?

102

1          MR. FLEMING:  I said neither, but I can

2   make it affirmative.  Why don't I restate the question.

3          MR. FURST:  Please.

4   BY MR. FLEMING:

5     Q.   In connection with either deal, did FTFT ever

6   ask A.G.P. whether the investors were on the protected

7   investor list that FT Global had?

8     A.   Not to my recollection.  I mean, there is

9   correspondence on, you know, deals 3 and 4 for Future

10  FinTech with the same securities purchase agreements and

11  the related documents for the transaction along with

12  company counsel.

13    Q.   Does looking at what we've marked here as

14  Exhibit 13, the demand letter, refresh your recollection

15  as to any communications between A.G.P. and Mr. Ko?

16    A.   If there's correspondence or -- like I

17  mentioned earlier, I know that David Bocchi had a

18  discussion with Patrick Ko most likely after this

19  letter; but I was not privy to those -- or involved in

20  those discussions.

21    Q.   By the way, the letter is Exhibit 14.

22  BY MR. FLEMING:

23    Q.   Were the contents of FT Global's demand letter

24  discussed internally at A.G.P.?

25    A.   When we got this demand letter, we had

103

1 discussions with -- I believe at the time it was SRF.

2     Q.   I'm not asking you about discussions with SRF.

3 Just internally without counsel.

4     A.   No.  As soon as we received the letter, we

5 involved counsel.

6     Q.   Mr. Cataudella, I think I'm through.  I just

7 want to confer with my colleague for a minute.  So if we

8 could take like a five-minute break.  Is that okay?

9     A.   Sure.  No problem.

10            (Recess taken)

11 BY MR. FLEMING:

12     Q.   Just one follow-up question for you,

13 Mr. Cataudella.  When you used the term "affiliate,"

14 what do you understand that to mean, when two companies

15 are affiliates?

16     A.   I mean, back to the form ADV, right, for

17 Hudson, let's say, for instance.

18     Q.   Okay.  So it's whatever the definition they're

19 using in the form ADV is one that you would accept as

20 affiliates?

21     A.   Sure.

22     Q.   Can you be any more specific as to what the

23 meaning of that term is?

24     A.   No.  I don't have the word-for-word definition.

25     Q.   Have you ever heard of the idea that affiliates

104

1 are entities that one controls the other or they're

2 under common control?

3    A.   Have I heard that definition in the past?  Is

4 that the question?

5    Q.   Yes, yes, yes.

6    A.   I may have heard that.

7    Q.   Is that a definition that you would accept?

8    A.   I mean, like I said, I'm going based on the

9 form ADV and, you know, what is deemed to be an

10 affiliate, although I don't -- my duties haven't been to

11 determine what's an affiliate and what's not.

12    Q.   Okay.  Thank you very much.

13           MR. FLEMING:  I pass the torch to

14 Mr. Akins.

15           MR. AKINS:  Thanks, Tom.

16                RE-EXAMINATION

17 QUESTIONS BY MR. AKINS:

18    Q.   A few follow-up questions, Mr. Cataudella.

19           Do you recall Jeffrey calling you in

20 January to ask about Patrick Ko's complaint?

21           MR. FURST:  I'm sorry.  Can you either

22 read that back or -- I just missed what you said.

23           MR. AKINS:  Yeah.  I can start over.

24 BY MR. AKINS:

25    Q.   Do you recall Jeffrey Li calling you in January

105

1 of 2021 to ask about Patrick Ko's complaint about the

2 protected investor list?

3            MR. FURST:  Thank you.

4    A.   Not specifically.  But if there's more data --

5 I was speaking to Jeffrey on the transaction, so we had

6 a dialogue.  But if there's more information you can

7 give, that would be helpful.

8 BY MR. AKINS:

9    Q.   Do you recall bringing in Harry to also join in

10 the discussion with Jeffrey?

11   A.   Again, I was regularly communicating with both

12 of those individuals, so not specifically.

13   Q.   Okay.  I'm going to show you what I'm marking

14 as Exhibit 14 --

15            MR. FLEMING:  I think 15.

16            MR. AKINS:  15.  Let me quickly change

17 that.

18            MR. FURST:  Before you ask your question,

19 what was Exhibit 13?  I know there was some switching

20 up.

21            MR. FLEMING:  The January 11, 2021

22 placement.

23            MS. MA:  Yeah.  The January 11, 2021

24 placement agreement, Bates No. FTFT00006022.

25            MR. FURST:  Excellent.  Thank you so much.

106

1          MR. AKINS:  It would be helpful if we

2 could go back and check -- and I may need your help with

3 this -- the December 29th e-mail string.  I don't recall

4 what exhibit number that is.

5          MS. MA:  Sure, yeah.  One second.

6          The December 29th e-mail from Grodko to

7 Li?

8          MR. AKINS:  Yes.  If you could share your

9 screen.  Thank you.

10 BY MR. AKINS:

11   Q.  Mr. Cataudella, you see that we referred to

12 this e-mail earlier; and it is an e-mail from Zach

13 Grodko to a list of people, including you and Jeffrey

14 Li.

15          Do you see the time that the e-mail was

16 sent?  It was 2:13 p.m.?

17   A.  I do see that, yeah.

18   Q.  The top e-mail at the top that mentions Anson

19 wire and Hudson sends wire, that's 2:13 p.m.

20          MR. AKINS:  Now, Jacqueline, I'm going to

21 switch over to where I'm sharing my screen, if you don't

22 mind.

23          (Exhibit 15 marked)

24 BY MR. AKINS:

25   Q.  So now I'm showing you an e-mail that is

107

1 redacted as attorney/client privilege.  But the subject

2 matter of the e-mail is a recall request.  "Zach Grodko

3 would like to recall the message Project Ford - legal

4 opinion."

5             Do you see the date and time for this

6 recall request?

7     A.   2:14 p.m.

8     Q.   So less than a minute after the prior e-mail

9 Zach Grodko recalls his e-mail, right?

10    A.   Uh-huh.

11    Q.   Is that a "yes"?

12    A.   That's what it looks to be, yes, based on the

13 e-mail.

14    Q.   Do you know why Zach Grodko recalled his e-mail

15 from everybody?

16    A.   Why Zach specifically recalled his e-mail, I do

17 not.

18             (Exhibit 16 marked)

19 BY MR. AKINS:

20    Q.   I'm going to show you Exhibit 16.  Exhibit 16

21 is an excerpt from the deposition transcript of Hudson

22 Bay where they presented Richard Allison as a

23 representative.  This is page 30.  I'll scroll down to

24 the highlighted portion.

25             Hudson Bay is asked, "Do you know how Tech

108

1 Opportunities was chosen to be the investing entity in

2 this transaction?"

3              And Allison on behalf of Hudson Bay

4 testifies, "I was involved personally."  And I'm

5 summarizing; you can read it.  "I remember at some

6 point -- I don't know if it was communicated to me

7 directly -- there was a request from the placement agent

8 to use an entity other than Hudson Bay Master Fund."

9              Do you agree that this testimony is

10 truthful, that there was a request from the placement

11 agent to use an entity other than Hudson Bay?

12    A.   Insofar as this was testimony from Rick

13 Allison, I would expect it to be truthful.

14    Q.   The placement agent would refer to A.G.P.,

15 right?

16    A.   In this context the placement agent would be

17 referred to as A.G.P.

18    Q.   So it is truthful that A.G.P. asked Hudson Bay

19 to use an entity other than Hudson Bay, right?

20              MR. FURST:  Objection as to form,

21 misstates his testimony.

22    A.   To me that's an assumption based on this

23 testimony.

24 BY MR. AKINS:

25    Q.   Okay.

109

1    MR. AKINS:  I'll pass the witness.

2    (Proceedings concluded at 1:17 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

110

1                    CHANGES AND SIGNATURE

2  WITNESS NAME: CARMELO CATAUDELLA

3  DATE OF DEPOSITION: September 13, 2022

4  PAGE LINE  CHANGE                    REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

111

1      I, CARMELO CATAUDELLA, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

5                                    _____

                                     CARMELO CATAUDELLA

6

7 THE STATE OF _____)

8 COUNTY OF _____)

9      Before me, _____, on this day

10 personally appeared CARMELO CATAUDELLA, known to me or

11 proved to me on the oath of _____ or through

12 _____ (description of identity card

13 or other document) to be the person whose name is

14 subscribed to the foregoing instrument and acknowledged

15 to me that he/she executed the same for the purpose and

16 consideration therein expressed.

17      Given under my hand and seal of office on this _____

18 day of _____, _____.

19

20                                    _____

                                     NOTARY PUBLIC IN AND FOR

21                                   THE STATE OF _____

22 My Commission Expires: _____

23

24 _____No Changes Made  _____ Amendment Sheet(s) Attached

25

112

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3 FT GLOBAL CAPITAL, INC.,   )
                              )
 4      Plaintiff,            )
                              )
 5 vs.                        )   CASE NO. 1:21-cv-00594-JP
                              )
 6 FUTURE FINTECH GROUP,      )
   INC.,                      )
 7                            )
        Defendant.            )

 8

 9                    REPORTER'S CERTIFICATE

10        ORAL DEPOSITION OF CARMELO CATAUDELLA

11                    September 13, 2022

12

13      I, Melinda Barre, Certified Shorthand Reporter in

14 and for the State of Texas, hereby certify to the

15 following:

16      That the witness, CARMELO CATAUDELLA, was duly sworn

17 by the officer and that the transcript of the oral

18 deposition is a true record of the testimony given by

19 the witness;

20      That the original deposition was delivered to

21 William Akins.

22      That a copy of this certificate was served on all

23 parties and/or the witness shown herein

24 on _____.

