THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FT GLOBAL CAPITAL, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:21-cv-00594-JPB |
| FUTURE FINTECH GROUP, INC., | ) ) ) |
| Defendant. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

Defendant Future FinTech Group, Inc. (the "Company") files its reply in support of its motion for summary judgment on all causes of action and claims asserted by Plaintiff FT Global Capital, Inc. ("FT Global").

**SUMMARY IN REPLY**

The Company has always stayed true to the plain language of the Placement Agent Agreement ("PAA") with FT Global. Although FT Global's response is replete with complaints about the Company circumventing the PAA, the reality is FT Global is attempting to expand the PAA far beyond its plain language to encompass responsibilities and burdens the parties *never* agreed to.

The PAA's plain language shows what the parties agreed to. The parties agreed the PAA's Tail List was to be limited to "such investors" FT Global

1

introduced or "wall-crossed" to the Company during the PAA's term. Yet, FT Global drafted a Tail List that included numerous named entities who were not introduced or wall-crossed to the Company – and also a new category of "affiliates." The law varies considerably on defining "investor" and "affiliate." An "investor" is a single entity; whereas, Georgia law defines "affiliate" in at least 20 ways.

FT Global's theory of recovery depends on the Court accepting its unilateral expansion of the PAA to encompass "affiliates." The PAA was FT Global's standard placement agent agreement it provided to the Company. The PAA was unilaterally drafted by FT Global and, if FT Global wanted the Tail List to expand to "affiliates" in the same manner it expressly referenced "affiliates" in the PAA in its own self-interest as the Placement Agent, it could have written it that way. Instead, FT Global used "affiliates" in *five other places* in the PAA without referencing the term with regard to "investors" allegedly "wall-crossed" or "introduced" to the Company **or** the "Tail List."

Because the PAA does not permit FT Global's unilateral attempted expansion, questions of who was introduced and/or wall-crossed to the Company are irrelevant. All the Court needs to do is see that investors A&T SPV and Tech Opportunities are not named on the Tail List FT Global sent to the Company after the expiration of the PAA. The Court can stop there and grant summary judgment. FT Global's position

that the Court should take "investors" to mean "affiliates" because it now thinks the PAA should have been written that way essentially asks the Court to rewrite the PAA while rendering other references to "affiliates" in the PAA superfluous. This contract dispute should be resolved on summary judgment by reading the PAA as it is written, using the words it uses, not as FT Global wishes it had written it using words that do not appear within its plain language.

## MEMORANDUM OF LAW IN SUPPORT

### I. THERE ARE NO ISSUES OF FACT: A&T SPV AND TECH OPPORTUNTIIES WERE NOT ON THE TAIL LIST

**A. The Court can interpret the PAA as a matter of law.**

The PAA is an unambiguous contract. The Court can interpret the PAA as a matter of law and decide the scope of a valid Tail List. The Tail List was to be "a written list of such investors Placement Agent had introduced or 'wall-crossed' to the Company during the Term." (Ex. C at § 1(C)). The PAA does not state that the Tail List can include "affiliates" of "such investors" or some other broad category under a common "fund manager."  No fact issues prevent the Court from interpreting the PAA to decide that the Tail List was limited to "a written list of such investors" whom FT Global introduced or wall-crossed to the Company during the PAA's term.

In Georgia, the enforcement of unambiguous terms in a contract "presents an issue of law properly decided by summary judgment." *Congress Fin. Corp. v. Commercial Technology*, 910 F. Supp. 637, 641 (N.D. Ga. 1995).

> The Georgia courts have explained that the process of contract construction . . . is composed of three steps. The court must first determine whether an ambiguity exists and then attempt to resolve the ambiguity using Georgia's rules of contract construction. Contracts, even when ambiguous, are to be construed by the court and no jury question is presented unless after application of applicable rules of construction an ambiguity remains. The third step in the process – jury determination of an ambiguous contract term – is never reached if application of the rules of construction resolves any ambiguity within the contract. *Id.* (internal citations and quotations omitted).

Here, only the first step is needed: there is no ambiguity as to the PAA's Tail List allowance. The Tail List used in the PAA was clearly limited to "such investors."