25      I further certify that pursuant to FRCP Rule
```

1 30(f)(1), that the signature of the deponent:

2     _____ was requested by the deponent or a party before

3 the completion of the deposition and that the signature is

4 to be before any notary public and returned within 30 days

5 from date of receipt of the transcript.  If returned,

6 the attached Changes and Signature Page contains any

7 changes and the reasons therefor:

8     ____was not requested by the deponent or a

9 party before the completion of the deposition.

10     I further certify that I am neither counsel for,

11 related to, nor employed by any of the parties or

12 attorneys in the action in which this proceeding was

13 taken, and further that I am not financially or

14 otherwise interested in the outcome of the action.

15     Certified to by me on this, the _____ day

16 of _____, 2022.

17

18

19

20     _____

21     Melinda Barre
       Texas CSR 2192
22     Expiration:  12/31/23

23

24

25

FT GLOBAL CAPITAL vs
FUTURE FINTECH GROUP

Carmelo Cataudella
September 13, 2022

114

1  COUNTY OF HARRIS      )

2  STATE OF TEXAS        )

3      I hereby certify that the witness was notified on

4  _____ that the witness has 30 days or (____

5  days per agreement of counsel) after being notified by

6  the officer that the transcript is available for review

7  by the witness and if there are changes in the form or

8  substance to be made, then the witness shall sign a

9  statement reciting such changes and the reasons given by

10  the witness for making them;

11      That the witness' signature was/was not returned as

12  of _____.

13      Subscribed and sworn to on this, the _____ day of

14  _____, 2022.

15

16

17

18

19      _____

20      Melinda Barre
        Texas CSR 2192
21      Expiration:  12/31/23

22

23

24

25

**$**

**$880,000**  98:17

---

**1**

**1**  7:19,20 40:4 41:21 63:15

**10**  75:9 78:11,12,14,18,20,22 96:22, 24

**11**  64:9 66:8 78:10 81:18,19 96:17 97:5 98:22 105:21,23

**12**  39:5 84:7,9 98:1 100:23

**12-11**  66:10,21

**12-11-2020**  64:3

**12:00**  64:4,9

**13**  15:16 26:13,20 27:12,17 28:1,5,13 35:19 46:16 48:20 91:20 96:17,19 102:14 105:19

**13th**  14:10 15:7 19:20 21:12 22:21 27:6 54:21 55:21,24 56:7,13

**14**  50:16,24 67:2 97:9,10,12 102:21 105:14

**14th**  21:2 22:22 25:1 37:4 38:14 46:24 48:6 70:23

**15**  96:22 105:15,16 106:23

**16**  107:18,20

**1:17**  109:2

**1:24**  75:24

---

**2**

**2**  14:6,7 15:6 22:25 23:2,13 24:21 25:17 30:2,22 45:24 51:1,2 52:9,19, 25 91:8,18

**2015**  11:24

**2016**  11:24

**2018**  11:4

**2020**  10:23 11:1 13:10 14:10 15:7,16 22:17 26:13,20 27:12,17 28:1,5,13 35:19 42:13 46:16 48:20 50:16,25 63:25 64:9 68:22 75:24 78:25 82:10 83:3 85:5 87:7 91:20 98:11

**2020/spring**  13:9

**2021**  10:24 11:1,2 13:9,10 39:5 96:17 97:5 98:1,23 100:23,25 101:6,18,20 105:1,21,23

**21**  97:7

**24**  42:13 68:22 75:24

**24th**  70:24

**28th**  84:19,20

**29**  78:24 82:10 83:22 85:16 87:6

**29th**  57:10,11,21 60:14 81:22 83:3 84:17 106:3,6

**2:13**  85:15 106:16,19

**2:14**  107:7

---

**3**

**3**  39:2,4 40:4 52:19,23,25 102:9

**30**  61:9 98:11 107:23

---

**4**

**4**  41:17,18,20 42:21 53:2,5,7,24 102:9

**427**  62:7

---

**5**

**5**  42:10,12,13 75:12,14 78:16,17

---

**6**

**6**  50:9,13 51:11,12

---

**7**

**7**  62:2,4

---

**8**

**8**  65:18,20

---

**9**

**9**  68:18,19,25

**9:14**  82:10

---

**A**

**A&t**  28:3 39:6,13,14,15,20 40:24 41:3,5,6,22 45:8,15 57:20 60:17,20 70:9 83:2 86:24 87:19 88:11,12 89:14,18,19 90:18 91:1 94:13,21 95:8,18 96:5

**A-E-G-I-S**  11:8

**A.G.P.**  6:21 7:16 8:6 9:4,11,14,18,24, 25 10:5,7,13,18,25 11:3 12:15 15:17 16:3,16 17:2,11,18 18:6,13,15,18,24 19:3,19 20:4,7,12 21:3,4,19,21 22:11, 12,19 23:4,13,24 24:19,25 25:16,23 26:1,3,9,11,18 27:4,11,14 28:25 29:11,16,17,19,25 30:6,13,15,20,21 31:3,13 32:2,6,10,13,16,22 33:3,10, 13,14,18,24 35:10,18,24 36:2 37:13, 18 38:17 39:1,11,22 40:22 41:14,15 42:1,5 43:6,7 44:1,5,10,16 45:2,7,13, 20,25 46:4,15,19,25 47:4,13,21 48:7, 9,12,14 49:13,18 51:3 52:5 53:9,18, 21 54:4,7 55:8,9,11 57:1,2,4,5 58:2,8, 12,14,19 59:2,6,7,9,17,19 60:15,16,23 62:4,8 68:11 69:3 70:3,7,14 71:14,16,22, 24 72:2,13,18,20 73:10,12,13,20,22 74:5,13 75:3 76:20 78:23 79:23 80:9 81:6,11,13 83:19 88:22,25 89:12,16, 20 90:3,19,24 91:2,16 92:3,14 96:3 97:6,18,25 98:25 99:3,21 100:1,4,7,9, 19 101:7 102:6,15,24 108:14,17,18

**A.g.p.'s**  9:12 15:1 16:19 17:4,7 20:14,17,19,21 24:13,22 25:8 31:1,8, 11,17,19 34:2 37:12 45:16 52:3,7 53:9,22,23 58:4 59:1 80:1 86:4 88:18, 21 89:7 95:6 99:15 101:5

**a.m.**  82:10

**abbreviation**  20:2

**abide**  91:3

**abided**  95:13

**ability**  67:9

**accept**  85:20 103:19 104:7

**accepting**  86:16

**access**  93:1

**accident**  7:15

**account**  8:24 9:2

**accountant**  12:10

**accounting**  12:9,12,23

**accounts**  16:10 26:3 92:23

**accurate**  101:8

**acronym**  29:10

**act**  22:20

**action**  29:25 30:3

**actual**  20:8

**add**  70:24

**added** 53:14

**addition** 53:3

**address** 79:19 81:1,2,3,5

**addresses** 97:16

**adhere** 47:4

**ADV** 29:3,7,11 44:14,16,22 45:2,6
95:1 103:16,19 104:9

**advise** 19:3 57:2,5

**advisory** 11:20

**Aegis** 11:6,10,12,13,15

**affiliate** 28:16,18 29:1,24 44:6,10,11,
14 45:19 89:25 90:4,6,10 92:4,16,17,
19 93:8,20,25 94:3,4,10,15,18,21
95:18,19 96:5,6 103:13 104:10,11

**affiliated** 28:12 45:8 74:3 90:17

**affiliates** 16:11 27:21 29:2,5,20
88:19 90:11 91:25 95:9 103:15,20,25

**affiliation** 45:14 89:21

**affirmative** 102:2

**aforementioned** 98:12

**afternoon** 48:20

**agency** 22:6,22 25:1 26:10 29:14
31:21 34:1 35:6 36:15 38:13 46:6,20,
22 57:14 60:15 93:2,13

**agent** 20:15 21:23 22:10,20 24:21
25:5 31:2,12 33:5,16 36:9 45:25
46:14 72:19 86:4 90:1 98:16 108:7,
11,14,16

**agent's** 17:12

**agents** 25:9

**aggregate** 98:16

**agree** 108:9

**agreed** 52:16 91:5 95:12

**agreeing** 49:12

**agreement** 17:1,23 18:3,5,17,22,25
20:23,24 21:1,2,11,23 22:2,5,6,10,18,
21,22,23 23:2,4,5,12,15,16,21,25
24:9,14,20,25 26:2,9 29:14 31:22
32:24 33:5,16,25 34:16 35:7,8 36:9,
14,15,16,17,19,20 37:2,13,20,25
38:4,5,9,13,14,19 45:19,25 46:6,7,14,
19,20,21,22,24 47:1,3,10,12,15,18,
19,20,22,23,25 48:7,13,15,17,18
49:2,9,11,13 50:17,23 51:19,22 52:4,
5,12,15,20 53:4,12,17,18,20 54:8,10,
16,17,22 55:6,8,12,15,16,20 56:1,8,

14,23,25 57:1,14 60:15 64:19 65:1,8
66:15,25 67:10,11,16,24 68:21 69:1,
2,10 70:14,19,21,22,23 71:13,14
80:23 90:1 93:12,13 96:15,16 97:5
99:2 105:24

**agreements** 20:8 22:15 23:1,9
24:19,21 25:2,5 26:10,25 31:2,12,18,
21 32:1,7,14 34:1 35:17,24 36:18
37:19 45:18,20 46:5 47:14 52:6 60:16
91:3 93:2,3 102:10

**ahead** 50:1 73:16

**Akins** 5:4,5 6:7,11,12 7:21 14:8 19:8
21:9,17 22:8,24 23:11 24:7 25:4,21