### B. The plain meaning of "investor" is narrower than "affiliates."

"'Investor' is defined as '[a] buyer of a security or other property who seeks to profit from it without exhausting the principal' or '[b]roadly, a person who spends money with an expectation of earning a profit.'" *Centerboard Secs., LLC v. Benefuel, Inc.*, No. 2017 U.S. Dist. LEXIS 7985, *23 (N.D. Tex. Jan. 20, 2017) (quoting Investor, Black's Law Dictionary 903 (9th ed. 2009)). The term "investor" "clearly refers to a ***single entity***." *Id.* at *23 (emphasis added).

In an analogous case, *Centerboard Secs., LLC* involved a dispute over a fee (called a "success fee") to be paid for securing investments. Benefuel hired

4

Centerboard to find investors. *Centerboard Secs., LLC*, 2017 U.S. Dist. LEXIS 7985, at *22. If "current investors" invested, however, the success fee was calculated only on the increase in their *pro rata* equity ownership. *Id.* at *4. An entity who had already invested in Benefuel had an affiliated entity in the same investing family who newly invested. The parties disputed whether the affiliated entity was a "current investor" given the alleged affiliation between the existing investor and new investor. *Id.* at **23-24. Benefuel wanted the new investor to be considered a "current investor" so it could pay a smaller success fee. The court interpreted "investor" to decide if it includes "affiliates" of an existing investor. *See id.* at *24.

The court rejected Benefuel's definition of "investor," which sought what FT Global seeks here: to include investments through "any vehicle chosen to invest" "whether directly or indirectly." *Id.* at *24. The Court decided an "investor" and its "affiliates" are not the same and melding the two could lead to absurd results given the expansion potentially wrought by referring to "affiliates":

> Benefuel contends that the pro rata ownership clause should apply to Flint Hills and its affiliate FHR – implying that they are a single entity. In order to succeed, Benefuel must show that its interpretation is the superior interpretation.
>
> While it may be true that Flint Hills and FHR are part of the 'Koch family' of companies, Benefuel has not sufficiently shown that the court should consider them the same entity – and thus 'current investors' – under the agreement. The logical conclusion of Benefuel's argument is that the court should consider Koch, and all

5

> Koch-backed entities, as 'current investors' under the agreement simply because one entity, Flint Hills, had previously invested. Because there are an unknown number of Koch-affiliated entities, Benefuel's proposed definition would lead to absurd results and expand the definition of 'current investor' well beyond its plain meaning.

*Id.* at \*25. The Court reasoned that:

> Benefuel's proposed definition expands the definition of 'current investor' beyond its plain meaning through the phrases 'directly or indirectly' and 'any vehicle chosen.' Benefuel's definition seemingly opens the door to including entities that were not then 'existing.' Moreover, Benefuel seeks to expand the term 'investor' beyond a single entity, when the definition clearly refers to a single entity. *Id.* at \*24.

FT Global's interpretation would likewise "lead to absurd results and expand the definition" of "investor" "well beyond its plain meaning."

This conclusion to treat "investor" different than "affiliate" is bolstered by the definitional differences between "investor" and "affiliate." "[A]ffiliate" is "defined over 20 times in the Georgia Code, and the definitions vary." *See Salinas v. Atlanta Gas Light Company*, 347 Ga. App. 480, 483-484 (Ga. App. 2018) (citing O.C.G.A. §§ "7-1-4 (a corporation or similar organization is an 'affiliate' of a financial institution if, inter alia, the financial institution controls the election of a majority of directors, trustees, or other persons exercising similar functions at the corporation, or where the financial institution or its shareholders own or control 50 percent of the shares of the corporation, or where the corporation owns or controls 50 percent of

6

the financial institution); 14-2-1110 (1) ('Affiliate' means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a specified person.'); 18-2-71 (1) (B) ('Affiliate' has multiple definitions, including '[a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor[.]"). Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Black's Law Dictionary (10th ed. 2014) (quoted in *Salinas*, 347 Ga. App. at 484); *see also MagiCon, LLC v. Weatherford International*, No. 4:08-CV-03636, 2009 U. S. Dist. LEXIS 126503, at **43-46 (S.D. Tex. Aug. 14, 2009) (citing five dictionaries' definitions of "affiliate"). Ultimately, "there is no one definition of 'affiliates.'" *Omnicom Group v. 880 West Long Lake Assocs.*, 504 F. Appx. 487, 491 (6th Cir. 2012).