26:17 27:3,10 28:10,17,24 31:9,25
32:9,21 33:9 34:3,10,18,23 35:2,3
36:7,22 37:5,15 38:6,16 39:3 40:3,21
41:19 42:11 43:25 44:12,23 45:12
46:13 47:2,9 48:5 49:3,25 50:4,10
52:2,13 54:19 55:3,23 56:5,11,18
58:10 61:7 83:24 104:14,15,17,23,24
105:8,16 106:1,8,10,20,24 107:19
108:24 109:1

**Akins'** 61:25 70:1

**alert** 99:3

**allegation** 99:5

**allegations** 9:5

**allegedly** 80:16

**Alliance** 6:18,21 12:16 50:14 97:17

**Allison** 71:17,18 74:1,14,15 107:22
108:3,13

**allocations** 82:24

**alternatively** 91:1

**altogether** 95:17

**Amin** 39:5,16,18,21 40:5,10,19 41:21
73:12,13,23 74:1 82:13 90:15

**Amin's** 90:20

**amount** 17:5 98:17,22

**Anagnostou** 42:25 43:1,3

**Anson** 29:11 32:11 38:20 39:5,24
40:5,7,13,15 41:21,23 42:2,3 45:2,6,
8,14 57:20,23 58:19,20 60:21 73:10,
14,25 74:4 81:23 82:11,13 85:17 86:7
87:17,18,22 88:10,11,19 89:11,13,22
90:18,19 91:1 94:15 95:9,19 96:6
106:18

**answers** 60:4

**Antonopoulos** 78:3 79:21 80:22

**Antonopoulos'** 81:1

**appeared** 91:7

**appears** 98:21

**approximately** 70:18 72:24

**April** 101:18,20

**Armistice** 74:23,24 75:1,3,4

**assertion** 99:22

**assertions** 99:9 100:20

**assimilated** 87:15

**associate** 10:17,20

**assume** 55:9 85:6

**assumes** 73:15

**assumption** 59:3 64:22,23 65:4,5
66:23 72:11 73:18 96:14 108:22

**attachment** 79:4,5

**attachments** 79:2

**attention** 62:17 79:20 85:14 98:6
99:15

**attorney** 5:16 14:14,18,21 64:11

**attorney's** 5:13

**attorney/client** 107:1

**avoid** 16:4 18:15 20:15,21 23:24
24:10 27:5

**aware** 20:13 48:9 54:14 55:11 58:18,
23 60:11 64:3,10,15 83:1,4,18 89:16
90:4,7,12,14 91:6,8 92:22 99:18

**B**

**bachelor's** 12:8

**back** 12:14 14:5 19:23 23:22 24:8
36:23 43:14 46:10 50:25 51:11 52:12
54:6 67:16 84:16 91:16 95:24 101:11
103:16 104:22 106:2

**bank** 11:6 16:23,24 23:19

**banker** 18:4 26:7 63:18,19,21 64:1,2,
7,10 66:15,19

**banking** 9:15 10:9 11:2 12:17,22
13:14,15,16,25 92:25

**based** 8:21 26:6,23 30:23 32:14
37:19 49:7 57:24 58:16,22 59:4 67:5
71:20 77:16,21 82:22 83:16 87:15
90:14 100:21 104:8 107:12 108:22

**basis** 60:1

**Bates** 62:7 105:24

**bathroom** 96:21

**Bay** 42:6,7,14 43:15,18 44:2,4,6,10, 16,22 57:23 58:11,14,15 59:7 71:15, 18,21,23,25 72:5,14,19 73:2 74:15 76:17,21 77:9,13,22 79:20,25 80:6, 11,18 81:2,3,5 90:13,22 91:25 92:5, 16 93:8,20 96:5 107:22,25 108:3,8, 11,18,19

**Bay's** 58:3,25

**begin** 61:6

**beginning** 11:4 84:16,23

**behalf** 7:3 8:6 42:15 49:9 72:20 80:23 108:3

**belief** 56:17

**believed** 58:4

**believes** 88:25

**benefit** 16:23

**bet** 28:18

**big** 45:3

**bill** 49:23 61:5 77:9 78:16

**binder** 6:6,9

**binds** 7:6

**bit** 30:18 62:21 63:5 69:14,18

**bite** 61:12

**blocked** 69:20

**Bocchi** 9:14,17 13:16,18,23,24 14:22 59:12 102:17

**bottom** 42:21

**bound** 31:13 46:15,19,25

**breach** 8:19,21

**break** 18:10 49:24 50:12 61:8 85:20 96:21 103:8

**bring** 12:19 60:25

**bringing** 105:9

**broader** 9:21

**broken** 89:3

**brought** 8:25 14:24 29:22 72:2 99:16

**business** 11:18 12:16,18,21,24 66:11 71:5,22,24 76:2

**buys** 76:12

## C

**C-O-R-E** 11:17

**call** 5:8 6:21 62:17 68:17 81:12 85:14 86:14 98:6

**called** 11:6,14 62:5 70:9 76:15

**calling** 23:5 59:3 104:19,25

**calls** 9:13 13:5 40:17 56:2,16 88:5,14

**capital** 11:7,10,12,13,14 12:25 43:18 44:2,4,6,16 71:15,18,23 72:6,14,19 74:23,24 75:1 76:21 77:9 79:20,25 80:6,11,18 81:2 90:13,23 91:25 92:5, 16 93:9,21

**Capital.com** 42:14 76:18

**care** 78:3 79:19 80:6 81:4

**Carmelo** 5:1 15:8,13 61:11

**carved** 17:7

**case** 14:3,23 32:7

**Cataudella** 5:1,5 6:13 7:22 14:9 50:11 61:22 62:9 68:24 75:15 78:22 91:17 103:6,13 104:18 106:11

**cc'd** 41:8

**Cease** 97:14

**Center** 40:4

**certificate** 85:9,10

**certificates** 85:1,9,11

**certifications** 12:12

**certified** 12:10

**CFO** 85:9

**chain** 84:1,17,23 85:7,13

**chairman** 9:14 97:22

**change** 38:20 50:5 105:16

**check** 106:2

**checked** 67:18

**chosen** 108:1

**City** 5:12

**claim** 100:10 101:8

**claiming** 8:19,25

**clarify** 19:23

**classic** 66:1

**clause** 47:16 55:17,22

**clear** 22:25 31:1

**client** 5:7 49:10 54:1 72:20

**clients** 12:25

**close** 69:18 82:2,16

**closed** 91:21

**closing** 57:12,15 85:8,10

**code** 60:1

**cold** 13:4

**colleague** 103:7

**collecting** 59:17,19

**collectively** 14:22 91:5

**college** 11:20 12:1,2,3,4,5

**comfortable** 8:5

**comment** 51:6

**commitment** 62:5,13

**committee** 62:5,13,15

**common** 65:13 66:9 104:2

**communicated** 9:22 108:6

**communicating** 105:11

**communications** 38:2 54:16 80:4 81:11 102:15

**companies** 103:14

**companies'** 13:2

**company** 15:9 16:9 22:19 26:8 31:23 33:23 34:17 37:3,14 46:4 47:14 52:6 54:3,18 57:18 59:23 60:18 66:22,24 67:15,17 80:5 83:10,20 84:1,25 86:2,3 88:22,23 99:2,14 101:1 102:12

**company's** 64:11 66:17,20

**compensated** 9:2 16:25

**compensation** 24:23

**compiling** 60:3

**complaint** 8:13,15 104:20 105:1

**completing** 98:10

**compliance** 59:20,21 97:24

**comprehensive** 52:20

**computer's** 75:19

**conceptual** 74:11

**concerned** 96:3

**conclude** 83:6

**concluded** 109:2

**conclusion** 56:3

**conduct** 32:6 35:25

**confer** 103:7

**confidential** 50:15 60:1

**confirm** 15:20 16:10 36:9 37:18
70:13 78:5

**confirmation** 21:19,22 30:4,5 36:10
48:1,10,22 49:5 51:20 52:8 54:9,23
55:5,24 56:6,14,22

**confirmed** 15:25 19:10,15,19 24:2,9
28:25 33:4 36:2,24 37:7,8,16,17,21
38:7,8,12 46:15 48:19 49:14 54:20
55:14 91:7

**confirming** 19:13 30:1

**confirms** 22:9

**connect** 59:16

**connected** 80:10

**connection** 69:2 75:4 83:24 101:21
102:5

**consistent** 70:17,25

**constitutes** 52:5

**consummated** 98:14

**contact** 29:22 49:21 64:25 78:2
101:2

**contacted** 64:7,17,23 73:21 74:19
90:16

**contacting** 18:24 87:21,25

**contents** 102:23

**context** 42:19 108:16

**continue** 50:11

**contract** 8:19,21

**contracts** 20:20

**control** 104:2

**controls** 104:1

**conversation** 32:20 33:17 49:16,18

**conveyed** 85:24 100:16

**convoluted** 66:3

**corporate** 6:18,24 7:3

**corporation** 7:4,7

**correct** 7:17 10:19 11:9 15:14,18,24
16:2 19:22 23:21 24:12 25:7 29:18
37:22 38:9,15 51:10,17 53:22 59:7

64:6 66:13 70:7,8,11 75:17 76:18,22
79:5,14,15,18 82:25 87:7,9 89:12,20
91:9 93:23 96:14 97:8 101:17

**correctly** 10:3,22 60:14 82:3,17,18
85:22 98:18

**correspond** 68:8,9,10

**correspondence** 26:25 30:24 36:18
38:3 47:17 49:8 54:15 57:16 58:17
60:3 83:17 90:19 99:10,25 101:3
102:9,16

**counsel** 9:9,12,13 15:1 16:9 22:19
23:19 26:8 46:5 53:13 54:13,18 57:17
60:7,19 66:21,24 67:17 80:5 86:3,4
88:23 95:1,3 101:1,2 102:12 103:3,5