As the foregoing shows, while "investor" means a single entity, "affiliates" means a wide array of things. That the PAA's Tail List allowance used "investors" means the Tail List is limited to "investors," not the multi-definitional concept of "affiliates." The Court should follow the words used in the PAA and not words that

were *not* used. "The court cannot ignore the plain language of the agreement and cannot add words that do not appear on the face of the agreement." *Centerboard Secs., LLC*, 2017 U.S. Dist. LEXIS 7985, at *27.

Because FT Global's interpretation cannot be reconciled with the plain meaning of "investor," the term "investor" is not subject to two or more reasonable interpretations. "Because Benefuel's interpretation cannot be reconciled with its plain meaning, the term 'current investor' is not subject to two or more reasonable interpretations." *Id.* at *24. "Thus, the term 'current investor' is not ambiguous and parol evidence cannot be considered." *Id.* Likewise, the term "investor" is not ambiguous and parol evidence is not necessary for the Court to interpret whether the PAA permits the expansion of "affiliates" in the Tail List when such explanation was not part of the PAA's use of "investors."

### C. FT Global included "affiliates" elsewhere in the PAA, but not with regard to the Tail List.

FT Global acknowledges it used "affiliates" elsewhere in the PAA. (Resp. at 15 and n.6). *Centerboard Secs., LLC*, is instructive on this point. It stands for the conclusion that if FT Global wanted the PAA to extend to affiliations, it could have written that into the PAA.

The PAA was FT Global's standard services contract, written with FT Global's letterhead and addressed to the Company's CEO in the form of an

engagement letter, or one supplied by its counsel. (Ex. H at 14:4-15:17). FT Global signed the PAA and sent it to the Company to be "Accepted and Agreed to as of the date first written above." The PAA reveals FT Global clearly knew how and when to use "affiliates" where it wanted the PAA's representations and responsibilities to extend to "affiliates." For instance, "affiliates" was used in the following places:

> (D)  None of the Company or the Company's directors, executive officers or **affiliates** is a 'bad actor' as defined in Rule 506(d) of the Securities Act.
>
> […]
>
> The Company agrees to indemnity and hold harmless the Placement Agent and **its affiliates** […]
>
> > […] the Placement Agent or any of **its affiliates** […]
> >
> > […] the Company or **its respective affiliates** […]
> >
> > […] the Company or **its respective affiliates** […]

(Doc. 1 – Ex. A to Compl. at § 10) (emphasis added).  FT Global could have drafted its PAA to extend the Tail List entities to include "affiliates," but it did not.

In *Centerboard*, "[t]he word affiliates is used elsewhere in the agreement but does not appear in the pro rata ownership clause." *Centerboard Secs., LLC*, 2017 U.S. Dist. LEXIS 7985, at *26-27.

> As they did to other clauses in the agreement, the parties could have added the term affiliates to the provision describing current investors if they intended that provision to apply to affiliates of current investors. Moreover, Benefuel could have specifically required that the agreement

note that all Koch-affiliated entities are deemed 'current investors.' However, under agreement as finally executed, the only reasonable interpretation is that the parties did not intend 'current investor' to include affiliates of Flint Hills. *Centerboard Secs., LLC*, 2017 U.S. Dist. LEXIS 7985, at **27-28.

FT Global admitted that the PAA's Tail List provision did not use the word "affiliates." (Ex. H at 41:14-42:4). FT Global testified that the use of "affiliates" was based on nothing more than its own assumption: "Many of our investors have affiliate. When we introduce Future Fintech to investor, we *assume* that to mean the main name but also the group and the affiliates." (Ex. H at 41:10-14). FT Global's entire case is based on an unwritten, unagreed, unilateral *assumption*. FT Global's self-serving *assumption* is not the Company's fault.[1] This Court should conclude as the Court concluded in *Centerboard*, that "under [the] agreement as finally executed, the only reasonable interpretation is that the parties did not intend ['investors'] to

---

[1] FT Global argues it was incumbent upon the Company to "object" to FT Global's unilateral use of "affiliates" in the Tail List sent to the Company after the PAA expired. (Resp. at 14). FT Global's cited authority traces back to Civil Code 1910, § 4267, which has been recodified at O.C.G.A. § 13-2-4. That section applies only when a contract is ambiguous. *See, e.g., Holloway v. Brown*, 171 Ga. 481, 483 (Ga. 1930) ("This section, however, is not applicable unless the contract is ambiguous."). The PAA is unambiguous. But even if that section applied, FT Global's reliance is misplaced. FT Global cannot claim to have ascribed a controlling meaning to "affiliates" during negotiations when "affiliates" never was part of the PAA's Tail List allowance. FT Global's post-expiration Tail List does not bear on the negotiation of the PAA months earlier.