**couple** 18:11

**court** 50:13 61:13 95:23

**current** 10:16 12:14

**cut** 82:4 100:15

**D**

**Daniel** 81:22 82:10,12

**darn** 97:2

**data** 105:4

**date** 17:1 63:2 64:3,13 70:22 107:5

**date/time** 64:2

**dated** 36:15 50:16,24 68:22 96:16
97:5 100:22

**dates** 99:20

**David** 9:14 13:15,18 14:22 59:12,16
102:17

**day** 15:15,25 26:2 31:23 34:17 36:21,
23 37:2,19,21 46:24 47:16,20 48:6,
10,22 51:20 54:9 55:20

**days** 65:2 70:18 71:7,9,10

**deal** 41:3 66:15 101:21 102:5

**deal-wise** 35:22

**dealing** 76:21 77:7 85:7

**deals** 72:2 73:1 101:19 102:9

**dealt** 54:1,3

**December** 14:10 15:7,16 19:20 21:2,
12 22:17,21,22 25:1 26:13,20 27:6,
12,17 28:1,5,13 35:19 37:4 38:14
42:13 46:16,24 48:6,20 50:16,24
54:21 55:21,24 56:7,13 57:10,11,15,
21 60:14 63:24 64:9 66:8 67:2 68:22

70:23,24 75:24 78:24 81:22 82:10
83:3,22 84:17,20 85:5,16 87:6 91:20
98:11 106:3,6

**decide** 21:4,21

**decision** 26:5,11,18 27:2,4

**declared** 65:15

**decline** 74:24

**declined** 75:2

**deemed** 104:9

**defendant** 5:6

**define** 28:16,22,23 65:11

**definition** 20:2 28:18 29:10 92:17,18
93:25 103:18,24 104:3,7

**degree** 12:7

**delivery** 86:9,17

**demand** 97:25 98:25 99:4,16 101:16
102:14,23,25

**depending** 17:1 53:19

**depends** 86:14

**deponent** 56:16

**deposition** 5:19 6:15 7:10,11,14 9:8,
19,23 14:2,12,16,17 17:22 27:1 35:12
39:9 41:12 43:4 45:5 58:18,23 62:5
75:7 91:18 94:25 107:21

**depositions** 14:3

**Desist** 97:14

**desk** 73:1

**desktop** 5:18

**details** 42:23 43:23 77:12,25 79:9

**determine** 45:13,19 104:11

**determining** 89:24

**devices** 45:21

**dialogue** 105:6

**diligence** 67:14

**direct** 67:2,25 68:2 101:2

**directly** 9:20 11:13 108:7

**discovery** 26:23,24 30:24 38:25
45:4 57:11,24 58:16,22 63:11 75:7
83:17

**discussed** 45:18 55:22 102:24

**discussing** 66:20

**discussion** 33:1 46:9 57:8,22 59:9,

11,14,16 95:25 102:18 105:10

**discussions** 9:12 14:21,25 33:24 42:1,2,5 95:1,2 99:7,11 101:3,7,14 102:20 103:1,2

**distinction** 43:17

**document** 7:23,25 35:9 50:16,24,25 51:1,2,10 62:6,10,11 69:4 75:15 87:2

**documentation** 9:10 85:8

**documents** 5:23 6:1,3,14 18:19 19:1 30:23 31:19,20,21 38:25 45:4 59:18, 20 67:14 71:20 83:16 93:3 102:11

**dollar** 98:22

**dollars** 76:14

**domain** 71:21 76:17 90:18,20,23

**don'ts** 47:23

**dos** 47:23

**draft** 54:21

**drafted** 53:17,21

**duly** 5:2

**duties** 31:17 45:16 89:24 93:12,15 104:10

**DWAC** 85:18,19,20 86:7,8,9

**DWACS** 89:3

**E**

**e-mail** 9:22 14:10,11,15,19,23 15:7, 19 16:3,7,9 19:2,11,17,18,20 20:22, 24,25 21:5,13 22:4,9 23:23 25:25 26:13,20,25 27:6,13,18 28:1,6,13 29:1 30:4,5,10,12,16,21 31:23 34:17 35:9,20 36:6 40:2,5,20 41:2,9 42:13, 17,20 43:9,11,22 46:16,23,25 47:16 48:1 49:7 51:5,12,19,20 55:22 57:11, 16,19,21 60:13,22 71:19 75:23 76:4 77:9,11,23 78:23 79:8 81:21,22 82:4, 8,14,18 83:11,22,25 84:21 85:7,12, 15,17,25 86:1 87:6,8,14,16,20 88:1, 18,22 89:2,7,10 90:21 91:7,19,23 92:22 97:12,16 99:13 106:3,6,12,15, 18,25 107:2,8,9,13,14,16

**e-mailed** 38:12

**e-mailing** 40:10

**e-mails** 13:4 22:17 30:25 58:16 60:3, 19 71:21 75:16 76:16 83:17 85:13 90:15,18

**earlier** 30:18 50:18 60:13 77:19 102:17 106:12

**eat** 61:12

**Edward** 11:17

**effect** 27:2 30:25 36:11 39:1 47:11, 12 49:15 58:24 83:18 100:13

**effective** 65:9,11,15 66:9,22 67:22

**effectiveness** 66:11,12

**effectuated** 67:20

**efforts** 45:13

**electronic** 86:9

**eliminated** 48:9,22 52:8

**embodied** 47:19,20 48:13,16

**employed** 9:18 10:5 27:16 41:14,15 43:6,7

**employee** 9:24,25 39:12,21 40:22

**employees** 9:11

**employer** 72:8

**employment** 27:19

**encompass** 31:3

**encompasses** 52:15 53:3

**end** 11:24 38:8

**ended** 27:15

**engaged** 22:19 30:20

**engagement** 17:4,8,22,23 18:1,3,5, 17,22,25 21:2 22:2,5,18 23:2,5,15,16, 20,25 24:8,14,20,25 25:15,22 26:2,9 29:13 31:22 33:25 35:8 36:14,16,17, 19,20 37:13 38:3,5,14,19 44:17 46:6, 11,12,21,23 47:10,12,15,18,25 48:7, 16,18 49:2,8,10,12 50:15,17,22 51:22 52:12 53:20 54:18,22 55:7,16,20 56:1,8,14,23,25 64:18 65:1,8 66:15, 25 67:10,11,24 70:19,23 71:13 93:12 94:18 95:11

**engagements** 93:1

**engaging** 23:19

**enter** 55:25 56:8 91:5

**entered** 51:21 54:10

**entering** 56:14,23 57:1

**entire** 25:15,22 47:21 48:15 52:5 53:4

**entirety** 47:22 48:12 55:12 69:8

**entities** 15:22 16:4 19:20 20:15 21:20 27:17 28:5,12 31:14 32:3 35:19 38:18 70:6 98:14 104:1

**entitled** 7:23 97:14

**entity** 41:5 42:7 44:4 70:9 82:19 108:1,8,11,19

**escrow** 85:18,20

**escrows** 89:2

**essence** 49:11

**et al** 47:17

**evaporated** 36:10

**event** 17:19

**evidence** 60:10 73:16

**exact** 7:12 17:5 20:1,2 38:1 59:13 81:4 87:14,20 99:19

**EXAMINATION** 5:3 61:18

**examining** 61:6

**Excellent** 105:25

**excerpt** 107:21

**exchange** 14:10,19 19:3 30:21 31:24 46:10,16 76:14

**exchanged** 86:13

**exchanges** 90:21 91:19 92:24

**exclusive** 22:20

**excuse** 33:12 57:4 79:5

**executed** 64:19 69:2 70:21

**execution** 67:13

**exercise** 39:17,19 40:12 41:4

**exercising** 41:4,5

**exhibit** 7:19,20 8:3,7 14:6,7 15:6 22:25 23:2,13 24:21 25:17 26:2 30:2, 22 39:2,4 40:4 41:17,18,20 42:10,12, 13,18 45:24 50:9,13 51:1,2,11,12 52:8 60:25 62:2,4 65:12,18,20 68:17, 18,19,25 75:9,12,14 78:5,9,12,14,16, 17,18,20,22 81:18,19 84:5,7,9 91:8, 18 96:17,19 97:9,10,12 102:14,21 105:14,19 106:4,23 107:18,20

**exhibits** 97:2

**existed** 17:3

**expect** 73:20 88:3,7,8,11,16 108:13

**expected** 73:22

**explain** 85:24

**explicitly** 18:24 22:5 23:20 38:4

**express** 9:6

**extent** 72:6

**F**

**facilitate** 39:18 40:6,12,23

**fact** 24:2 42:20 63:21 89:2 96:4,5 97:25 99:3

**fact's** 54:25

**facts** 14:23 73:16

**fair** 7:16 13:18 16:16 34:6,11,19 76:20 87:2 94:2

**fairly** 46:22 71:1

**fall** 10:23 11:1

**familiar** 13:20 73:2 76:7 99:19

**family** 74:6,7,10

**faster** 50:21

**February** 101:18,19

**fee** 16:25 18:1,6,23 53:2,5,8,14 54:2, 4 98:16

**feel** 8:5

**felt** 33:19

**file** 13:3 68:5,13

**filed** 8:13 68:15

**files** 29:3

**fill** 62:15

**filled** 64:14

**final** 86:12,14

**financials** 13:3

**financing** 9:1 70:6

**financings** 70:2 80:9

**find** 12:20 15:8

**fine** 50:4 61:10 62:17 78:19

**finished** 96:23

**Fintech** 5:8 8:19 9:1 16:5 19:16,21 21:12,21 22:11 23:4 24:14 25:3,16,23 27:25 30:20 33:11,14,18 42:7,8 44:18 51:18,21,25 54:8,9,13 55:25 56:7,10, 13,22,24 57:2,5,6,23 58:15,21 60:10, 18 62:6 65:23 102:10

**Fintech's** 56:17

**firm** 9:16 11:20 17:20 64:4,8 67:13 87:5 95:12

**firms** 12:23,24

**five-minute** 103:8

**Fleming** 61:5,10,16,19,23 62:3 63:9, 14 64:24 65:21 68:20 69:23 71:11 72:12 73:19 74:20 75:11 76:25 77:5 78:1,9,12,15,21 79:6,7 80:15,25 81:20 84:8,22 88:9,17 91:14 92:10 93:4 94:12 95:23 96:1,10,23 97:1,3, 11 101:11,15 102:1,4,22 103:11 104:13 