10

include affiliates of" any other investment entity." *See Centerboard Secs., LLC*, 2017 U.S. Dist. LEXIS 7985, at *28.

Furthermore, adopting FT Global's position would render the actual references to "affiliates" superfluous. Under Georgia law, a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner giving effect to all the contractual terms. Courts must favor a construction that upholds the contract in whole and in every part and look at the whole contract in construing any part. Courts should not render any language in a contract as superfluous, and any construction that renders portions of the contract language meaningless should be avoided." *Whitesell Corp. v. Electrolux Home Prods.*, No. CV 103-050, 2020 U.S. Dist. LEXIS 165837, at *12 (S.D. Ga. Sep. 10, 2020). Here, the term "affiliates" is expressly referenced in the PAA multiple times. A finding that the term "such investors" inherently includes the term "affiliates" would render the actual references to the affiliates within the PAA unnecessary. "To do so would contravene…basic contract principles because it would render other portions of the parties' agreements meaningless." *Id.* at 13.

**D. The Court should reject FT Global's new "investment manager" theory.**

In its response brief, FT Global introduces a new "investment manager" or "fund manager" theory to avoid summary judgment. (Resp. at 14-17). FT Global

wants to convince the Court to ignore the significant definitional distinctions between "investors" and "affiliate," and ignore FT Global's own selective use of "affiliates" throughout the PAA, to fuse all affiliated entities under one company solely based on purported common ownership or decision-making by an "investment manager." This theory fails under the definitional approach discussed above, as "affiliates" is distinctly different from "investor." It also fails under legal scrutiny.

FT Global argues that a "fund manager is the sole decision-maker and allocates any shares among the funds that it owns and manages." (Resp. at 14). No case law supports FT Global's fusion under an "investment manager" theory that the Court needs to disregard the entity independence of A&T SPV and Tech Opportunities, opting instead to treat them the same "investor" because they operate, allegedly, under the same "investment manager." Having a common "investment manager" does not make them the same entities as specifically named on the Tail List.

Anson is an entity. Hudson Bay is an entity. A&T SPV is its own entity, as is Tech Opportunities, all incorporated and existing as separate legal entities. Georgia law takes corporate independence seriously:

> Georgia still recognizes corporate identity as separate from that of its principals or owners, so long as the corporate forms are maintained. The law of corporations is founded on the legal principle that each corporation is a separate entity, distinct and apart from its stockholders.

> We have long recognized that great caution should be exercised by the court in disregarding the corporate entity. *Yukon Ptnrs v. Lodge Keeper Group*, 572 S.E.2d 647, 651 (Ga. App. 2002).

FT Global has done nothing to eradicate the corporate separateness of A&T SPV or Tech Opportunities. An "investor" "clearly refers to a single entity," and this concept is not eroded by the same investment manager.

Nothing changes the fact the Court should interpret the PAA to conclude that when it says "investors" it means "investors," not "investor and its affiliates." A&T SPV was an "investor." Anson was not. Tech Opportunities was an "investor." Hudson Bay was not. Anson and Hudson Bay were on the Tail List FT Global sent after the expiration of the PAA. A&T SPV and Tech Opportunities were not. Affiliation and "investment manager" concepts are irrelevant to the Court's interpretation of the unambiguous plain language of the PAA. They are antithetical to the plain language used in the PAA's Tail List allowance.

The Court has before it all it needs to interpret the PAA to determine that the PAA did not authorize FT Global to expand identified "investors" to unknown and unidentified "affiliates" and then claim a fee for any investment by "affiliates." Had it wanted its own document to give it that right and force the Company to have greater responsibility and burden of ferreting out who would qualify as an "affiliate," it could have written the PAA in that fashion and the parties would have negotiated

13

whether that was acceptable and how to address that request. None of that happened. FT Global just "*assume[d]*" it. FT Global cannot now complain it wanted a broader Tail List than its own unambiguous contract allows.