105:15,21

**flow** 13:21 50:3 85:20

**focus** 12:8

**follow** 20:17,19 21:3,19 22:4 32:13, 16 47:21 61:25 75:14

**follow-on** 50:15 67:4

**follow-up** 77:23 103:12 104:18

**Ford** 85:1,4 107:3

**forget** 58:9

**Forgive** 54:7

**form** 19:5 21:6,14,24 22:13 23:6 24:5,17 25:18 26:14 27:7 28:7,14,19 29:3,6 31:5,15 32:4,18 33:6,21 34:7, 13,20 36:4,12,25 37:9,23 38:10,22 39:25 40:17 43:20 44:7,14,16,19,22, 25 45:2,6,9 46:2,17 47:5 48:2,24 51:23 52:10 53:22,23 54:11,24 55:18 56:2,9,15 58:6 62:12,18,22,25 63:7, 10,12 64:5,6,20 65:14 66:3 71:2 72:9 73:15 74:16 76:23 77:2 80:12,19 88:5,13 91:10 92:6,20 94:6 95:1,20 96:7 101:24 103:16,19 104:9 108:20

**forms** 29:11 62:16

**forward** 61:15

**forwarded** 80:4

**foundation** 38:23 48:3 55:19

**frame** 10:24 101:6

**free** 18:7 24:15 25:10,16 31:3 32:2,6 38:17 67:9

**Friday** 64:18

**front** 5:18,24 6:9 54:21 78:25

**FT** 8:14,18,25 9:1,4 59:10,18 61:24 98:1,14,16 99:4,6,9,16,22 100:3,6,9, 20 101:8 102:7,23

**FTFT** 5:8 39:17,19 41:22 43:9,19 59:23 63:24 65:9,13 66:9 67:8 68:11 69:3 70:3,7,15 74:25 75:25 79:2 80:9 82:23 83:2,15 85:5,17 86:6 88:3,7,11, 16,19 89:1,8 95:6 96:3 97:6 98:10,15,

25 99:3,17,22 100:4,7,9,19 101:7,21 102:5

**FTFT00006022** 105:24

**full** 47:18,19 74:11

**fully** 64:16 85:19

**fund** 29:3 32:11 39:14 41:3 42:9 43:24 44:2,3 58:9 73:2,3,8,9 74:7,15 77:13,25 78:3 81:14,16 108:8

**funds** 27:15,20 28:3 29:11 38:20 40:5 41:21 42:2 44:9 45:2,6,8,15 57:7 58:19,20 73:5,11,14,25 74:3,4,7,10 77:8 82:11 83:5 84:2 85:20 86:16 87:23 88:24 89:16,21 90:4 94:11,15, 19

**Funds.com** 39:6

**Furst** 6:5,8,9,14 19:5,6 21:6,7,14,15, 24,25 22:13,14 23:6 24:5,17,18 25:18,19 26:14,15,21 27:7,8 28:7,8, 14,19 31:5,6,15 32:4,18,19 33:6,7,21, 22 34:7,8,13,14,20 35:1 36:4,12,13, 25 37:1,9,10,23,24 38:10,11,22,23 39:25 40:1,17 43:20,21 44:7,8,19,20 45:9 46:2,3,17,18 47:5 48:2,3,24,25 49:22 50:2 51:23,24 52:10,11 54:11, 24,25 55:18 56:2,9,15 58:6,7 61:15 63:5 64:20 69:17 71:2 72:9 73:15 74:16 76:23,24 77:2,3 78:13,14,19 80:12,13,19 84:19 88:5,13 91:10 92:6,20 94:6 95:20 96:7,20,25 101:24 102:3 104:21 105:3,18,25 108:20

**future** 5:7,8 8:19 9:1 16:5 17:1 19:16, 21 21:11,20 22:11 23:4 24:14 25:3, 16,23 27:25 30:20 33:11,13,18 42:7,8 44:17 51:8,18,21,25 54:8,9,13 55:25 56:7,10,12,16,22,24 57:2,5,6,22 58:15,20 60:10,18 62:6 65:23 102:9

**G**

**game** 34:6,11,19

**gave** 59:6,21 88:18 89:8

**general** 73:7

**generally** 8:10 16:15,21 17:23 18:2 23:18

**gentlemen** 97:20

**Gents** 39:17

**George** 42:24 43:1,3,7 79:20 80:21

**give** 45:25 51:15 67:6 105:7

**Global** 6:18,21 8:14,18,25 9:1,4 50:14 59:10,18 61:24 98:1,16 99:4,9,

16,22 100:3,6,9 101:8 102:7

**Global's** 98:14 99:6 100:20 102:23

**good** 40:24 41:2,7 49:25 50:5

**governs** 17:22

**GP** 73:7

**graduated** 12:5

**great** 82:1,14

**Grodko** 10:2,4 39:5,8,12 40:22 41:1
42:14,16 43:15 75:16,24 76:3,16
78:23 81:22 82:10 83:6 84:24 85:15
86:2,18 87:10,18,21,25 106:6,13
107:2,9,14

**group** 16:21 62:6 65:23 87:16 91:5

**groups** 29:5

**guess** 65:6 68:17 78:9

**guide** 18:20

**guys** 40:5 61:8,12 77:4

---

**H**

**Half** 82:4

**halfway** 41:21

**handle** 20:5 78:4

**handling** 20:7

**happen** 33:17 49:17,19 71:6,7,8

**happened** 14:25 71:1,10

**happy** 17:15 20:18 35:15 38:1 74:12
78:5

**Harry** 41:10,11,15 81:23 82:11,12
86:5 105:9

**Harry's** 41:8

**head** 9:15 13:15,25 43:1 78:6

**hear** 77:4

**heard** 74:6 103:25 104:3,6

**helpful** 69:13 105:7 106:1

**hereof** 52:7

**hide** 38:20

**Higgins** 13:7,8,11,13

**Higgins'** 13:19

**highlighted** 107:24

**hit** 66:1,5 85:18

**hold** 12:12

**honest** 87:13

**hours** 71:6

**HTFL** 86:4

**Hudson** 42:6,7,14 43:15,18 44:2,4,6,
10,16,22 57:19,23 58:3,11,14,15,25
59:7 60:20 71:15,18,21,22,25 72:5,
14,19 73:2 74:15 76:17,21 77:9,13,22
79:20,25 80:6,11,18 81:2,3,5,7,12
82:1,15,20 83:7,9,11 85:19 86:7,18,
21 87:2,11,15,22 88:2,19 89:11,13,22
90:8,13,20,22,25 91:24 92:5,16 93:8,
20 95:9,18 96:5 103:17 106:19
107:21,25 108:3,8,11,18,19

**hundred** 13:20 62:16 65:16

**hypothetical** 59:4

---

**I**

**idea** 58:5 59:1,6 62:22 103:25

**identified** 20:15 26:12 28:12 32:3
98:14

**ignore** 21:4,12,21 33:11,14 43:23
77:24

**ignoring** 22:1

**immediately** 10:15

**implied** 20:25

**include** 20:9 24:14 25:6,9 31:21 34:5
36:3 37:6 41:5 47:3,10 77:22

**included** 9:13 16:11,24 23:19 32:8,
10,23 36:19 37:13 47:23 54:3

**including** 59:23 84:25 85:17 86:5
90:20 106:13

**incoming** 39:6

**incorporate** 32:1

**incorporated** 31:12

**incorrectly** 97:21

**individual** 71:17 74:18,19 95:13

**individually** 92:25 93:5 95:12

**individuals** 27:14,15,16,20 71:25
76:17 78:24 90:5,22 99:8 105:12

**induced** 56:10

**inducement** 55:25 56:7

**information** 16:8 42:22 60:9 62:6
78:2 89:8 105:6

**inquire** 90:24 94:9,17,18 101:22

**inquired** 100:19

**inquiry** 94:20 95:8

**inside** 30:6,12,13,21 41:21 60:5

**instance** 18:23 29:12 32:12 53:9
54:1 103:17

**institutional** 43:2

**instructions** 77:22

**intended** 53:7

**intentionally** 53:5,16,25

**internal** 81:11

**internally** 81:6,8 89:12 102:24 103:3

**interrupt** 50:2

**introduction** 8:24

**invest** 34:24 42:7 58:15,20 72:1
73:20,23 75:2 90:17

**invested** 27:25 28:2 57:6 60:12 70:6
74:22,23 89:17 90:16

**investigate** 93:14

**investing** 27:15 57:3 81:15 108:1

**investment** 9:15 10:8 11:2,6 12:17,
22 13:14,15,16,25 19:15 24:3 27:11,
14 31:14 32:11,24 35:5 36:2 38:17
42:3,8 44:2 72:7 74:25 75:5 83:14
92:25

**investments** 17:3 32:2 72:13,19
73:6 101:17

**investor** 17:12 39:23 40:7,13,16
42:3 76:12 79:13,16 82:25 83:1,4
98:15 99:6,23 100:5,11 101:9,23
102:7 105:2

**investors** 15:21 16:5,21,23,24 17:7
18:7,14,16,24 19:4,12,16,21 20:22
21:20 23:24 24:3,10,15 25:10,17,24
26:12,19 27:5,12,24,25 28:2,4,11
31:4 32:23 33:19 34:6,11,15 35:13,18
36:3 37:11 38:21 45:23 48:20,21
57:3,6 59:5 60:11 70:2 73:1,4 74:13
87:23,24 88:20 89:9,13,15 91:21,24
99:5,22 100:2,5,10 101:4,8,22 102:6

**invoice** 60:7

**involve** 7:16 15:21 19:13,14,16 24:3
45:23 48:21

**involved** 17:2 59:15 67:12 102:19
103:5 108:4

**Ioannou** 41:10,11 81:23 82:11,12

86:5

**issued** 39:15,19 89:4

**issuer** 16:24 17:11 18:1,3,14,23 23:18,19

**issuers** 13:2 17:9,23 18:19,21 20:9

**item** 8:18

**items** 9:10

**iteration** 51:4

                            **J**

**Jacqueline** 106:20

**January** 39:5 96:17 97:5,7 98:1,22 100:23,25 104:20,25 105:21,23

**January/february** 101:6

**Jeffrey** 15:7,19 19:11 21:12 23:13,22 24:4,10 25:24 26:6,8,12,19 27:5,12, 17 28:1,5,13 29:19,21,22,23 30:1,11 31:24 32:8,15,23 33:2,3,10,14,23 35:19 36:1,24 37:7 45:22 46:4,8,16 48:19 49:4,7,14,17,19,21 51:5,19,20 53:12 57:17 59:23 60:17 64:13 80:4 83:25 86:2 92:23 99:7,14 101:7 104:19,25 105:5,10 106:13

**Jeffrey's** 19:17,20 20:22 21:4 22:4

**Joan** 86:3

**John** 97:22

**join** 105:9

**joined** 10:12

**jvenezia@allianceg.com** 97:14

                            **K**