## II. NO ISSUES OF FACT AS TO WHETHER FT GLOBAL INTRODUCED AND/OR WALL-CROSSED A&T SPV AND TECH OPPORTUNITIES

It is irrelevant whether FT Global introduced or wall-crossed the alleged "affiliates" A&T SPV and Tech Opportunities because "affiliates" were not to be included in the Tail List FT Global sent to the Company. If the Court were to indulge this argument, it is apparent FT Global wants the Court to read "introduced" backward from its plain meaning.

The PAA's Tail List allowance requires that an "investor" be "introduced or 'wall-crossed' to the Company during the Term." (Doc. 1 – Ex. A to Compl. at § 10). The introduction must be "to the Company." FT Global would have the concept of "introduced" mean that it alone can "introduce" the identity of the Company to anyone it chooses, and thus there has been an "introduction" to the Company. This is an absurd reading of the PAA. Even the case authority cited required that the "purchaser [be] led *to* the principal." (Resp. at 19) (emphasis added). FT Global has absolutely no evidence the Company was ever introduced to A&T SPV or Tech Opportunities by FT Global because it simply did not happen.

14

## III. NO ISSUES OF FACT AS TO GOOD FAITH AND FAIR DEALING

FT Global's claim that the Company knew of A&T SPV's and Tech Opportunities' involvement before the first investment closed misrepresents facts. (Resp. at 23). AGP testified that its employee sent an email to the Company with those entity names and recalled that email within seconds of sending it. (Doc. 38 at 106:25-107:13). FT Global's theory was strictly based on equating "investors" with "affiliates." No real argument or evidence is offered to show summary judgment should not be granted as to this claim. *See OnBrand Media v. Codex Consulting, Inc.*, 301 Ga. App. 141, 147, 687 S.E.2d 168 (2009) (no independent liability).

## CONCLUSION

Future FinTech Group, Inc. respectfully requests that the Court grant summary judgment and dismiss FT Global Capital, Inc.'s Complaint in its entirety.

Respectfully submitted,

FISHERBROYLES, LLP

*/s/ Diem N. Kaelber*
Diem N. Kaelber
Georgia Bar No. 0087155
(Also barred in California, Florida, and Ohio)

*Attorneys for Defendant*
*Future FinTech Group, Inc.*

Mail: 21081 Canyon View Drive
Saratoga, CA 95070
(408) 898-3170 (Office)
(866) 414-5083 (Facsimile)
diem.kaelber@fisherbroyles.com

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| FT GLOBAL CAPITAL, INC., | ) | |
| | ) | |
| FT Global, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:21-cv-00594-JPB |
| | ) | |
| FUTURE FINTECH GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **LR 7.1(D) CERTIFICATE OF FONT COMPLIANCE**

I hereby certify that the foregoing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C), Northern District of Georgia, specifically Times New Roman 14 point.

*/s/ Diem N. Kaelber*
Diem N. Kaelber

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing *Defendant's Reply in Support of Its Motion for Summary Judgment and Memorandum of Law in Support* was filed electronically on November 16, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system upon the following counsel of record:

>Eric Lang
>The Lang Legal Group, LLC
>2566 Shallowford Road, Suite 104, No. 230
>Atlanta, Georgia 30345
>
>Thomas J. Fleming
>Jacqueline Y. Ma
>Olshan Frome Wolosky LLP
>1325 Avenue of the Americas
>New York, New York 10019
>
>Matthew H. Schwartz
>Schwartz Law Center, LLC
>2985 Gordy Parkway
>Suite 550
>Marietta, Georgia 30066

Respectfully submitted,

                              FISHERBROYLES, LLP

                              */s/ Diem N. Kaelber*
                              Diem N. Kaelber
                              Georgia Bar No. 0087155
                              (Also barred in California, Florida, and Ohio)

                              *Attorneys for Future FinTech*
                              *Future FinTech Group, Inc.*

Mail: 21081 Canyon View Drive
Saratoga, CA 95070
(408) 898-3170 (Office)
(866) 414-5083 (Facsimile)
diem.kaelber@fisherbroyles.com