**Keith** 74:19,22

**key** 59:22 60:2

**keywords** 59:24

**Kim** 81:23 82:11,12

**kindly** 27:9 75:18

**knowing** 12:24

**knowledge** 18:8 29:17 30:14 42:4 45:1,11 46:10 49:16,20 58:8,12,13 59:8 62:14 72:4 75:6 80:21 91:2 93:24 100:17,18,24 101:5,13

**Ko** 59:10,12 97:13 102:15,18

**Ko's** 104:20 105:1

                            **L**

**L-I** 15:8

**lack** 38:23 48:3

**laid** 18:25 22:5 23:20

**laptop** 5:18

**law** 12:23 64:4,8

**lawsuit** 5:6 8:10,16 99:18

**lead** 26:7 63:18,19,21 64:1 66:15,19

**leads** 15:19

**leaving** 90:6,10

**legal** 15:1 20:2 29:9 56:3 90:11 107:3

**letter** 97:25 98:7,25 99:4,16 100:22 101:16 102:14,19,21,23,25 103:4

**Letters** 97:15

**Li** 15:7,19,20 23:22 24:4 26:7,8,12 29:19 30:11 31:24 32:15,23 33:2,3, 10,14,23 36:1,24 37:7 45:22 46:4,8, 16 48:19 49:4,7,14,17,19,21 53:12 57:17 59:23 60:17 64:13,18,25 80:4 84:1,24 85:16 86:2 91:19,20 99:8,14 101:1 104:25 106:7,14

**Li's** 21:12 24:10 25:24 26:19 27:5,12, 17 28:1,5,13 30:1 35:19

**liaison** 26:7 29:21

**light** 17:16,21

**likewise** 90:20

**limited** 16:8

**lines** 13:21 49:19

**list** 15:21 16:10,12,13,14,17,20,21 17:3,10,13,17,19 18:6,7,13 19:4,11 20:5,7,9,16 21:5 22:4 23:17 24:4,11, 15,16 25:6,9,11,17,24 29:5 31:3,4,11 32:2,8,17 33:5,15,20 34:5,12,15 35:13 36:3 37:7 38:18 45:24 47:4,11 48:11,21 49:6 51:13 57:3,7 59:22 60:11 91:6,9,15,20,21 98:15 99:6,24 100:3,5,11 101:9,23 102:7 105:2 106:13

**listed** 8:2,6 15:23 19:4,17,20 20:22 26:19 27:5,12,17,25 28:5,13 35:19 38:18 44:10,13,24 63:1 68:4

**LLC** 69:25 70:1,5,10 77:8 79:3,10,12, 24 80:10,17,24 82:20 83:2,8,14,20 86:19,23,24 87:3,12,19 88:3 89:14 90:8,13,22 92:4 93:8,20 94:13,22

**LLP** 29:12

**located** 5:11

**long** 10:10,20 11:8,10,22 69:4 97:1

**longer** 32:16 33:4 37:8,17,21 38:8 49:15 65:3

**looked** 35:11 44:21 71:9

**lot** 13:4

**LP** 80:11

**lunch** 61:8

                            **M**

**MA** 63:12 69:20 77:18 78:11 105:23 106:5

**made** 8:24 26:5 27:2,4 64:2,10,15 74:5 99:18

**Maher** 74:19,21,22

**make** 26:11,18 39:6,12 40:24 43:17 52:16 59:3 65:4,5 74:24 80:5,14 94:20 95:7 102:2

**makes** 40:23 98:9

**making** 64:22 99:4

**Management** 29:12 32:11 71:15,19, 23 72:6,14,20 79:20,25 80:7,11,18 81:2 90:13 91:25 92:5,16 93:9,21 94:15

**manager** 90:16

**Manhattan** 12:3

**mark** 65:18 75:8 78:8,11 81:17 84:9 96:17 97:9

**marked** 7:19,20 14:6,7 39:2 41:18 42:10 50:9,12 62:2 65:20 68:19 75:13 78:16,20 81:19 84:7 91:8,18 96:19 97:10 102:13 106:23 107:18

**marking** 68:25 78:14 97:2 105:13

**master** 73:2,9 74:15 77:13 108:8

**math** 70:24

**matter** 7:14 35:8 43:8 52:7 53:13 65:2 71:6 100:2 107:2

**meaning** 32:22 103:23

**means** 12:19

**meant** 29:23 33:4 37:20

**members** 86:6

**mention** 39:7 46:21

**mentioned** 14:20 19:24 58:9 60:13,
21 83:22 102:17

**mentioning** 83:23

**mentions** 32:8 49:2 83:9 88:23
106:18

**message** 41:20 107:3

**Michals** 9:14,17 14:22 97:17,21

**mind** 106:22

**minus** 69:18

**minute** 16:13 103:7 107:8

**minutes** 49:23 50:7 61:9 96:22,24

**Miscellaneous** 51:14 52:4

**missed** 104:22

**misstates** 34:8 108:21

**mistaken** 87:22

**moment** 51:15

**Monday** 38:8,13 48:6 49:15 51:6
64:19

**money** 17:9,11 76:12 86:13

**motor** 7:15

**multiple** 23:9 74:3

                    **N**

**named** 57:20

**names** 60:1,2,20 89:11 90:23

**Nathoo** 39:5,17,21 40:5 41:22 73:12,
13,20,24 74:1,15 81:23 82:13 90:15

**necessarily** 66:19 67:18 93:10

**negotiate** 67:16

**negotiated** 46:7,19

**negotiating** 49:8

**negotiation** 26:6,9

**negotiations** 18:19

**normal** 17:20

**note** 52:16

**notice** 7:23 39:6,13,20 40:24 41:4
66:10,12 88:19

**notices** 80:3

**number** 10:11 15:22 57:19 60:17
68:5 72:25 106:4

                    **O**

**objection** 19:5 21:6,14,24 22:13
23:6 24:5,17 25:18 26:14,21 27:7
28:7,14,19 31:5,15 32:4,18 33:6,21
34:7,13,20 36:4,12,25 37:9,23 38:10,
22 39:25 40:17 43:20 44:7,19 45:9
46:2,17 47:5 48:2,24 51:23 52:10
54:11,24 55:18 56:2,9,15 58:6 64:20
71:2 72:9 73:15 74:16 76:23 77:2
80:12,19 88:5,13 91:10 92:6,20 94:6
95:20 96:7 101:24 108:20

**obligated** 22:3 98:15

**obligations** 18:20

**obtained** 72:18

**occur** 64:25

**occurred** 32:20 70:20 72:24 98:13

**offer** 67:9

**offering** 50:15 53:19 62:20 63:16
64:3,16 67:3,5 98:10

**offerings** 99:5,23

**office** 5:13 81:1,2

**Officer's** 85:9

**offices** 5:14

**omitted** 37:11 53:6,16,25

**one's** 97:5

**operate** 31:20

**operating** 32:13

**operations** 35:25 81:24 82:13

**opine** 52:1 90:3

**opinion** 9:3,6 45:7 107:4

**Opportunities** 42:6,9 44:3,5 57:20
58:4,11 59:1 60:17,20 69:25 70:1,5
77:8 78:3 79:3,10,12,24 80:10,17,24
81:7,12 82:20,24 83:2,8,10,14,20
86:19,23,24 87:3,12,15 88:3 89:14,17
90:8,13,22,25 92:4,15 93:8,20 94:22
95:8,18 96:4 108:1

**Opportunity** 28:3 42:15 43:18 44:1,
9,24 77:8

**opposed** 65:2

**orally** 38:2 100:16

**order** 9:7 45:25

**ordinary** 66:14

**organization** 13:21 18:18 55:8

**organize** 60:9

**original** 77:22

**originally** 53:17 67:1

**originate** 12:19

**originating** 12:21

**outlay** 38:15

**outline** 18:5 24:22

**outlined** 18:2 22:2 29:13 31:17
34:16 35:23 37:3 45:17 89:25 93:12

**outlines** 21:2 36:17 55:7

**outlining** 53:5

**outreach** 74:5

**oversees** 13:16,19

**overview** 62:20 63:16

                    **P**

**p.m.** 64:4,9 75:24 85:15 106:16,19
107:7 109:2

**page-wise** 6:3

**pages** 48:16 69:5 70:12 89:17

**paid** 9:2

**paragraph** 51:14 52:4 53:3 54:6
98:9,12,21

**part** 5:7 38:19 74:3 80:18 85:7

**participated** 70:2

**participating** 5:19

**parties** 47:19 48:15 53:4 55:13

**partner** 13:24 73:7

**Partners** 6:19,21 50:14

**party** 48:13 59:4

**pass** 61:1,4 104:13 109:1

**passing** 74:8

**past** 17:6 52:17 74:23 104:3

**Patrick** 59:10,12 102:18 104:20
105:1

**pay** 98:15

**payable** 53:8

**pays** 76:12

**pending** 85:18 89:3

**people** 84:25 85:16 106:13

**percent** 13:20 62:16 65:16

**perfect** 63:6 69:21 75:22

**period** 30:19 44:17 53:10 71:12 72:15,21 73:11 74:14 76:13 96:13 98:13 100:22,25

**permitted** 25:23 35:18,21

**person** 36:1 80:9

**personally** 72:2 73:21,23 108:4

**personnel** 71:14,15,16 79:25 81:12

**persons** 41:20

**Phil** 9:13 14:21 97:21

**phrase** 76:1,6,7

**physically** 6:1,2

**place** 32:14 63:24 64:9 67:23 91:4 99:11

**placement** 17:12 20:14 21:11,23 22:6,10,20,22 24:15,1,5,9 26:10 29:14 31:2,12,21 32:24 33:5,12,15 34:1 35:6 36:9,15 38:13 45:24 46:6, 14,20,22 57:12,13,14 60:15 63:22,23, 24 64:8 69:3 70:20 72:19 79:14 83:10,19 85:4,8 86:4 88:20 89:9 90:1 92:12 93:2,6,13,22 94:9,16 96:15,16 97:6,7 98:16,22 105:22,24 108:7,10, 14,16

**placements** 25:2 45:17 68:11 79:17 95:7 96:2

**play** 17:19

**PM** 90:15

**pm@allianceg.com** 97:13

**PMS** 74:2

**point** 29:22 30:17 36:1 37:16 46:21 49:20,25 59:9,12 60:22 67:8 94:20, 23,24 99:18 108:6

**policies** 17:18 20:6,12

**policy** 20:4

**portfolio** 90:15

**portion** 107:24

**position** 52:3,7 88:18,21 89:7 97:23

**possession** 98:5

**possibility** 96:8

**possibly** 16:25

**post** 60:14

**posted** 82:2,15

**potential** 16:4 17:9 18:15 66:20

**potentially** 29:4

**practice** 13:17

**prep** 93:10 94:25

**preparation** 6:14 9:23 14:16 27:1 44:21 45:5 58:17,23 75:7 93:11

**prepare** 9:8,19

**prepared** 61:14

**preparing** 14:11,17 17:21 35:11 39:9 41:12 43:3

**presence** 15:1

**presented** 107:22

**press** 86:15

**presume** 41:7 54:14 55:20 73:23

**presuming** 54:17

**pretty** 52:20 66:3 69:4 75:19

**previous** 67:5

**previously** 14:20 71:22,24 72:13,18 75:13 78:15 91:18

**pricing** 22:7

**principal** 9:15 13:24 73:25

**prior** 10:15 11:15 17:12 22:7 36:19 37:21 38:3 43:23 48:10 52:6 54:15,16 57:12,15 72:16,22 83:19 107:8

**privilege** 107:1

**privy** 92:24 102:19

**problem** 27:23 103:9

**procedure** 20:5

**procedures** 17:18 20:6,12

**proceed** 61:12,16

**proceedings** 109:2

**process** 11:22 16:22 76:14,15 86:16

**produced** 62:7

**production** 45:4

**prohibited** 26:1,3 34:12,15

**project** 60:1 85:1,4 107:3

**prospective** 18:1

**prospectus** 68:10,13

**prospectuses** 68:4,15

**protected** 98:15 99:6,23 100:5,10 101:9,23 102:6 105:2

**provide** 19:24

**provided** 24:4 26:25 38:25 43:24 53:21 74:12

**provision** 51:14

**provisions** 47:22 49:12

**public** 12:10 13:2,3

**pull** 29:11 37:25 44:16 45:2 67:4,5,7

**pulled** 59:21

**purchase** 60:16 68:21,25 69:2 70:14,20 71:14 80:23 93:2 97:4 102:10

**purchaser** 41:6

**purchasers** 86:10,25

**purported** 100:3

**put** 23:24 65:17

## Q

**Queens** 12:4

**question** 13:23 14:11 18:9 20:11 21:8 24:6 25:20 26:16 27:9 28:9,16, 21 31:10 33:8 35:1 47:7,8 48:4 49:23 55:2,9 56:19 60:4 63:15 66:6 70:4 77:6 81:10 89:5,6 92:9 93:5,18 96:20 101:10 102:2 103:12 104:4 105:18

**questioning** 61:20,21

**questions** 5:4 7:7 61:19,24,25 70:1 75:15 104:17,18

**quickly** 71:1,5 105:16

**quiz** 69:9

**quote** 91:21

## R

**raise** 12:25

**raised** 17:9,11

**RE-EXAMINATION** 104:16

**reach** 71:14 73:10 74:13

**reached** 71:16 73:12

**read** 8:13,15 14:2 51:15 54:17 69:7 82:3,7,17,18 85:22 95:24 98:18 101:11,12 104:22 108:5

**reading** 87:2

**reads** 82:14 85:17 98:12

**reasonable** 56:12,21,24

**reasonableness** 56:17

**recall** 10:21 17:14 30:3 54:1 58:1
60:14,23 65:7 66:25 67:21 69:25
83:21,23 84:4 87:13,14,20,21,25
95:10 99:1,12 100:25 101:3,14
104:19,25 105:9 106:3 107:2,3,6

**recalled** 107:14,16

**recalls** 107:9

**receive** 97:25

**received** 63:10 87:6 103:4

**receiving** 89:2

**recess** 50:8 103:10

**recognize** 69:1 97:16

**recollection** 35:17 54:3 57:9,25
60:24 64:15,17 66:7 70:18 71:1 75:1
99:13 100:8,21 102:8,14

**record** 13:4 15:4 19:24 50:6 95:25
101:12

**redacted** 107:1

**refer** 13:1 24:8 42:12 81:6,15 108:14

**reference** 38:2 79:2 98:10

**referenced** 24:20 51:10

**references** 75:25

**referencing** 22:16 76:5 98:22

**referral** 64:4

**referrals** 12:23

**referred** 39:13 51:1 82:20 87:11
88:12 106:11 108:17

**referring** 6:9 23:3,13,15 44:13,14,15
50:18 51:13 81:13 82:8,21 83:7,23
86:19,20,23 87:11,19 98:2

**refers** 22:25 23:2

**reflects** 15:4

**refresh** 66:7 102:14

**registered** 67:2,9,25 68:1,2

**registration** 65:9,11,14 66:8,13,22
67:19,23 68:5 77:13 79:9,11 80:2

**regularly** 105:11

**related** 18:25 35:22 93:3 102:11

**relates** 34:2

**relationship** 90:7,12,25 95:6

**relative** 71:4

**releases** 86:15

**relevant** 34:1 35:9

**reliance** 31:19

**relied** 56:13,22

**relies** 35:24

**rely** 18:18 31:19 56:25

**remaining** 8:18 12:4

**remember** 7:12 40:7 57:9 108:5

**reminding** 40:13

**repeat** 21:8 26:16 33:8 47:7 48:4
55:2 90:9 92:8 95:22

**rephrase** 18:9 24:6 25:20 27:9 28:9
47:7 89:5,6 90:9 92:8,11 95:22
101:10

**replicated** 33:15

**report** 13:11,23

**reporter** 50:13 61:13 95:23

**reporting** 66:17

**represent** 5:6 53:9 61:23

**representation** 80:14

**representative** 6:18,25 7:3 9:4
58:25 88:22 107:23

**representatives** 57:18 58:3 60:18
84:1

**represented** 80:17

**request** 24:10 30:1 45:23 107:2,6
108:7,10

**requested** 101:12

**respect** 17:17 35:12 43:19 44:17
52:6

**respective** 18:4 81:16 86:7,8

**respond** 23:22 38:7 59:18 96:9

**responded** 15:15,25 28:25 36:1
54:20 55:14 91:7

**response** 15:16 24:9 69:25

**responsibilities** 18:20 20:25 22:3
24:23 32:7 35:7 45:16 46:11 91:4
95:15

**responsibility** 20:14,17,19,21 94:17

**rest** 82:9

**restate** 56:19 57:4 102:2

**Restating** 26:21

**restroom** 49:24

**result** 30:1 89:1

**reveal** 39:23 40:6,13,15

**review** 6:13 8:2 26:23 30:23 35:16
38:24 42:18 45:5 57:8,10,24 58:16,22
67:5,12 75:6 77:16,21 78:5 83:16
90:14 94:25 99:13 100:21

**reviewed** 9:9 14:11 17:21 20:6,11
30:17 33:25 44:21 48:14 71:20 83:18
95:1

**reviewing** 20:8

**Richard** 107:22

**Rick** 71:17,18,21,24 72:1,5 74:1
108:12

**role** 34:2 35:10

**roles** 12:16 13:19 18:20 22:2 24:22
32:6 35:7 46:11 91:4

**room** 5:15

**running** 11:23

## S

**S3** 65:14

**safe** 83:6

**sale** 67:20

**sales** 43:2 73:1

**Scott** 6:7,8 19:5 21:6,14,24 22:13
24:17 25:18 26:14 27:7 28:7 31:5
32:18 33:6,21 34:7,13 36:12,25 37:9,
23 38:10,22 39:25 43:20 44:7,19
46:2,17 48:2,24 51:23 52:10 54:24
58:6 61:10 69:16 76:23 77:2 78:13
80:12

**screen** 5:21,23 7:18 8:9 14:5 50:6
62:10 65:17 106:9,21

**screenshot** 65:22 66:4 68:14

**scroll** 30:8 39:16 50:19 52:17,24
54:6 62:21 63:5 75:18,22 77:15,16,17
79:6 84:13,20 107:23

**scrolled** 69:8

**search** 60:2,6 61:1

**SEC** 13:3 29:4 65:15,22,25 66:12,16

**secretary** 85:10

**section** 53:2,5,7,12,23 54:5

**securing** 17:3

**securities** 46:5 53:13 57:17 60:16, 19 64:11 66:21 67:19,20 68:1,21,25 69:1 70:13,20 71:13 76:12,14 80:23 86:3 93:2 96:16 97:4 98:12 101:1 102:10

**security** 70:12

**send** 30:5,12 41:22

**sending** 30:4 51:5 76:16 99:14

**sends** 77:23 79:8 85:15,19 91:20 106:19

**sense** 40:23 90:11

**sentence** 52:3,8 98:11,21

**separate** 44:2 68:4

**service** 60:5,8

**set** 23:17

**settled** 22:10

**settlement** 43:9,10,19 76:1,5,6,7,9, 11,15 78:4

**settling** 76:21

**Shah** 42:14 43:14 75:17,23 77:23 78:24 79:8

**Shah's** 77:11

**share** 7:18 98:25 106:8

**shares** 65:9,13 66:8 67:9 85:5 86:10, 13,17

**sharing** 8:9 50:6 106:21

**shed** 17:15

**Shilpi** 42:14 43:14,22 75:17 76:3 78:24

**short** 50:12

**shortly** 64:25 90:2 99:16

**show** 7:18 14:6 17:15 35:15 39:4 41:17 50:12 62:4 65:7,12,18 68:16 75:8,12 78:8,18 81:17 84:5 91:15 96:15 97:9 105:13 107:20

**showed** 6:14 78:16

**showing** 7:22 14:9 40:11 68:14,24 69:12,24 75:13,23 78:22 81:21 91:17 97:4,12 106:25

**shown** 18:13

**sight** 6:2

**sign** 20:8 31:18 69:18

**signature** 63:2 69:5,12,24 80:22 89:17

**signed** 21:1,11 22:6,22 23:4 25:1 26:2 31:23 34:16 36:20 37:2,19 38:14 46:7,15,24 47:16,20,24 48:7,14 51:6 55:6,8 63:7,12 65:1,8 66:16 67:1,10, 11 70:19,23,24 90:1

**signing** 38:3 47:12 49:10 54:16 57:13 60:14 71:13 80:23

**signs** 20:20 55:11

**similar** 74:1

**simple** 63:15

**simply** 66:6

**single** 80:8

**sit** 74:9

**sitting** 92:25

**situation** 14:1 19:2 81:14

**slower** 50:20

**small** 75:19

**so-called** 91:6

**solicit** 18:7 24:15 25:10,13,16,24 27:11 31:4,13 32:2,11,24 33:19 35:4, 18 38:17

**solicitation** 37:12

**solicitation-wise** 35:22

**solicited** 27:14 72:7,13

**soliciting** 26:3

**sort** 9:23

**source** 12:16,18

**speaking** 18:2 105:5

**specific** 20:10,18 23:8,12 24:19,20 26:10 30:3 60:24 81:14 103:22

**specifically** 17:14 22:2 24:22 31:18 34:5 35:14,23 36:18 45:17 46:7 47:1, 15,17 53:15 67:21,25 91:12 93:14 95:10 99:1,2 105:4,12 107:16

**specifics** 67:6

**speculate** 56:16 88:15

**speculation** 40:18 88:6,14

**spelled** 15:8 18:16 21:22 97:21

**spoke** 9:9 80:9,17

**spring** 10:24 11:1 13:10

**SPV** 28:3 40:8,14 41:22 45:8,15 57:20 70:9 83:2 86:24

**SRF** 5:14,22 9:13 103:1,2

**stamp** 62:7

**stand** 29:8

**stands** 19:25

**start** 11:3,14,19 42:21 67:13 104:23

**starting** 10:18

**starts** 67:12

**stated** 53:15

**statement** 65:9,12,14 66:8,13,23 67:19,23 68:5

**states** 15:20 52:4 53:11

**status** 27:19 66:17 90:4,6,10 94:10, 18,21

**stay** 18:14 19:3 49:5 63:3

**step** 17:24 86:12,15

**stick** 45:20 47:13

**stock** 42:22 65:10,13 66:9

**stop** 8:9 50:6

**Street** 74:2

**strictly** 91:2

**string** 42:20 106:3

**structures** 73:8

**subject** 7:14 43:8 52:7 79:4 82:23 85:1 107:1

**subjects** 63:1

**subpoena** 7:23 59:18

**subsection** 53:24

**subsequent** 79:17

**substantiated** 55:1

**substantive** 42:22

**sufficient** 18:15 19:3

**suggest** 75:3

**suit** 99:17

**sum** 76:12

**summarizing** 108:5

**summary** 41:20

**Sunday** 15:16 38:7,12 49:15 51:12

**supersede** 54:17

**superseded** 36:20,24 38:4 47:25
49:1 51:12,19 54:23 55:5

**supersedes** 20:23,24 49:5 52:6 54:8

**superseding** 55:16

**supervisor** 13:6,7,8,13,19

**supposed** 16:4 37:4

**supposedly** 80:10

**switch** 106:21

**switching** 105:19

**sworn** 5:2

**symbol** 42:22

**syndicate** 86:2

---

**T**

**table** 6:5

**tail** 15:21 16:11,12,13,14,17,19,21,25
17:3,9,12,17,19 18:1,6,7,13,23 19:4
20:5,7,9,15 21:5 22:4 23:17 24:4,10,
15,16 25:6,9,10,17 31:3,4,11 32:2,8,
16 33:4,14,20 34:5 35:13 36:3 37:7
38:18 45:24 47:3,11 48:10,21 49:6
51:13 53:2,5,8,9,14 54:4 57:3,7 60:11
61:6,21 98:13 100:3

**tails** 54:2

**takes** 97:1

**talk** 9:7,11,21 10:2 16:13 30:15,20
39:8 41:11 42:16 43:3 45:22

**talked** 9:19 14:15,18

**talking** 5:9 6:22

**team** 12:17,22 13:7,15 26:9 40:12
48:14 57:17 59:20,21,22 60:8,19
67:12,13 73:1 84:2 86:2,6 91:3 92:24,
25 99:8 100:1

**Tech** 28:2 42:5,8,15 43:18 44:1,3,5,9,
24 57:20 58:4,11 59:1 60:16,20 69:24
70:1,5 77:7,8 78:2 79:3,10,11,24
80:10,17,24 81:6,12 82:19,24 83:2,7,
9,13,20 86:19,23,24 87:2,11,15 88:2
89:14,17 90:7,12,21,25 92:4,15 93:8,
20 94:21 95:8,17 96:4 107:25

**ten** 70:18 71:9,10

**ten-day** 71:12 73:11 74:14

**tentative** 55:15

**term** 48:18 49:1 74:6 87:18 92:19

103:13,23

**terms** 17:1 18:2 20:3,24 21:3 23:18
33:25 34:1,4 37:3,6 38:1,15 43:9,10,
19 46:11,25 47:14 49:9,12 50:15
54:18 55:7,15 56:25 59:22 60:2 76:1,
5,7 82:23

**testified** 5:2 6:24 7:9 51:12 58:25

**testifies** 108:4

**testify** 5:7 6:17 8:5

**testifying** 7:2,3 69:25

**testimony** 7:6 24:13 25:8 31:1,8,11
34:8 50:18 59:2,4 83:24 108:9,12,21,
23

**text** 9:22

**thereof** 49:9

**things** 9:23 18:11

**thinking** 40:19

**Thomas** 13:7,8 61:23 70:4 99:20

**time** 10:24 12:8 16:8 30:17,19 46:20,
23 47:24 55:11,14 59:13 64:16 65:8,
25 67:22 72:15,21 74:5 76:13 87:25
92:11 93:6,22 94:8,16,23,24 96:13
99:19 101:6 103:1 106:15 107:5

**times** 17:2,5,6,8 72:24

**timing** 50:5

**title** 10:7,10,12,15,18,24

**today** 6:15 9:8 14:12 35:12 39:18
41:12 43:4 74:9 82:2,16

**told** 37:7 51:18 54:8

**Tom** 104:15

**top** 52:23 63:6 66:1 78:6 81:22 85:12
106:18

**topics** 8:2,6 50:5

**torch** 104:13

**touch** 79:24

**track** 15:8 51:2

**trading** 67:9

**transaction** 19:1,12,13 22:16 23:9
26:8 29:23 35:23 39:14,15 41:6 57:16
59:24 64:11 68:13 71:9 73:6 76:11,22
81:15 86:5,13,25 89:23 90:17 93:3
102:11 105:5 108:2

**transactions** 22:17 23:10 24:23
34:2 59:25 71:5,7,8 98:13

**transcript** 15:4 107:21

**transcripts** 14:2

**true** 76:19 80:8 94:13

**truth** 100:19

**truthful** 59:2 108:10,13,18

**type** 66:12

**typed** 43:11

**typical** 53:20

**typically** 53:18 67:12 78:4

---

**U**

**U-N-I-C-O-R-P** 11:16

**Uh-huh** 40:25 48:8 64:12 75:10
84:18 98:8 107:10

**unaware** 60:9

**unclear** 51:7 68:15

**understand** 6:17 7:2,6 16:14 29:2
39:11 48:15,17 56:6 67:8 73:13,24
76:10 79:23 81:10 87:10,17 88:2,3,
10,11 91:12 103:14

**understanding** 8:16,20,23 16:19
29:4 35:16 39:22 54:22 58:3 59:22
69:7 74:10,11 80:1 83:13 86:11 87:1,
4 92:3,14 93:7,17,19 94:3,14 96:11

**understands** 16:17 48:12

**understood** 7:5 49:11 67:22 72:5
76:20 89:1 95:16 96:12

**undertake** 45:13

**Unicore** 11:15,16,18,23

**unsigned** 63:8

**unsuccessful** 11:21

**unsure** 43:12 51:25 59:13

**untruthful** 59:2

---

**V**

**vehicle** 7:15 83:14

**Venezia** 97:17,22

**venture** 11:14,18

**verbally** 38:2

**verbatim** 35:16

**vice-president** 10:8

**view**  66:1 92:3

**VP**  11:2

## W

**wall**  8:25 74:2

**wanted**  39:12

**warrant**  40:12 42:23 79:3

**warrants**  39:15,17,19 41:4,5 73:5 77:12 79:9 80:2,3,6

**website**  5:22 65:23,25 66:16

**week**  71:9

**weeks**  65:2

**William**  5:5 48:4

**winter**  10:23 11:1 13:8,10

**wire**  39:7 41:22,23 85:18 86:7 106:19

**wire/posts**  85:19

**wiring**  82:1,15,19,22 86:16

**word**  28:21 29:1 76:6 86:18

**word-for-word**  103:24

**words**  65:2

**work**  11:3,5,12 13:4,21 65:24 66:14 68:12 74:21 76:8

**worked**  13:14 27:20 72:5 73:13 80:11

**worry**  69:10

**writing**  40:20 100:12

**written**  20:4 38:4

**wrong**  43:24 77:25 100:9

**wrote**  76:4

**WSP**  19:24

**WSPS**  17:20

**Wu**  86:3

## Y

**year**  7:11,13 11:11 12:3

**years**  7:12 10:11,21 11:25 12:4 65:14 72:16,22

**York**  5:12

## Z

**Zach**  39:4,8,12 40:22 41:1 42:13,15, 16 43:23 76:3 82:21 86:2 106:12 107:2,9,14,16

**Zach's**  87:16

**Zachary**  10:2,4 43:13,15

**zoom**  52:21 69:13,15,20 82:4 84:10