Exhibit H

# In the Matter Of:

*FT GLOBAL CAPITAL vs*

*FUTURE FINTECH GROUP*

*PATRICK KO*

*August 03, 2022*

1

1      THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3   FT GLOBAL          :
    CAPITAL, INC.,     :
4       Plaintiff,   :
     vs.              :
5   FUTURE FINTECH    : NO.
    GROUP, INC.,      : 1:21-cv-00594-JPB
6       Defendant.  :

7              - - -

8           WITNESS:  PATRICK KO

9              - - -

10           August 3, 2022

11             - - -

12       Zoom deposition taken pursuant to

13   notice, beginning at approximately 10:05

14   a.m., before Kathryn Rose, Court

15   Reporter-Notary Public, there being present:

16             - - -

17

18

19

20

21

22

23

24

2

1

2

APPEARANCES

3

OLSHAN FROME WOLOSKY, LLP

4   BY:  THOMAS FLEMING, ESQUIRE
        JACQUELINE MA, ESQUIRE

5        ALEC ORUDJEV, ESQUIRE
    1325 Avenue of the Americas

6   New York, New York 10019
    (212)451-2300

7   Tfleming@olshanlaw.com
    Jma@olshanlaw.com

8   Representing the Plaintiff

9   FISHER BROYLES
    BY:  WILLIAM AKINS, ESQUIRE

10        DIEM KAELBER, ESQUIRE
    Highland Park Place

11   4514 Cole Avenue, Suite 600
    Dallas Texas, 75205

12   (214)924-9504
    William.akin@fisherbroyles.com

13   Representing the Defendant

14

15

16

17

18

19

20

21

22

23

24

1            - - -

2            I N D E X

3            - - -

4    WITNESS        EXAMINATION        PAGE

5    PATRICK KO

6      By Mr. Akins              7

7

8

9            - - -

10           E X H I B I T S

11           - - -

12

    NUMBER   DESCRIPTION              PAGE
13                          MARKED

14    Ko-1     Notice of Deposition    8

15    Ko-2     Signed FTFT Engagement   13
             Letter
16
    Ko-3     Tail List                39
17
    Ko-4     Ko E-mail Regarding     43
18           Tail List

19    Ko-5     Ko E-mails with Hudson   57
             Bay
20
    Ko-6     Ko E-mail to Hudson     60
21           Bay

22    Ko-7     Sample Term Sheet       60

23    Ko-8     Ko E-mail deal          65
             abandoned

24

4

1
NUMBER   DESCRIPTION            PAGE
2                          MARKED

3   Ko-9     Cease and Desist        70
            Letter
4
    Ko-10    Carmelo Cataudella      80
5         E-Mail

6   Ko-11    Amin Nathoo E-mail      83

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1    LITIGATION SUPPORT INDEX

2

3  Direction To Witness Not To Answer

4

5       (None)

6

7
  Request For Production Of Documents
8

9
       (None)
10

11

12      Stipulations

13

14      (None)

15

16
     Questions Marked
17

18
      (None)
19

20

21

22

23

24

6

1          - - -

2          THE VIDEOGRAPHER:  We are now on

3    the record.  Today's date is August 3, 2022,

4    and the time is 10:05 a.m., eastern time.

5    This is the video deposition of Patrick Ko in

6    the matter of FT Global Capital, Inc., versus

7    Future Fintech Group, Inc., filed in the

8    United States District Court for the Northern

9    District of Georgia, Atlanta Division.  Case

10   No. 1:21-CV-00594-JPB.

11          This deposition is taking place

12   via web videoconference with all participants

13   attending remotely.  My name is Adriel

14   Olvera.  I'm the videographer representing

15   Lexitas.

16          Counsel on the conference, please

17   identify yourselves and state whom you

18   represent, beginning with the questioning

19   attorney.

20          MR. AKINS:  William Akins on

21   behalf of the defendant Future Fintech.

22          MR. FLEMING:  Thomas Fleming on

23   behalf of the plaintiff and also with me is

24   my colleague Jacqueline Ma, also representing

1   plaintiff, and also with me is Alec Orudjev,

2   who's in-house counsel for the plaintiff.

3          THE VIDEOGRAPHER:  Anyone else?

4          MS. KAELBER:  Also present is

5   Diem Kaelber on behalf of the defendant.

6          THE VIDEOGRAPHER:  The court

7   reporter today is Kathryn Rose, representing

8   Lexitas.  The court reporter will now

9   administer the oath.

10              - - -

11          PATRICK KO, after having been duly

12   sworn, was examined and testified as

13   follows...

14              - - -

15              EXAMINATION

16              - - -

17   BY MR. AKINS:

18   Q.    Good morning, Mr. Ko.  My name is

19   william Akins.  I represent the defendant

20   Future Fintech.

21       Can you hear me okay?

22   A.    Yes, good morning, Mr. Akin.

23       How are you?

24   Q.    I'm good.  How are you, sir?

8

1   A.    I am losing my voice, but I'm okay.

2   Q.    Well, if you need to take a break at

3   any point today to refresh your voice, let me

4   know.

5   A.    Sure, thank you.

6   Q.    I'm going to share my screen just to

7   show the deposition notice for today's

8   deposition.  This is what I'm marking as

9   Exhibit-1.  It's the deposition notice for

10  today's deposition.

11        Are you appearing today for your

12  deposition pursuant to this deposition

13  notice?

14  A.    Yes.

15  Q.    Where are you physically located right

16  now?

17  A.    I'm in Miami Beach.

18  Q.    Does FT Global Capital, Inc., have an

19  office in Miami Beach?

20  A.    Yes, we do.

21  Q.    You understand that you're here today

22  to testify as a representative on behalf of

23  FT Global Capital, Inc.?

24  A.    Yes.

1  Q.    Is there anyone else in the room with

2  you right now?

3  A.    No.

4  Q.    What did you do to prepare for your

5  deposition today?

6  A.    You mean today?

7  Q.    Thank you.  What did you do to prepare

8  for your deposition?

9  A.    My attorneys and our in-house counsel

10  has spent time, walk me through the process

11  and the case.  We've had phone calls and

12  meetings.

13  Q.    Did you review any written materials

14  to prepare for your deposition today?

15  A.    Yes, I did.

16  Q.    Do you have any written materials with

17  you in the room?

18  A.    None I can access.

19  Q.    Do you have any method of

20  communicating with either FT Global's general

21  counsel or your counsel in this litigation in

22  front of you, such as via text message or

23  direct messages?

24  A.    No.

10

1    Q.    Can you agree that you will not

2    communicate independently with your counsel

3    throughout this deposition while I'm

4    questioning?

5    A.    Yes.  Thank you.  Yes, during the

6    questioning, I will not communicate with my

7    counsel.

8    Q.    Thank you.  Have you ever testified

9    before?

10   A.    Yes, sir, I probably did.

11   Q.    When approximately did you testify?

12   A.    That must be probably at least 10-15

13   years ago.

14   Q.    Was that in the United States or

15   another country?

16   A.    In US.

17   Q.    What was the context in which you gave

18   a deposition?  Was it in a deposition or a

19   trial?

20   A.    I don't believe it was in trial.  I

21   think it was part of the inquiry from the

22   Security Exchange Commission.

23   Q.    Were you being deposed by an attorney

24   from the Security Exchange Commission?

11

1   A.    Yes.

2   Q.    What was that deposition regarding,

3   the subject matter?

4   A.    I believe it's related to a public

5   trading company called China Energy Savings,

6   I believe.

7   Q.    What was that issue in that dispute?

8   A.    They were just investigating the

9   company.  We were witness to it.

10  Q.    Were you with FT Global at that point?

11  A.    That, I'm not sure.  I have to check.

12  Q.    What is your current position at FT

13  Global?

14  A.    I'm the president of FT Global

15  Capital.

16  Q.    How long has FT Global Capiital been

17  in business?

18  A.    I think FT Global incorporated in 2006

19  and we applied to be a registered

20  broker-dealer in 2007.

21  Q.    How long have you been the president

22  of FT Global?

23  A.    Since inception.

24  Q.    Does FT stand for anything?

12

1   A.    FT stands for First Trust.

2   Q.    Stands for what, sir?

3   A.    First Trust.

4   Q.    First Trust, okay.

5         Was FT Global ever called First Trust

6   Global?

7   A.    No.

8   Q.    How many employees does FT Global have

9   currently?

10   A.    Two.

11   Q.    You, I assume, and one other?

12   A.    Yes, our general counsel.

13   Q.    How many employees did FT Global have

14   in 2020?

15   A.    One.

16   Q.    Was there ever anybody by the name

17   of -- I may screw this up -- Delfine or

18   something along those lines that worked for

19   FT Global?

20   A.    No.

21   Q.    In 2020, you were the only employee of

22   FT Global?

23   A.    That is correct.

24   Q.    Were there any independent contractors

1   that worked with FT Global in 2020?

2   A.     Could you define what you mean by

3   independent contractor.

4   Q.     Was there anybody that provided

5   services to FT Global in 2020 that did so

6   pursuant to any contractual agreement?

7   A.     Not as I recall.  On occasion, we have

8   service providers, like outside

9   counsel/lawyers.  That's why I wasn't sure

10  what you're referring to.

11  Q.     It would be somebody paid as an

12  independent contractor.

13         Has FT Global had independent

14  contractors in 2020 or 2021?

15  A.     No.

16  Q.     I'm going to show you, and share my

17  screen, the placement agent agreement at

18  issue in this case.

19         Mr. Ko, I'm showing you a placement

20  agent agreement -- what I'm calling a

21  placement agent agreement -- that I've marked

22  as Exhibit-2.

23         Do you see FT Global Capital, Inc., as

24  the header of this document?

14

1   A.    Yes, sir.

2   Q.    What is the date?

3   A.    July 28, 2020.

4   Q.    Do you recognize this as the exclusive

5   placement agent agreement with Future Fintech

6   Group, Inc.?

7   A.    Yes.

8   Q.    Do you want me to scroll through the

9   agreement so you have an opportunity to scan

10  to make sure it's the completed agreement?

11  A.    Yes, sir.

12  Q.    I'll do so.  This is the end of page

13  1, end of page 2, end of page 3, end of page

14  4.

15        On page 5, there are signature blocks

16  with signatures.

17        Do you recognize your signature on

18  page 5?

19  A.    Yes.

20  Q.    Do you recognize the signature of

21  Future Fintech Group's representative on page

22  5?

23  A.    Yes.

24  Q.    Following page 5, there is an appendix

15

1    A - indemnification provisions.

2        Do you see that?

3    A.    Yes.

4    Q.    Who created the first draft of this

5    agreement?

6    A.    I believe either my outside counsel or

7    myself, based on our standard form.

8    Q.    Based on your standard form?

9    A.    Uh-huh.

10   Q.    Is that a yes?

11   A.    I don't know which one.  Either based

12   on our standard form or created by our

13   outside counsel.

14   Q.    Who is your outside counsel at that

15   point?

16   A.    It's been two years.  I'm not sure.

17   We've used several outside counsel.

18   Q.    Do you recall the name of the law firm

19   that the outside counsel worked for at that

20   point?

21   A.    I can recall at least two.  One is

22   called Schiff Hardin.  I think the other one

23   is called Sheppard Mullin.  I think at the

24   time we had two law firms.  I could not

16

1   recall which one prepared for this.

2   Q.    What is your understanding as to what

3   FT Global needed to do under that agreement

4   in order to earn a fee?

5   A.    We are exclusive placement agent for

6   Future Fintech with regard to public/private

7   financing.

8   Q.    As the exclusive placement agent, what

9   are the responsibilities that FT Global took

10  on in that role?

11  A.    By that, do you mean responsibility

12  took on after we signed the agreement?

13  Q.    Yes.

14  A.    I think our main purposes is try to

15  assist Future Fintech to conduct a capital

16  raising transaction.

17  Q.    From other entities who would be

18  investors, correct?

19  A.    Yes, specifically from institutional

20  investors.

21  Q.    How did Future Fintech and FT Global

22  communicate or contact each other prior to

23  this agreement?

24  A.    I think mostly via telephone, phone

17

1   calls, and e-mails.

2   Q.      I asked a bad question, but thank you

3   for that answer.

4        How did you come in to knowing that

5   Future Fintech was looking to hire a

6   placement agent?

7   A.      We actually, I myself, have met

8   chairmanship of Future Fintech's previous

9   company called Sky People Juice, I think,

10  prior to 2010.

11       In recent years, I met him in China on

12  a business trip at least once, and in 2020, I

13  believe in early or middle 2020, they brought

14  on an UCO or large shareholder, Mr. Huang,

15  who became the CEO.

16       At that time, the company had

17  dramatically changed their business model and

18  they've been talking to us about their future

19  business plan as well as capital needs.

20  That's when I got involved with the company

21  for this particular -- with regards to this

22  placement agent that you're referring to.

23  Q.      For the court reporter's purposes,

24  Mr. Huang is spelled H-U-A-N-G; is that

18

1  correct.

2  A.     That's correct.  Because that's his

3  last name, yes, sir.

4  Q.     After the placement agent agreement

5  was signed, what did FT Global do to fill its

6  responsibilities under the agreement?

7  A.     We have done a lot of tasks.  I can

8  probably summarize a few key points.  First

9  one is, as a duty as a registered

10 broker-dealer, we usually start due diligence

11 to our client, in this case Future Fintech.

12 First is due diligence process.

13        Second, we review Future Fintech's

14 material information, financial information,

15 and we discuss with management, try to

16 formulate the best way to capital raising.

17 Thirdly, we begin contacting potential

18 institution investor by exploring various

19 methods of capital raising.

20        Thirdly, once institution investor

21 express interest, we'll seek either interest

22 as well as order term sheet.  We'll help

23 facilitate negotiation between Future Fintech

24 as well as potential investor.  That is the

1  main task.

2      If you have five minutes, I can give

3  you more details what we have done.

4  Q.    I may well get into those details.

5  Let me ask a question.

6      Did any institutional investor express

7  interest in investing in Future Fintech

8  during the term of this placement agent

9  agreement?

10  A.    Yes.

11  Q.    Who did express that interest?

12  A.    There were, I want to say, at least

13  half-a-dozen interested parties, but I

14  believe there was, in terms of written term

15  sheet in our business call or indication of

16  interest, there were I'll say at least two or

17  three.

18  Q.    How would an institutional investor

19  express interest in Future Fintech?

20  A.    Normally, as I indicated earlier, they

21  will submit a written form were there would

22  be a written term sheet or written indication

23  of interest.

24      Sometimes they will also give us

20

1  verbal, what I call, summary terms, and if a

2  company proceeds to understand more, we will

3  request a written term sheet or indication of

4  interest from them.

5  Q.     Do you recall if any particular

6  investor expressed verbally they were

7  interested in investing in Future Fintech?

8  A.     Yes.

9  Q.     Who is that?

10  A.     Several of them.  What I remember, if

11  I recall, I think there is Hudson Bay

12  Capital, Sabby Management, Ayrton Capital,

13  Intercoastal.  That would be what I can

14  remember now.

15  Q.     Did any potential investor, including

16  those, ever agree to invest in Future Fintech

17  during the three-month term of this placement

18  agent agreement?

19  A.     Would you define agreement and I'll

20  try to get you an exact answer.

21  Q.     By agreement, did they tell you that

22  they were going to invest in Future Fintech?

23  A.     I think most of the investors that

24  provide indication of interest had agreed to

1   invest in Future Fintech if Future Fintech

2   agreed to accept their proposed terms.

3   Q.     Would it be fair to say that those who

4   agreed to invest were ones who provided the

5   term sheets?

6   A.     No, not necessarily.  As I said, some

7   of these investors did not provide term sheet

8   or written indication of interest.  They gave

9   us verbal.

10  Q.     If they didn't provide a term sheet or

11  written indication of interest, are you

12  saying that you still understood them to

13  agree to invest in Future Fintech?

14  A.     Yes.  I can explain to you, if you

15  care, how our business practice.

16  Q.     I'm sorry, I didn't hear you.

17  A.     You were trying to say something.  I

18  didn't want to interrupt.  Please.

19  Q.     You offered to explain the business

20  practice.  I think that would be helpful.

21  A.     Okay.  Generally speaking, as

22  placement agent on behalf of, in this case,

23  Future Fintech, when we reach potential

24  investor, some investors are what I call lead

1  investor.  They will provide terms,

2  indication of interest.

3       Some investors are simply syndicate

4  investors.  They will stand by while we

5  negotiate terms, but they are still

6  interested.  Once they understand the terms

7  from the lead investor, they will tell us

8  whether they will commit or not.

9  Q.     During the term of this placement

10  agent agreement, did any investor tell you

11  that they were uninterested and not going to

12  invest in Future Fintech?

13  A.     Yes.

14  Q.     Do you happen to recall who those

15  potential investors were?

16  A.     Once again, it's been two years.

17  There might be a few I miss, but I vividly

18  remember one is called Dominion Capital and

19  the other one, I think, is called Osprey

20  Capital.  They were not interested.

21  Q.     Did any investor actually invest in

22  Future Fintech during the term of FT Global's

23  placement agent agreement?

24  A.     Due to the terms of FT Global

23

1  placement agent agreement, I believe it's

2  July 2020 to October 2020, our investor and

3  Future Fintech did not reach agreement.

4  Therefore, no investor was able to invest in

5  Future Fintech.

6  Q.    I'm going to ask you some questions

7  about section C of the agreement that you see

8  shared on the screen.

9       First question is, do you see under

10  the -- well, maybe I've got the wrong

11  section.  Hold on.

12      Now we're referring to Section C in

13  front of you on the shared placement agent

14  agreement.

15      Section C refers to the placement

16  agent being entitled to a placement agent fee

17  with respect to any public or private

18  offering or other financing or capital

19  raising transaction during the tail period.

20      Have I correctly summarized that?

21  A.    Yes.

22  Q.    It continues, specifically the first

23  sentence continues, such financing or capital

24  is provided to the company by investors whom

24

1  the placement agent had introduced to the

2  company.

3      What do you understand the meaning to

4  be of introduced to the company in that

5  sentence?

6  A.    Okay.  Before I answer the question,

7  the whole sentence says introduced to the

8  company during the term or investors

9  wall-crossed by the placement agent.  I just

10  want to be sure.  Okay.

11      First, I'll show you how our business

12  work when it comes to introduced.  Introduced

13  to me means, as placement agent for Future

14  Fintech, we reach out to potential investors

15  with regard to capital raising transaction

16  for Future Fintech.

17  Q.    What do you rely on for that

18  understanding of usage of introduced to the

19  company?

20  A.    Would you please define the question a

21  little bit.  You said would I rely?  I'm not

22  quite sure.

23  Q.    You had stated that your understanding

24  of introduce was that FT Global would reach

25

1  out to the investor.

2      Is there a source that you're relying

3  on to have that understanding of what

4  introduced to the company means?

5  A.    Yes.  What I rely on is the signed

6  exclusive placement agent agreement of which

7  Future Fintech has hired as exclusive agent

8  on behalf of them to reach out to the

9  investor.

10  Q.    Isn't it true that, if FT Global

11  reaches out to an investor, that investor is

12  no introduced to Future Fintech?

13  A.    I don't quite understand the question.

14  Q.    Well, is the concept of introducing a

15  concept that requires that Future Fintech and

16  the potential investor are actually

17  introduced to each other?

18  A.    Our understanding of concept

19  introduction in this context is Future

20  Fintech does not have to be there or Future

21  Fintech appointed exclusive agent.  We

22  contact the investor on behalf of Future

23  Fintech with regard to capital raising

24  transaction.

1  Q.    The language says introduced to the

2  company, correct?

3  A.    Yes, sir.

4  Q.    It doesn't say that Future Fintech was

5  introduced to FT Global, does it?

6  A.    No, the language said introduce the

7  company, as we introduce Future Fintech to

8  the investor.

9  Q.    Well, if you introduce Future Fintech

10 to the investor, that's not introducing the

11 investor to Future Fintech, correct?

12 A.    I still don't understand the question.

13     Our understanding is we introduce the

14 investor to Future Fintech, the business, the

15 company, what we call them.

16 Q.    Did any investor during the term of

17 this placement agent agreement speak with

18 anyone at Future Fintech?

19 A.    Not as I recall.

20 Q.    Did you set up any meeting between any

21 potential investor and Future Fintech during

22 the term of this placement agreement?

23 A.    I do not recall.

24 Q.    Were there e-mails that you saw

27

1   between the potential investors and Future

2   Fintech during the term of this placement

3   agreement?

4   A.      There might be some, but I don't

5   recall.

6   Q.      Was there any direct communication

7   between any potential investor and Future

8   Fintech during the term of this placement

9   agent agreement?

10   A.      Could you repeat the question.

11   Q.      Was there any direct communication

12   between a potential investor and Future

13   Fintech during the time of the placement

14   agent agreement?

15   A.      Not as I was aware.

16   Q.      Earlier, you wanted to clarify that

17   the sentence continues to say or investors

18   wall-cross -- and wall-cross is in quotes --

19   by the placement agent in connection with the

20   placement.

21        Now, do you see that wall-cross is in

22   quotes?

23   A.      Yes.

24   Q.      Why is wall-cross in quotes in this

28

1   agreement?

2   A.     Honestly, I'm not sure.  Maybe trying

3   to emphasize an industry practice.

4   Q.     Do you have an understanding of what

5   wall-cross means?

6   A.     Wall-cross generally means when FT

7   Global discloses confidential information to

8   someone.

9   Q.     What source are you relying on for

10  that understanding?

11  A.     Would you clarify that question, what

12  source?

13  Q.     Is there a commonly understood

14  definition in the industry in which FT Global

15  operates that that is the understanding of

16  what wall-cross means?

17  A.     Yes.  Thank you for the clarification.

18         Wall-cross is a commonly used term in

19  our industry, of which investment banker or

20  placement agent, like us, gives confidential

21  information to someone with regard to a

22  transaction.

23  Q.     Is confidential information the same

24  as material nonpublic information?

29

1    A.     Material nonpublic information is a

2    specific term.  From a business point of

3    view, you might treat the same, but I'm not

4    quite sure legally; it might be slight

5    difference.

6    Q.     Is it FT Global's understanding that

7    confidential information is the same as

8    material nonpublic information?

9    A.     Yes, sir.

10   Q.     At the time of this placement agent

11   agreement, did FT Global have a written

12   procedure for introducing investors?

13   A.     Yes.

14   Q.     Where was that written procedure?  Was

15   it in an operations manual inside of FT

16   Global or somewhere else?

17   A.     It might be several places, but one

18   place for sure is in our written supervision

19   procedure, WSP.

20   Q.     Written supervision procedures?

21   A.     Correct.

22   Q.     Do you know if those written

23   supervision procedures were turned over to

24   your attorneys in this case?

1   A.    I'm not quite sure.

2   Q.    When were those written supervision

3   procedures first created?

4   A.    At the beginning of the company

5   establishment.

6   Q.    Who created it?

7   A.    Our consultant created them and me, as

8   not only the president, I'm also the chief

9   compliance officer and each year we update.

10  Q.    When was the last time, if you recall,

11  that they were updated before the date of

12  this placement agent agreement?

13  A.    I don't quite remember.

14  Q.    Are the written supervision procedures

15  kept in an electronic form, or are they

16  something that is printed out and kept around

17  the office in paper form?

18  A.    I'm pausing because in recent years

19  everything move to electronic form.  In 2020,

20  I'm not sure.  It could be paper, could be

21  electronic.

22  Q.    Do you have a general understanding of

23  how many pages the written procedures are?

24  A.    I have to make a guess.  It should be,

1  let's say, 1,000-2,000 pages.

2  Q.     I got to ask.  Did you write those

3  1,000 or 2,000 pages?

4  A.     Thanks to great lawyers like you.

5  These are FCC requirements, FINRA

6  requirements.

7  Q.     Now, did that same written supervision

8  procedures also include FT global's procedure

9  for wall-crossing?

10  A.     It should be, I think.  It definitely

11  covered how we share confidential information

12  with people.

13  Q.     Well, you need that in writing, right?

14  So that if the FCC or FINRA asks, you can

15  show them that those are your procedures?

16  A.     Yes, that's why we have a procedure.

17  Q.     Did FT Global follow those procedures

18  with respect to carrying out its activities

19  under this placement agent agreement?

20  A.     I believe so.

21  Q.     Can we agree that, if those written

22  procedures have not been provided to your

23  attorneys, that you can provide them to your

24  attorneys after the deposition?

32

1          MR. FLEMING:  We'll take that

2   under advisement.  I think we can provide

3   them to you.  I have to look at them first.

4          MR. AKINS:  Understood.

5   BY MR. AKINS:

6   Q.     Without having it in front of us,

7   Mr. Ko, I want to ask questions about

8   introduction procedures and wall-cross

9   procedures.  I'll go back to introduction.

10         Do you recall what the written

11  supervision procedure said as to the written

12  procedure for introductions of potential

13  investors?

14  A.     I don't recall specific language, but

15  I'll be happy to share with you as I recall.

16  Q.     Would the answer be the same with

17  respect to wall-crossing procedures?

18  A.     Yes.

19  Q.     Which usually comes first, if one

20  does?  Is it introduction or wall-crossing?

21  A.     Generally speaking, again, I'm not

22  good at legal terms, but can I give you our

23  business practice and you can phrase in the

24  word you prefer.

1     Usually, after we got engaged, we will

2   call potential investor via telephone phone

3   calls.  That's the first thing we do.  Once

4   the investor is interested to know the detail

5   of the particular transaction, we'll share

6   confidential transaction information with

7   them.  That's usually what we do.

8       There will be cases where the investor

9   may not necessarily want to know confidential

10  information and, therefore, we stop right

11  there.

12  Q.    I'm sorry, I think I went off on to

13  the written procedures.

14      What is your understanding of what

15  wall-cross means in the placement agent

16  agreement?

17  A.    Wall-cross means we're giving specific

18  transaction information to investor with

19  regard to capital raising activity.

20  Q.    If I understand this correctly,

21  wall-crossing means the provision of more

22  information than simply introducing the

23  investor to Future Fintech?

24  A.    Yes.

34

1    Q.     Before you wall-cross a potential

2    investor, do you require that that potential

3    investor sign a confidentiality or

4    nondisclosure agreement?

5    A.     No.

6    Q.     Why not?

7    A.     It's just not industry practice.

8    Q.     Before you provide confidential

9    information to the potential investor, do you

10   require that they sign a confidentiality or

11   nondisclosure agreement?

12   A.     I just answered the question.  No.

13   Q.     Before you provide material nonpublic

14   information to a potential investor, do you

15   require that they sign a confidentiality or

16   nondisclosure agreement?

17   A.     No.

18   Q.     Did FT Global have in-house counsel

19   during the term of this placement agent

20   agreement?

21   A.     No.

22   Q.     Was this placement agent agreement

23   ever filed with FINRA?

24   A.     I believe so.

1   Q.    Do you recall when it was filed with

2   FINRA?

3   A.    It's usually filed with FCC -- I'm not

4   quite sure about FINRA -- right after the

5   transaction along with other documents.

6   Q.    You wouldn't have filed this document

7   until after there was a financing transaction

8   that took place?

9   A.    I'm not sure if we would have filed

10  before, but I'm sure we would certainly file

11  after.

12  Q.    Do you recall whether or not this

13  agreement was ever filed with FINRA or the

14  FCC?

15  A.    This document should be filed either

16  with the FCC or FINRA.

17  Q.    Do you recall ever receiving comments

18  back from either the FCC or FINRA?

19  A.    No.

20  Q.    Did you use this general type of

21  placement agent agreement with any other

22  entities like Future Fintech who were looking

23  for investors?

24  A.    Yes.

1  Q.    About how many times?

2  A.    Could you give a timeframe, please.

3  Q.    I would say about five years before

4  this agreement to the present.

5  A.    Through that time we normally will

6  conduct, I'll say, on average, 10

7  transactions a year.  This form was signed at

8  least 10 times.  Usually, we also send this

9  form to other potential corporate clients we

10  were not lucky enough to engage with them.

11  That number could be much higher.  My guess

12  is we must have been using this 100 times, if

13  not 200 times during that five-year periods.

14  Q.    During that time period and during

15  those number of times, excludeing this

16  dispute, has FT Global encountered any other

17  disputes regarding its placement agreement?

18  A.    You're still talking about that

19  five-year timeframe?

20  Q.    Yes.

21  A.    We probably have one other situation.

22  Q.    What was the reason for that dispute?

23  A.    You're referring to the tail

24  financing?  You're still referring to that

1  section C, right?

2  Q.    If that's what that one other dispute

3  arose out of, then yes.

4  A.    Yes.

5  Q.    You had one other dispute regarding

6  tail financing?

7  A.    Yes.

8  Q.    Did that dispute result in a lawsuit

9  being filed?

10  A.    I believe so.

11  Q.    Who was your attorneys for that

12  lawsuit?

13  A.    Mr. Fleming.

14  Q.    Is that lawsuit ongoing?

15  A.    I think so.

16  Q.    Where is the lawsuit?  What court or

17  jurisdiction is the lawsuit in?

18  A.    I'm not sure.

19      Tom, can you...

20  Q.    Tom and I can talk afterwards.

21      MR. FLEMING:  I can tell you

22  afterwards.  You'll find it quickly through

23  the internet, but I can tell you.

24

1  BY MR. AKINS:

2  Q.    When was that dispute initiated?

3  A.    Several months ago, I think.

4  Q.    Now, we limited it to a specific time

5  period, but prior to that five-year time

6  period since the inception of FT global, was

7  there any other disputes that we have not

8  talked about concerning FT Global's placement

9  agent agreement?

10  A.    We've been in business since 2007 to

11  now is about 15 years.  The only memory I can

12  remember, other than the two we mentioned, we

13  have one other dispute.  We filed a lawsuit

14  and I believe we either settled or we went

15  out of court.

16  Q.    What did that dispute concern

17  specifically?  I know the placement agent

18  agreement, but what else?

19  A.    It's about our investment banking fee.

20  I don't recall exactly, but it's about the

21  investment banking fee.

22  Q.    Was Mr. Fleming also FT Global's

23  attorney for that dispute?

24  A.    No.

1   Q.    Approximate timeframe in which that

2   dispute was resolved?

3   A.    I would say four/five years ago.

4   Q.    Do you recall what jurisdiction it was

5   in?

6   A.    I believe Delaware.

7   Q.    I think you said that dispute was

8   resolved by what you referred to as an

9   out-of-court settlement?

10   A.    If I recall correctly, we were going

11   to trial and the other party proposed for

12   mediation.  Is that the right word,

13   mediation?  And they settled in the mediation

14   process.

15   Q.    Now, referring back to Exhibit-3, the

16   same Section C.  It ends with a statement

17   that the placement agent shall provide a

18   written list of such investors placement

19   agent had introduced or wall-crossed to the

20   company during the term, right?

21   A.    Yes.

22   Q.    Did FT global provide to Future

23   Fintech such a written list?

24   A.    Yes, we did.

1   Q.     I'm going to refer to what I have

2   marked as Exhibit-3.  This is a document that

3   is Bates labelled FT Global GA-2397.

4        Mr. Ko, is this -- well, let's call it

5   what it is --  Exhibit-A, Investors List for

6   Tail Period.

7   A.     Mr. Akins, would you please enlarge

8   the -- so I can read.  There you go.

9        Thank you.

10  Q.     You're welcome.  Would you like me to

11  re-ask my question?

12  A.     Yes, please.

13  Q.     Is this the protected investor list

14  that FT Global provided to Future Fintech

15  following the expiration of the term of the

16  placement agent agreement?

17  A.     Yes.

18  Q.     Who drafted this protected investor

19  list?

20  A.     I did.

21  Q.     When did you draft it?

22  A.     I believe at the end of our term.  I

23  used our standard form and by updating the

24  investor list.

1   Q.     Is it fair to say that you decided

2   what names went on this list?

3   A.     Yes.

4   Q.     Why did you add and affiliates after

5   each of the entries?

6   A.     It's our common practice and also

7   many -- I'm sorry, can I finish or you have a

8   question you want to ask?

9   Q.     Please do.

10  A.     Many of our investors have affiliate.

11  When we introduce Future Fintech to investor,

12  we assume that to mean the main name but also

13  the group and the affiliates.

14  Q.     The placement agent agreement itself

15  did not include the word affiliates after

16  investors, correct?

17  A.     I don't know.  Again, we have to go

18  back.  But if you tell me it did not include,

19  I believe you.

20  Q.     Let's do that.  Let's go back to

21  Exhibit-2, under Section C -- Section 1,

22  Subsection C, actually.

23  A.     Okay.

24  Q.     In that section, I believe it's one

42

1   long sentence.

2        In that sentence, do you see the word

3   affiliates?

4   A.    No.

5   Q.    Were there any investors or potential

6   investors who FT Global communicated with who

7   were left off of the protected investor list?

8   A.    Yes.

9   Q.    Why were they left off?

10  A.    We simply made a mistake.  We forgot

11  to put two names on the list.

12  Q.    Do you recall who those two names

13  were?

14  A.    They were Dominion Capital and Osprey

15  Capital.

16  Q.    Those were the two who said

17  essentially that they were uninterested,

18  correct?

19  A.    That's correct.

20  Q.    Now, the investor list for tail period

21  or what we've been calling the protected

22  investor list, the first sentence states that

23  the following list of potential investors who

24  FT Global Capital Inc., has introduced or

1  contacted on behalf of FTFT.

2      It doesn't use the term wall-cross in

3  that sentence, does it?

4  A.    No.

5  Q.    Then, at the end of the agreement,

6  there is no reference to wall-cross, correct?

7  A.    No.

8  Q.    Let me ask it another way.

9      Do you see any reference to wall-cross

10  in this agreement, or do you see any

11  reference to wall-cross in this document?

12  A.    I do not see the wording of wall-cross

13  in this document.

14  Q.    It says introduced or contacted,

15  correct?

16  A.    Correct.

17  Q.    I want to show you Exhibit-4.

18  Exhibit-4 is a document Bates labelled FT

19  Global GA-2388.

20      Mr. Ko, do you see that this document

21  is an e-mail from you to individuals at

22  Future Fintech?

23  A.    Yes, I see now.

24  Q.    When it refers to sending you the

44

1  enclosed protected list for our tail period,

2  is that referring to what we've been

3  discussing in Exhibit-3?

4  A.    Yes.

5  Q.    The third sentence says we would

6  certainly like to get an extension for our

7  engagement since we've brought you numerous

8  term sheets.

9       Did any of those term sheets include

10 Anson or Hudson Bay?

11 A.    If it's the written term sheet you're

12 referring to, it does not include Anson and

13 Hudson Bay.

14 Q.    You indicated in here that FT Global

15 would like to get extension for the

16 engagement, but the engagement had expired by

17 its own terms on October 28, 2020, right?

18 A.    Correct.

19 Q.    How many times has FT Global issued a

20 protected investor list at the end of a

21 placement agent agreement?

22 A.    Once again, I like to have a

23 timeframe, but if you don't, I'm just using

24 2021 as an example, if it's okay with you.

45

1   Q.     To start, sure.

2   A.     2021 we successfully conducted, I'll

3   say, about 23 to 25 capital raising

4   transactions like this, and each time, after

5   the term ends, we'll send a protected list in

6   the tail period.  So, 2021 would be 23 to 25

7   times.

8   Q.     Okay.  So I'm clear about this, FT

9   Global sends a protected investor list

10  whether or not there is an investment during

11  the placement agent period, right?

12  A.     The protected tail list in our

13  placement agent agreement does not require a

14  successful completion of any transaction.

15  Q.     If there is a successful completion of

16  a transaction at the end of the placement

17  agent agreement, does FT Global still, as a

18  matter of course, issue a protected investor

19  list?

20  A.     Yes.  If there was a tail period that

21  we, the company, in our placement agent

22  agreement, yes.

23  Q.     About, roughly speaking, how many

24  times would FT Global enter into a placement

1  agent agreement that had not included a tail

2  period?

3  A.    As I recall, there was one case.

4  Q.    Most of the time, there is a tail

5  period agreed to, correct?

6  A.    That's a correct statement.

7  Q.    Has FT Global ever received

8  compensation for an investment that occurred

9  during the tail period?

10  A.    Yes.

11  Q.    About how many times in the existence

12  of FT Global has it occurred?

13  A.    Again, same period 2021, if I can use

14  that example, I will say at least once or

15  twice.

16  Q.    Since the inception of FT Global,

17  about how many times?

18  A.    That's a tough number.  I want to say

19  under 10, if you want me to make a guess.  We

20  can check, if you wish.

21       MR. AKINS:  I'm going to stop

22  sharing my screen.  We've been going almost

23  an hour.  Let's take a five-minute break and

24  we'll be back.

47

1          THE WITNESS:  Thank you.

2          THE VIDEOGRAPHER:  We are off the

3    record at 11:03 a.m.

4               - - -

5          (Whereupon, a break was taken at

6    this time.)

7               - - -

8          THE VIDEOGRAPHER:  We are back on

9    the record at 11:14 a.m.

10   BY MR. AKINS:

11   Q.     I want to pick up on the concept of

12   wall-crossing.

13         Can you provide a full description of

14   what your understanding is of what FT Global

15   does when wall-crossing a potential investor?

16   A.     Sure.  Happy to share.

17         When we reach out to potential

18   institutional investor, first we're making a

19   telephone call.  We will usually ask them

20   whether they are interested to know a

21   potential capital raising transaction.  If

22   the answer is yes, we'll give them the

23   company name, the proposed terms, which

24   usually includes the size of the transaction,

48

1  business terms, et cetera, and of course

2  timing of the transaction.  That's our usual

3  wall-crossing practice from FT Global point

4  of view.

5  Q.    These institutional investors that you

6  call, is it fair to say that some of them you

7  have a preexisting relationship with where

8  you already know who to call?

9  A.    Not some of them.  All of them we have

10  a preexisting relationship.

11  Q.    Before the engagement with Future

12  Fintech, did FT Global have a preexisting

13  relationship with Anson Funds Management?

14  A.    We know Anson Funds as a very active

15  player in the business.  We actually refer to

16  Anson by many sources, and we've never had a

17  chance to conduct any transaction with them

18  yet at that point.

19  Q.    Did FT Global reach out to Anson Funds

20  with respect to the potential investment in

21  Future Fintech?

22  A.    Yes.

23  Q.    Are you aware that a representative

24  for Anson Funds was deposed in this case?

49

1   A.    Yes.

2   Q.    Have you read the transcript of that

3   representative's deposition testimony?

4   A.    I probably read very briefly.  I took

5   a glance.  I didn't really read carefully.

6   Q.    Did you read from the first page to

7   the last page?

8   A.    I probably did.

9   Q.    Do you recall that the Anson Funds

10  representative testified that Anson was not

11  wall-crossed with respect to the Future

12  Fintech investment opportunity?

13  A.    Yes, I recall.

14  Q.    Do you agree with that?

15  A.    No.

16  Q.    Why do you not agree with it?

17  A.    We contact them with regard to

18  investing Future Fintech.  I'm not sure what

19  their internal procedure is.  I don't know.

20  Q.    Did you send anybody at Anson Funds an

21  e-mail confirming they had been wall-crossed?

22  A.    I did not.

23  Q.    Why not?

24  A.    We probably forgot.

50

1  Q.     Does a potential investor -- I think

2  you answered this, but I want to ask this

3  specific question.

4      Does a potential investor have to

5  agree to be wall-crossed?

6  A.     Yes.  As I said earlier, yes.

7  Q.     That agreement can be verbal?

8  A.     Yes.

9  Q.     Do you recall what information you

10  provided to Anson with respect to the Future

11  Fintech opportunity?

12  A.     Not exactly, but, generally speaking,

13  we call any investor by wall-crossing.  We

14  give them the company name, transaction

15  proposed, transaction size, timing, and

16  potential terms, if any, at that point.

17  Q.     How did you convey that information to

18  the person at Anson?

19  A.     I call them.

20  Q.     Do you recall who you called at Anson?

21  A.     Armi Nathoo.

22  Q.     Did you talk to anybody else at Anson?

23  A.     I might have talked to someone else at

24  Anson on logistic issues, but Mr. Nathoo is

51

1  our main contact when it comes to transaction

2  matters.

3  Q.    How many phone calls did you have with

4  Mr. Nathoo?

5  A.    With regard to Future Fintech or in

6  general.

7  Q.    With regard to Future Fintech?

8  A.    I don't recall exactly, but I think we

9  had at least two phone calls.

10  Q.    Has Anson provided any investments

11  where FT Global was the placement agent since

12  the Future Fintech placement agent agreement

13  expired?

14  A.    The answer is yes.

15  Q.    About how many times?

16  A.    I'll say at least 10.

17  Q.    Was there any investment that Anson

18  provided where FT Global was the placement

19  agent during the term of FT Global's

20  agreement with Future Fintech?

21  A.    I don't recall.  There might be one.

22  Q.    Of these potentially two phone calls

23  that you had with Mr. Nathoo, are those phone

24  calls typically recorded by FT Global?

52

1    A.    Not by FT Global.

2    Q.    Let me ask a more specific question.

3         Were these phone calls recorded by FT

4    Global?

5    A.    No.

6    Q.    Do you know whether these phone calls

7    were recorded by anyone?

8    A.    I don't know.

9    Q.    Is it in your procedures to record

10   wall-crossing phone calls?

11   A.    I don't believe so.

12   Q.    Did you send an e-mail to Mr. Nathoo

13   after the phone call to discuss what the call

14   was about?

15   A.    No.

16   Q.    Is FT Global's allegation in this case

17   that Anson invested in Future Fintech?

18   A.    That's correct.

19   Q.    Who was the placement agent associated

20   with that investment?

21   A.    You mean Anson's investment in Future

22   Fintech eventually after term expired?

23   Q.    Yes.

24   A.    I believe it's a firm called AGP

1  that's become the new placement agent for

2  Future Fintech.

3  Q.    Have you seen anything that shows that

4  Future Fintech was aware that AGP told Anson

5  to use a different name in its investment

6  with Future Fintech?

7  A.    Would you repeat the question.

8  Q.    Have you seen anything in the

9  documents you reviewed that shows that Future

10  Fintech was aware that AGP told Anson to use

11  a different name in its investment with

12  Future Fintech?

13  A.    I don't believe we seen anything from

14  AGP yet.  I don't recall.

15  Q.    Have you talked to anyone at Anson

16  about their investment in Future Fintech?

17  A.    Not specifically about the

18  transaction.

19  Q.    Do you know why Anson used the name

20  A&P to invest in Future Fintech?

21  A.    I don't know why they used it, but I

22  have my own theory of it.

23  Q.    I appreciate the clarification.

24       What would be your theory?

1   A.     My theory is Anson used a different

2   name to get our protected investor list.

3   Q.     Did you see anything in the documents

4   in this case that show that Future Fintech

5   told them to do so?

6   A.     I'm assuming someone told Anson to do

7   so.  I don't know whether it was Future

8   Fintech or AGP or altogether.

9   Q.     In Anson Funds representative's

10  deposition testimony, did he testify who told

11  him to use A&P?

12  A.     I'm sorry, is that a question to me,

13  or you're making a statement to me?

14  Q.     That's a question.  Let me rephrase

15  it.

16       In Anson Fund's representative's

17  deposition testimony, do you recall who he

18  said told him to use or told Anson to use

19  A&P?

20  A.     I thought I read that AGP told them,

21  but I'm not sure.  I took a quick glance.  I

22  wasn't reading very carefully.

23  Q.     Before the engagement agreement

24  with -- I'll rephrase that.

55

1        Before the placement agent agreement

2   with Future Fintech, did FT Global have an

3   existing relationship with Hudson Bay?

4   A.     Yes.

5   Q.     How many investments has Hudson Bay

6   made where FT Global is the placement agent?

7   A.     That's going to be a big number.  I

8   will say at least 50 to 100 transactions.

9   Q.     How many of those occurred after July

10  28, 2020?

11  A.     My guess is 20 at least.

12  Q.     Who's your contact at Hudson Bay?

13  A.     I have several contacts at Hudson Bay.

14  For Future Fintech's case, I believe there

15  were two gentleman, George Antonopoulos and

16  Rick Allison.

17  Q.     Are you aware that the deposition was

18  taken of Hudson Bay in this case?

19  A.     Yes.

20  Q.     Have you read the transcript of that

21  deposition?

22  A.     I took a quick glance.  These are long

23  transcripts.

24  Q.     What other information did FT Global

56

1  provide to Hudson Bay?

2  A.     I apologize.  Let me rephrase.  I

3  don't believe I read it yet.

4  Q.     What information did FT Global provide

5  to Hudson Bay concerning the Future Fintech

6  investment opportunity?

7  A.     Would you repeat again.  I was

8  talking, so I didn't...

9  Q.     What information did FT Global provide

10 to Hudson Bay regarding the Future Fintech

11 investment opportunity?

12 A.     Okay, thank you.  As usual, we provide

13 them the confidential information about the

14 potential PIPE transaction of Future Fintech,

15 which included contemplating dollar amount,

16 bill structure, and so on.

17 Q.     Was this information provided via

18 e-mail or over the phone?

19 A.     I believe both.

20 Q.     Over the phone, who would have

21 conveyed that information by FT Global?  You?

22 A.     Yes.

23 Q.     Who would you have conveyed it to at

24 Hudson Bay?

57

1    A.     Either George Antonopoulos or Rick

2    Allison.

3    Q.     Do you recall whether it was either

4    one or both?

5    A.     Could be either one and both.

6    Q.     Were those conversations reported?

7    A.     No.

8    Q.     At least not to your knowledge by FT

9    Global?

10   A.     Not to my knowledge by FT Global.

11   Thank you for correction.

12   Q.     Did Hudson Bay agree to be

13   wall-crossed?

14   A.     Yes.

15   Q.     Now, I'm going to show you, in sharing

16   my screen, what I have marked as Exhibit-5.

17   I know I need to enlarge it.

18       Is this sufficient?  Can you read it?

19   A.     Yes.

20   Q.     You e-mailed Rick Allison and George

21   Antonopoulos on October 24, 2020.  The

22   subject to the e-mail was over-the-wall

23   (FTFT), correct?

24   A.     Correct.

58

1   Q.    Your e-mail starts off, Hi, Rick, per

2   our recent communication.

3        What does that refer to, our recent

4   communication?

5   A.    I was referring to our recent phone

6   call.

7   Q.    Do you recall when that phone call

8   occurred?

9   A.    I do not remember exactly, but usually

10  we'll send this e-mail shortly after our

11  phone call.  So, my guess is the phone call

12  was probably a few hours to a day before this

13  e-mail.

14  Q.    Does this e-mail convey any

15  confidential information?

16  A.    Yes.

17  Q.    What do you consider to be the

18  confidential information conveyed by this

19  e-mail?

20  A.    The potential PIPE transaction for

21  Future Fintech.

22  Q.    Are any of the documents accessed by

23  the hyperlinks in this e-mail confidential

24  information?

1   A.    These are public filing by Future

2   Fintech.  This is public information.

3   Q.    Going back to the phone call.  Do you

4   recall how long that conversation would have

5   taken or how long the phone call was?

6   A.    No, I do not recall.

7   Q.    At the time that you sent this e-mail,

8   how many days were left on the placement

9   agent agreement term with Future Fintech?

10  A.    Probably about a week or so.  I don't

11  recall.

12  Q.    Do you recall that it expired on

13  October 28, 2020?

14  A.    Sounds about right.

15  Q.    Do you think that it's reasonable to

16  have anticipated the investment to be done by

17  Hudson Bay before the expiration of that

18  placement agent agreement?

19  A.    In this particular case, I don't

20  recall exactly what the term would be.

21  Normally, our normal transaction in the

22  registered offer will usually happen a day or

23  two days after this particular over-the-wall

24  e-mail is sent.

60

1  Q.    In response to this e-mail what did

2  Hudson Bay do, if anything?

3  A.    I do not know what they did

4  internally.

5  Q.    What was their response to you after

6  you sent this e-mail?

7  A.    They were interested in the

8  transaction.  They wanted to know more about

9  the deal.

10  Q.    How do you know that?  Did they call

11  you?

12  A.    They called me and we always

13  communicate with phone calls.

14  Q.    Were any of those phone calls

15  recorded?

16  A.    No.

17  Q.    I'm going to show you what I'm marking

18  as Exhibit-6.  I will enlarge it again.

19      This is another e-mail from you to

20  Rick Allison, copying George Antonopoulos,

21  that includes a sample term sheet for FTFT,

22  right?

23  A.    That's correct.

24  Q.    I'm going to move over to Exhibit-7.

61

1        Do you recognize Exhibit-7 as the

2   sample term sheet that would have been sent

3   with that e-mail?

4   A.      Yes.

5   Q.      Do you consider this sample term sheet

6   to include material nonpublic information or

7   confidential information?

8   A.      Yes.

9   Q.      What about this term sheet is

10  confidential or material nonpublic

11  information?

12  A.      As I stated several times during this

13  call, all the transaction detail of a public

14  company, such as Future Fintech, are

15  considered MNPI.

16  Q.      Have you seen anything that shows that

17  Hudson Bay invested in Future Fintech using a

18  different name?

19  A.      Could you repeat that question again.

20  Q.      Have you seen anything that shows that

21  Future Fintech received an investment from

22  Hudson Bay but using a name different than

23  Hudson Bay?

24  A.      Yeah.  Up to today, yes, I've seen it.

62

1  Q.    What was that?

2  A.    Through discovery process from

3  document production.

4  Q.    Have you seen anything that shows that

5  Future Fintech was aware that Hudson Bay was

6  investing in it under a different name?

7  A.    Again, I don't see Future Fintech's

8  acknowledgment, but they took all the money

9  and they're aware of the transaction and

10  Hudson Bay invest four times with Future

11  Fintech.  They must have known.

12  Q.    Why do you say they must have known?

13  A.    I'm not sure.  It's Hudson Bay

14  company.  All the documents are signed by all

15  the principals of Hudson Bay regardless what

16  entity they use.

17  Q.    Who would be those principals?  Who

18  signed the documents?

19  A.    George Antonopoulos, I believe, should

20  be one of them.

21  Q.    Why was FT Global unable to secure an

22  investment in Future Fintech from Anson

23  Funds?

24  A.    Both the investor and Future Fintech

63

1  could not agree on the term of the PIPE

2  transaction.  I'll be happy to elaborate, if

3  you care for more.

4  Q.     Please do.

5  A.     I believe when we started this

6  process, talking about July 2020, our best

7  option or best recommendation to Future

8  Fintech is conduct a transaction called

9  registered direct offering.

10       Unfortunately, due to Future Fintech's

11  internal issues, mainly their pending FCC

12  investigation and their noncompliance with

13  commission, their registration in the

14  registered direct offering was not declared

15  effective.

16       Matter fact, we had been spending

17  several month's time assisting the company.

18  Their counsel tried to get direct offering

19  registration effective.

20       While we're waiting and assisting them

21  for their registered direct offering, we had

22  to start the process of getting capital for

23  the money, different avenue.  One of them is

24  called PIPE transaction.  PIPE stands for

64

1   Private Investment in Public Equity.

2       PIPE transactions tend to be more

3   difficult simply because investor gives

4   funding to company first and their share

5   wouldn't be registered unless company

6   registers.  In turn, our investor offer to

7   Future Fintech was more complicated.

8       Therefore, the negotiation took a

9   little longer and most importantly Future

10  Fintech, in my opinion, had some really

11  unrealistic expectation.  They were asking

12  for terms that were not market acceptable.

13  That's the main reason, I think, the PIPE

14  transaction did not happen.

15      Please, if you want to.

16  Q.    Did you communicate Future Fintech's

17  terms to Anson and Anson was unable to agree

18  to those terms?

19  A.    Anson was syndicate investors and they

20  were not providing term sheets.  They simply

21  wanted to know what would be the final term,

22  and they'll decide whether they're interested

23  to co-invest.  We were mainly negotiating

24  term sheets with other funds, like L1

65

1  Capital.

2  Q.    L1 Capital provided approximately four

3  term sheets, correct?

4  A.    I think they provided one or two term

5  sheets, but the back-and-forth negotiation

6  between the company allowed mark-ups.

7  Q.    Anson Funds never provided a term

8  sheet, right?

9  A.    No.

10  Q.    That's correct?

11  A.    That's correct.

12  Q.    Why, in FT Global's opinion, was it

13  unable to secure investment from Hudson Bay?

14  A.    Hudson Bay is also -- they're what I

15  call the co-investor.  Once they read the

16  term sheet, the sample you just showed to me,

17  they expressed interest, but they didn't know

18  whether the term would be acceptable by the

19  company yet.

20  Q.    I'll show you what I'm marking as

21  Exhibit-8.

22       Mr. Ko, Exhibit-8 is an e-mail,

23  several e-mails, but on the screen now is an

24  e-mail from you to persons at Sabby

66

1   Management?

2   A.    Yes.

3   Q.    Your e-mail also refers to a recent

4   communication and to Sabby Management being

5   over-the-wall, right?

6   A.    That's correct.

7   Q.    On October 30, 2020, Robert Grundstein

8   at Sabby Management asked you, by response

9   e-mail, are we still restricted here, it's

10  been five weeks, right?

11  A.    Correct.

12  Q.    You respond on October 30, 2020, that

13  you're still trying to close the deal and

14  will keep you posted, right?

15  A.    That's correct.

16  Q.    Did Sabby Management provide a term

17  sheet?

18  A.    Not to my knowledge.

19  Q.    I'm scrolling up closer to the

20  beginning of Exhibit-8.

21       Then you respond again on December 1,

22  2020 that Sabby can take them off of the

23  restricted list, right?

24  A.    Correct.

67

1  Q.    Robert Grundstein at Sabby asks if the

2  deal has been abandoned and what date and

3  time, right?

4  A.    Yes.

5  Q.    You respond that the engagement with

6  the company expired on 10/28 without any deal

7  completed, right?

8  A.    Yes.

9  Q.    Mr. Grundstein asked you if the deal

10  was abandoned at that time and you responded

11  yes?

12  A.    Correct.

13  Q.    Why did you think the deal had been

14  abandoned?

15  A.    The PIPE transaction, of which we were

16  trying to complete it, was abandoned by the

17  company, and there is a further development

18  by that.  Now, I'm talking about December 1,

19  2020.  If you like, I can give you my

20  recollection of what happened during that

21  period.

22  Q.    Yes, please do.  I want to know why

23  you thought the deal was abandoned?

24  A.    Okay.  If you recall earlier when I

68

1   said our strategy for Future Fintech in the

2   beginning of the engagement was try to do

3   registered direct offering.  Simply because

4   registration was still pending effective, we

5   had to explore other options, one of which

6   was PIPE and then we get to the other option.

7       Long story short, by end of October,

8   PIPE terminated.  The company asked to keep

9   negotiating with the investor while we're

10  still working on the registration statement.

11  That's called F3 Amendment.

12      Fortunately, in, I would say, early

13  December, around that time, company finally

14  reached a very successful conclusion with the

15  FCC.  FCC was going to approve the F3, of

16  which PIPE would not be necessary.  Register

17  is the best option.

18      For all these reasons; one reason, the

19  PIPE transaction terms wasn't agreed upon

20  both by company and investor.  The other main

21  reason is, finally, F3 would become effective

22  and we would be contemplating a registered

23  direct offering instead.

24  Q.    Thank you for that.  Did you sometime

1  afterwards understand that -- let me ask

2  maybe a more specific question.

3      Is the PIPE offering what you

4  understood to be the deal in the e-mails

5  regarding whether the deal was abandoned?

6  A.    That's correct.  That's what I mean.

7  PIPE was abandoned.

8  Q.    FT Global, you mentioned, had a

9  warrant agreement.  That's referring to

10  warrant solicitation agreement with Future

11  Fintech?

12  A.    Yes.

13  Q.    Just to be clear, that warrant

14  solicitation agreement is not part of this

15  case, right?

16  A.    No.

17  Q.    That is fair, it's not part of this

18  case?

19  A.    I don't believe we're asking warrant

20  solicitation, no.

21  Q.    I'm going to stop sharing my screen

22  for just a minute.

23      We referred earlier to a company by

24  the name of AGP.  Do you understand them to

1  be Alliance Global Partners?

2  A.    Yes.

3  Q.    Were you familiar with Alliance Global

4  Partners before you saw their involvement in

5  the Future Fintech investments?

6  A.    Yes.

7  Q.    How long had you been familiar with

8  Alliance Global Partners?

9  A.    At least several years.

10  Q.    Is it fair to say Alliance Global

11  Partners is a competitor to FT global?

12  A.    I guess competitor, yes.

13  Q.    Let me go back to sharing my screen to

14  show you Exhibit-9.

15       Mr. Ko, do you see Exhibit-9?  On the

16  screen now is an e-mail from FT Global

17  Capital, Inc., to AGP, Alliance Global

18  Partners?

19  A.    Yes.

20  Q.    It's dated January 12, 2021?

21  A.    Yes.

22  Q.    Why did you write this letter?

23  A.    This is a cease and desist letter.  We

24  sent it to AGP January 12, 2021.

1   Q.    Who wrote the letter?

2   A.    Our legal counsel.

3   Q.    What legal counsel?

4   A.    I think our legal counsel Schiff

5   Hardin.

6   Q.    The letter starts that it has come to

7   our attention your organization has, and then

8   it continues.

9        How did it come to FT Global's

10   attention?

11   A.    Now, this is January 12th.  I believe

12   by now Future Fintech has done two

13   transactions with our protected list investor

14   via AGP.  Matter fact, AGP had reached out to

15   us after the first transaction in December, I

16   believe.

17        We simply feel AGP had done, at the

18   least, very unethical things in our business,

19   and while we're dealing with Future Fintech

20   on one side, we'd simply like AGP to stop,

21   cease/desist their activity.

22   Q.    You said AGP reached out to FT Global

23   in December of 2020?

24   A.    I think after the December 2021

72

1  transaction.

2  Q.      Who at AGP reached out to FT Global?

3  A.      I think it's the head of the

4  investment banker David Bocci.

5  Q.      Do you remember how to spell his last

6  name?

7  A.      B-O-C-C-I.  Forgive me, I may not

8  pronounce right, but I think his name is on

9  the website.  You can check.

10  Q.      Why did he reach out to FT Global?

11  A.      He was simply reaching out to us, and

12  initially, in my words, tried to understand

13  we had an issue with Future Fintech right

14  after announcement.

15        They simply want to say it was not

16  their fault, and they want to see what they

17  can do to facilitate our relationship with

18  Future Fintech.  They even mentioned, if

19  there is a way AGP could do, they can bring

20  us as a co-placement agent for the next

21  transaction.  That was the conversation.

22  Q.      We're there any e-mails exchanged

23  regarding that or was it all phone calls?

24  A.      I don't know.  We can check.

FT GLOBAL CAPITAL vs
FUTURE FINTECH GROUP

Patrick Ko
August 03, 2022

73

1   Q.      Who else at AGP communicated with FT

2   Global other than David Bocci regarding that

3   conversation?

4   A.      I don't recall anyone else but David.

5   Q.      Why did FT Global not want to go in

6   with AGP as a co-placement agent?

7   A.      Because we were the exclusive agent.

8   David knew this before he called me.

9   Q.      Did you tell him, no thanks, we're the

10   exclusive placement agent?

11   A.      I don't remember exactly if I told him

12   or not, but David knew the fact we were not

13   happy with December transaction and they knew

14   the fact we had been demanding the payment

15   from the company.

16   Q.      How did David at AGP know that FT

17   Global was unhappy with the first

18   transaction?

19   A.      I don't know the reason, but my guess

20   is company or someone told him.

21   Q.      How did FT Global first express that

22   it was unhappy with the December transaction?

23   A.      Literally, right after the

24   announcement.

74

1   Q.    What did FT Global do right after the

2   announcement?

3   A.    We phoned company management,

4   particularly Mr. Huang.

5   Q.    When you say we, do you mean you?

6   A.    Yes.

7   Q.    What did you say to Mr. Huang?

8   A.    I remember at least two main subjects.

9   One, we asked them to be mindful with our

10  protected list because we have at least one

11  investor on our protected list participate in

12  this deal.

13       Two, we discussed about the terms

14  because apparently one of the reasons, being

15  it's a PIPE transaction, companies did not

16  take our investor offer was the warrant

17  coverage.

18       If you go back to the term sheet, our

19  investor was offering them around, I think,

20  50 percent warrant coverage.  Company did not

21  agree, but when this register direct

22  offering, I'm talking about the December

23  announcement, company was willing to give

24  investor 100 percent warrant coverage; worse

1  than what we offered to the company.  That

2  was probably two subjects we talked about.

3  Q.    Did you tell him what investor was on

4  your protected investor list that had

5  invested?

6  A.    I do not remember if I tell him or

7  not, no.

8  Q.    Do you remember if he asked?

9  A.    I do not, no.

10  Q.    Before the lawsuit was filed, did you

11  have any other phone calls with Mr. Huang

12  where you told him who the investors were

13  that were on your protected investor list and

14  who had invested in Future Fintech?

15  A.    I believe we had similar phone calls

16  about this particular subject and he denied

17  any of the investors name appeared on my

18  protected list.

19  Q.    Did you disagree with that?

20  A.    Yes, I totally disagreed.

21  Q.    Did you tell him you disagreed?

22  A.    Yes.

23  Q.    Did you tell him why you disagreed?

24  A.    I believe so, yes.

1  Q.    What did you tell him?

2  A.    Told them we know there was at least

3  one investor who was on my protected list

4  participating in the transaction and possibly

5  there could be more.

6  Q.    Did you know at that time who that one

7  investor was?

8  A.    The first or second phone call, yes.

9  Q.    At that time, why didn't you tell

10  Mr. Huang who that investor was?

11  A.    I don't know.  I don't remember why I

12  didn't tell them.

13  Q.    In this same Exhibit-9, I'm scrolling

14  down to the second page on the paragraph

15  that's close to the second paragraph on the

16  end.

17      I'm highlighting a sentence in that

18  paragraph that states:  Specifically, we have

19  obtained evidence that your organization

20  requested that potential investors in FTFT's

21  most recent placement that were identified in

22  FT Global's protected investor list use a new

23  company through which to fund the transaction

24  or alternatively fund the transaction through

1  a different but controlled business entity.

2      How did you know that to be the case

3  in January when this letter was written?

4  A.    As I stated earlier, right after the

5  December 2020 announcement, we discovered

6  this fact via a conversation with a couple

7  investors who did not participate in the

8  transaction.  They were on our protected

9  list.

10  Q.    Who were those investors?

11  A.    I know Ayrton, for one.  Second one

12  could be Intercoastal, but I might be wrong.

13  At least Ayrton told us they were informed by

14  AGP.  There was a protected investor list

15  Future Fintech shared with AGP and they were

16  told, if you want to participate in the

17  transaction, they may have to use a different

18  name.

19  Q.    You're saying that the folks at Ayrton

20  knew that?

21  A.    Yeah, I think not just Ayrton.  There

22  are several other more investor contacted by

23  AGP.

24  Q.    Did they tell you how they knew that

1  information?  Was it because of conversations

2  with AGP?

3  A.      Probably because their communication

4  with AGP, yes.

5  Q.      Did you ever tell Mr. Huang in your

6  several phone calls before the lawsuit was

7  filed what AGP was up to?

8  A.      I don't have to tell Mr. Huang.  I

9  basically tell Mr. Huang they gave the list

10  to AGP.  By the way, our list is supposed to

11  be confidential propriety information of FT

12  Global, and the company representative of AGP

13  disclosed this confidential information to

14  the investor and some investor end up

15  investing in the company via different name

16  by conceding their identity.

17  Q.      When this letter was issued, did you

18  receive a response from AGP?

19  A.      I do not recall ever receiving a

20  response from AGP after this letter.

21  Q.      Without getting into attorney-client

22  communication, don't tell me what you and

23  your attorneys talked about, to your

24  understanding, why has FT Global not filed

79

1   suit against AGP?

2   A.    You just answered the question.

3   That's between us and attorney.

4   Q.    Have you talked to AGP about this

5   lawsuit since it was filed?

6   A.    No.

7   Q.    Do you know anyone at AGP that you

8   communicate with on a regular basis?

9   A.    Other than David Bocci contact me from

10  Future Fintech, there were probably one or

11  two occasions AGP other colleagues,

12  investment banking department mainly, reached

13  out to us, want to share business with us or

14  want to join some of our deal flows.

15  Q.    Have you done that, meaning join some

16  of their deal flow, since the Future Fintech

17  placement agent agreement expired?

18  A.    No.

19  Q.    Why not?

20  A.    Before the December 2020 incident, we

21  were considering AGP might be a good

22  co-placement agent at some point.  After

23  that, it just was for business reasons.

24  Q.    In your conversation or conversations

1  with persons at AGP, did you tell them that

2  we think that you are having your investors

3  use different entity names to invest in

4  Future Fintech?

5  A.    I do not think I did.

6  Q.    Did they tell you that they were

7  having investors use different names to

8  invest in Future Fintech?

9  A.    No.

10  Q.    You guys didn't discuss that at all?

11  A.    We don't discuss this.  We're

12  competitors.

13  Q.    I'm going to show you Exhibit-10, and

14  you had, I believe, just referred to this

15  vaguely or not specifically.  Let's talk

16  about it specifically.

17      Do you understand that the protected

18  investor list, as we've been calling it, was

19  provided to Carmelo Cataudella at AGP?

20  A.    Based on this e-mail, yes.

21  Q.    Wasn't that the best way to tell AGP

22  to stay away from your protected investors?

23  A.    But it's also bad for me to share our

24  list to AGP and they end up knowing who to

1   call.

2   Q.    Well, the list also includes and

3   affiliates for each of the entries, correct?

4   A.    That's correct.

5   Q.    Isn't it the placement agent's

6   responsibility to make sure that the

7   investors are not included in this protected

8   investor list?

9   A.    Would you repeat that question,

10   Mr. Akin.

11   Q.    Being in the placement agency

12   industry, isn't it a placement agent's duty

13   or responsibility to stay away from investors

14   that are on a protected investor list?

15   A.    It should be.

16   Q.    If they have investors that invest who

17   are on a protected investor list, they need

18   to make it right with the placement agent

19   whose list that is, right?

20   A.    Is that a question or statement?

21   Q.    It was a question.  I don't need an

22   answer to that specific question.

23       When did you first find out that the

24   protected investor list was sent to AGP?

FT GLOBAL CAPITAL vs                                    Patrick Ko
FUTURE FINTECH GROUP                                    August 03, 2022

82

1   A.     We had a hunch, if I can use that

2   word, at early December, but we never have

3   hardcore evidence until the discovery period

4   by looking at it.

5   Q.     In other words, before discovery in

6   this case, did anyone at AGP tell you that

7   they had received FT Global's protected

8   investor list?

9   A.     Again, the only conversation with AGP

10   with David Bocci, right after December 2020

11   transaction, he did not tell me he obtained

12   this list.

13          However, as I stated earlier, several

14   investors who were on the list and didn't

15   participate informed me AGP had a list and

16   their name was on the list.  Unless they use

17   a different entity, they could not

18   participate.

19   Q.     If I understand it correctly, AGP was

20   telling potential investors that they had to

21   use names that were not on this list if they

22   wanted to invest in Future Fintech?

23   A.     That's what we were told, yes.

24   Q.     I'm going to show you what's marked as

83

1  Exhibit-11.  Exhibit-11 is an e-mail from

2  Amin Nathoo at Anson Funds to you dated

3  Saturday, February 20, 2021.

4      The subject says:  Do you have a few

5  minutes to chat.  Right?

6  A.    Okay.

7  Q.    Did you guys talk?

8  A.    I don't remember.  It's December

9  2021 -- February, February, February.

10 Q.    By that time, the lawsuit had already

11 been filed in this case, right?

12 A.    Correct.

13 Q.    Do you recall whether or not you

14 discussed anything concerning any aspect of

15 this litigation?

16 A.    No.

17 Q.    Did you tell Mr. Nathoo that you're

18 aware by this point that Anson was investing

19 in Future Fintech?

20 A.    I do not recall ever having that

21 conversation.

22 Q.    After this e-mail, there was another

23 investment in Future Fintech in April of 2021

24 by Anson Funds, correct?

84

1   A.    Correct.  There might be two more.

2   Q.    You don't recall talking to Anson

3   Funds about their upcoming investments or

4   their past investments in Future Fintech?

5   A.    No.

6   Q.    Do you know was this e-mail included

7   in the e-mails that were sent to your

8   attorney?

9   A.    Was or wasn't?

10  Q.    Do you know whether or not it was?

11  A.    I don't know.

12  Q.    How long have you known Mr. Huang with

13  Future Fintech?

14  A.    Mr. Huang, right?  H-U-A-N-G?

15  Q.    Yes, Mr. Huang.

16  A.    I think I know him since 2020.  I will

17  say early to middle part of 2020.

18  Q.    When was the last time you talked to

19  him, either over the phone, e-mail, or text?

20  A.    I spoke to him approximately 10 days

21  or two weeks ago before today.

22  Q.    Do you consider him to be an honest

23  man?

24  A.    Again, honesty is a relative term.  At

1  this moment, he hasn't been honest with me on

2  this particular case.

3  Q.    What do you think he's been dishonest

4  about?

5  A.    He knew what happened.  He knew he owe

6  us placement agency and simply denied to pay

7  us.

8  Q.    Why do you think he knew what

9  happened?

10  A.    He took $80 million from the investor

11  we introduced to.

12  Q.    How do you know that he took that

13  money from the investors who were on your

14  protected investment list?  How do you

15  connect those dots?

16  A.    Again, it's not just one dot.  Many

17  dots.  First, we give him the protected list.

18  We inform him after the first transaction.

19  We inform him after the February 2021

20  transactions.  I'm sorry, I might have the

21  day wrong.

22        We filed the lawsuit and specifically

23  in our first lawsuit tell him exactly what

24  happened, how he concede the investor form.

FT GLOBAL CAPITAL vs
FUTURE FINTECH GROUP

Patrick Ko
August 03, 2022

86

1  Q.   But you never told him exactly who the

2  investors were that you had an issue with,

3  right?

4  A.   I don't recall if I did or not.  It

5  doesn't matter, right?  The matter is these

6  two investors was on the list.  He should

7  have checked at least if he disagreed with

8  me.

9  Q.   Isn't it true that the investment

10 company -- well, in this instance, Future

11 Fintech does not know who the investors are

12 until after the deal is ready to be signed?

13 A.   I don't know what AGP procedure behind

14 the transaction, so I can't really tell you.

15 One thing I can tell you is company received

16 investor signature page and their lawyer,

17 their corporate lawyer, professional team,

18 they should know by now.

19 Q.   I've got a couple follow-up questions,

20 and then I want to take a break and make sure

21 I've covered everything.

22     Have you texted anybody about this

23 lawsuit via text message?

24 A.   Text message, no.

87

1   Q.     Well, did you exchange any text

2   messages, for instance, with anyone at Anson?

3   A.     I do not recall I have communication

4   on the lawsuit with Anson, no.

5   Q.     Did you text message Mr. Huang?

6   A.     Mr. Huang kindly spoke to me via

7   telephone call.  We had a chat called WeeChat

8   that mostly Chinese people use, and I

9   understand he's traveling overseas and he

10  sometimes would call me via WeeChat or text

11  me over WeeChat.

12  Q.     You've provided all those WeeChat

13  transcripts to your attorney?

14  A.     No, I mean these are telephone calls

15  mainly.

16  Q.     The WeeChat transcripts, have you

17  provided those to your attorneys?

18  A.     No.

19  Q.     Do you have WeeChat transcripts about

20  this lawsuit with anybody else other than

21  Mr. Huang?

22  A.     Would you repeat that question again.

23  Q.     Do you have WeeChat transcripts or

24  messages with anybody else other than

88

1  Mr. Huang about this lawsuit?

2  A.     About the lawsuit, I don't recall.

3  No, I don't recall.  My primary contact with

4  the company about the lawsuit was with

5  Mr. Huang.

6  Q.     Did you communicate with any potential

7  investors via WeeChat concerning Future

8  Fintech?

9  A.     No.

10  Q.     Did you communicate with anyone from

11  AGP via WeeChat?

12  A.     No.

13         MR. AKINS:  Let's take a

14  five-minute break, and I'll come back and

15  we'll wrap up.

16         THE VIDEOGRAPHER:  We are off the

17  record at 12:14 p.m.

18             - - -

19         (Whereupon, a break was taken at

20  this time.)

21             - - -

22         THE VIDEOGRAPHER:  We are back on

23  the record at 12:29 p.m.

24         MR. AKINS:  Mr. Ko, thank you for

89

1  your time today.  I will pass the witness.  I

2  don't think I have anything further right

3  now.

4          MR. FLEMING:  I have no questions

5  for Mr. Ko.  I guess we're done.

6          MR. AKINS:  All right.  We're

7  done.

8          THE WITNESS:  Thank you very

9  much.

10          THE VIDEOGRAPHER:  This now

11  concludes the video deposition of Patrick Ko.

12  Going off the record at 12:29 p.m., eastern

13  time.

14              - - -

15      (Whereupon, the deposition concluded

16  at 12:30 p.m.)

17              - - -

18

19

20

21

22

23

24

1      C E R T I F I C A T E

2

3          I hereby certify that the proceedings,

4    evidence and objections noted are contained

5    fully and accurately in the notes taken by me

6    on this hearing of the above-captioned case

7    on August 3, 2022, and that this is a correct

8    transcription of same.

9

10

11

12

13

14

15          _____

16          Kathryn Rose

17

18

19

20

21

22

23

24

**$**

**$80** 85:10

**1**

**1** 14:13 41:21 66:21 67:18

**1,000** 31:3

**1,000-2,000** 31:1

**10** 36:6,8 46:19 51:16 84:20

**10-15** 10:12

**10/28** 67:6

**100** 36:12 55:8 74:24

**10:05** 6:4

**11:03** 47:3

**11:14** 47:9

**12** 70:20,24

**12:14** 88:17

**12:29** 88:23 89:12

**12:30** 89:16

**12th** 71:11

**15** 38:11

**1:21-CV-00594-JPB** 6:10

**2**

**2** 14:13

**2,000** 31:3

**20** 55:11 83:3

**200** 36:13

**2006** 11:18

**2007** 11:20 38:10

**2010** 17:10

**2020** 12:14,21 13:1,5,14 14:3 17:12,
13 23:2 30:19 44:17 55:10 57:21
59:13 63:6 66:7,12,22 67:19 71:23
77:5 79:20 82:10 84:16,17

**2021** 13:14 44:24 45:2,6 46:13 70:20,
24 71:24 83:3,9,23 85:19

**2022** 6:3

**23** 45:3,6

**24** 57:21

**25** 45:3,6

**28** 14:3 44:17 55:10 59:13

**3**

**3** 6:3 14:13

**30** 66:7,12

**4**

**4** 14:14

**5**

**5** 14:15,18,22,24

**50** 55:8 74:20

**A**

**A&p** 53:20 54:11,19

**a.m.** 6:4 47:3,9

**abandoned** 67:2,10,14,16,23 69:5,7

**accept** 21:2

**acceptable** 64:12 65:18

**access** 9:18

**accessed** 58:22

**acknowledgment** 62:8

**active** 48:14

**activities** 31:18

**activity** 33:19 71:21

**add** 41:4

**administer** 7:9

**Adriel** 6:13

**advisement** 32:2

**affiliate** 41:10

**affiliates** 41:4,13,15 42:3 81:3

**agency** 81:11 85:6

**agent** 13:17,20,21 14:5 16:5,8 17:6,
22 18:4 19:8 20:18 21:22 22:10,23
23:1,13,16 24:1,9,13 25:6,7,21 26:17
27:9,14,19 28:20 29:10 30:12 31:19
33:15 34:19,22 35:21 38:9,17 39:17,
19 40:16 41:14 44:21 45:11,13,17,21

46:1 51:11,12,19 52:19 53:1 55:1,6
59:9,18 72:20 73:6,7,10 79:17,22
81:18

**agent's** 81:5,12

**AGP** 52:24 53:4,10,14 54:8,20 69:24
70:17,24 71:14,17,20,22 72:2,19
73:1,6,16 77:14,15,23 78:2,4,7,10,12,
18,20 79:1,4,7,11,21 80:1,19,21,24
81:24 82:6,9,15,19 86:13 88:11

**agree** 10:1 20:16 21:13 31:21 49:14,
16 50:5 57:12 63:1 64:17 74:21

**agreed** 20:24 21:2,4 46:5 68:19

**agreement** 13:6,17,20,21 14:5,9,10
15:5 16:3,12,23 18:4,6 19:9 20:18,19,
21 22:10,23 23:1,3,7,14 25:6 26:17,
22 27:3,9,14 28:1 29:11 30:12 31:19
33:16 34:4,11,16,20,22 35:13,21
36:4,17 38:9,18 40:16 41:14 43:5,10
44:21 45:13,17,22 46:1 50:7 51:12,20
54:23 55:1 58:9,18 69:9,10,14 79:17

**Akin** 7:22 81:10

**Akins** 6:20 7:17,19 32:4,5 38:1 40:7
46:21 47:10 88:13,24 89:6

**Alec** 7:1

**allegation** 52:16

**Alliance** 70:1,3,8,10,17

**Allison** 55:16 57:2,20 60:20

**allowed** 65:6

**alternatively** 76:24

**altogether** 54:8

**Amendment** 68:11

**Amin** 83:2

**amount** 56:15

**announcement** 72:14 73:24 74:2,23
77:5

**Anson** 44:10,12 48:13,14,16,19,24
49:9,10,20 50:10,18,20,22,24 51:10,
17 52:17 53:4,10,15,19 54:1,6,9,16,
18 62:22 64:17,19 65:7 83:2,18,24
84:2 87:2,4

**Anson's** 52:21

**anticipated** 59:16

**Antonopoulos** 55:15 57:1,21 60:20
62:19

**apologize** 56:2

**apparently** 74:14

**appeared** 75:17

**appearing** 8:11

**appendix** 14:24

**applied** 11:19

**appointed** 25:21

**approve** 68:15

**Approximate** 39:1

**approximately** 10:11 65:2 84:20

**April** 83:23

**Armi** 50:21

**arose** 37:3

**asks** 31:14 67:1

**aspect** 83:14

**assist** 16:15

**assisting** 63:17,20

**assume** 12:11 41:12

**assuming** 54:6

**Atlanta** 6:9

**attending** 6:13

**attention** 71:7,10

**attorney** 6:19 10:23 38:23 79:3 84:8 87:13

**attorney-client** 78:21

**attorneys** 9:9 29:24 31:23,24 37:11 78:23 87:17

**August** 6:3

**avenue** 63:23

**average** 36:6

**aware** 27:15 48:23 53:4,10 55:17 62:5,9 83:18

**Ayrton** 20:12 77:11,13,19,21

**B**

**B-O-C-C-I** 72:7

**back** 32:9 35:18 39:15 41:18,20 46:24 47:8 59:3 70:13 74:18 88:14,22

**back-and-forth** 65:5

**bad** 17:2 80:23

**banker** 28:19 72:4

**banking** 38:19,21 79:12

**based** 15:7,8,11 80:20

**basically** 78:9

**basis** 79:8

**Bates** 40:3 43:18

**Bay** 20:11 44:10,13 55:3,5,12,13,18 56:1,5,10,24 57:12 59:17 60:2 61:17, 22,23 62:5,10,13,15 65:13,14

**Beach** 8:17,19

**begin** 18:17

**beginning** 6:18 30:4 66:20 68:2

**behalf** 6:21,23 7:5 8:22 21:22 25:8, 22 43:1

**big** 55:7

**bill** 56:16

**bit** 24:21

**blocks** 14:15

**Bocci** 72:4 73:2 79:9 82:10

**break** 8:2 46:23 47:5 86:20 88:14,19

**briefly** 49:4

**bring** 72:19

**broker-dealer** 11:20 18:10

**brought** 17:13 44:7

**business** 11:17 17:12,17,19 19:15 21:15,19 24:11 26:14 29:2 32:23 38:10 48:1,15 71:18 77:1 79:13,23

**C**

**call** 19:15 20:1 21:24 26:15 33:2 40:4 47:19 48:6,8 50:13,19 52:13 58:6,7, 11 59:3,5 60:10 61:13 65:15 76:8 81:1 87:7,10

**called** 11:5 12:5 15:22,23 17:9 22:18, 19 50:20 52:24 60:12 63:8,24 68:11 73:8 87:7

**calling** 13:20 42:21 80:18

**calls** 9:11 17:1 33:3 51:3,9,22,24 52:3,6,10 60:13,14 72:23 75:11,15 78:6 87:14

**Capiital** 11:16

**capital** 6:6 8:18,23 11:15 13:23 16:15 17:19 18:16,19 20:12 22:18,20 23:18,23 24:15 25:23 33:19 42:14,15, 24 45:3 47:21 63:22 65:1,2 70:17

**care** 21:15 63:3

**carefully** 49:5 54:22

**Carmelo** 80:19

**carrying** 31:18

**case** 6:9 9:11 13:18 18:11 21:22 29:24 46:3 48:24 52:16 54:4 55:14,18 59:19 69:15,18 77:2 82:6 83:11 85:2

**cases** 33:8

**Cataudella** 80:19

**cease** 70:23

**cease/desist** 71:21

**CEO** 17:15

**cetera** 48:1

**chairmanship** 17:8

**chance** 48:17

**changed** 17:17

**chat** 83:5 87:7

**check** 11:11 46:20 72:9,24

**checked** 86:7

**chief** 30:8

**China** 11:5 17:11

**Chinese** 87:8

**clarification** 28:17 53:23

**clarify** 27:16 28:11

**clear** 45:8 69:13

**client** 18:11

**clients** 36:9

**close** 66:13 76:15

**closer** 66:19

**co-invest** 64:23

**co-investor** 65:15

**co-placement** 72:20 73:6 79:22

**colleague** 6:24

**colleagues** 79:11

**comments** 35:17

**commission** 10:22,24 63:13

**commit** 22:8

**common** 41:6

**commonly** 28:13,18

**communicate** 10:2,6 16:22 60:13 64:16 79:8 88:6,10

**communicated** 42:6 73:1

**communicating** 9:20

**communication** 27:6,11 58:2,4 66:4 78:3,22 87:3

**companies** 74:15

**company** 11:5,9 17:9,16,20 20:2 23:24 24:2,4,8,19 25:4 26:2,7,15 30:4 39:20 45:21 47:23 50:14 61:14 62:14 63:17 64:4,5 65:6,19 67:6,17 68:8,13, 20 69:23 73:15,20 74:3,20,23 75:1 76:23 78:12,15 86:10,15 88:4

**compensation** 46:8

**competitor** 70:11,12

**competitors** 80:12

**complete** 67:16

**completed** 14:10 67:7

**completion** 45:14,15

**compliance** 30:9

**complicated** 64:7

**concede** 85:24

**conceding** 78:16

**concept** 25:14,15,18 47:11

**concern** 38:16

**concluded** 89:15

**concludes** 89:11

**conclusion** 68:14

**conduct** 16:15 36:6 48:17 63:8

**conducted** 45:2

**conference** 6:16

**confidential** 28:7,20,23 29:7 31:11 33:6,9 34:8 56:13 58:15,18,23 61:7, 10 78:11,13

**confidentiality** 34:3,10,15

**confirming** 49:21

**connect** 85:15

**connection** 27:19

**considered** 61:15

**consultant** 30:7

**contact** 16:22 25:22 49:17 51:1 55:12 79:9 88:3

**contacted** 43:1,14 77:22

**contacting** 18:17

**contacts** 55:13

**contemplating** 56:15 68:22

**context** 10:17 25:19

**continues** 23:22,23 27:17 71:8

**contractor** 13:3,12

**contractors** 12:24 13:14

**contractual** 13:6

**controlled** 77:1

**conversation** 59:4 72:21 73:3 77:6 79:24 82:9 83:21

**conversations** 57:6 78:1 79:24

**convey** 50:17 58:14

**conveyed** 56:21,23 58:18

**copying** 60:20

**corporate** 36:9 86:17

**correct** 12:23 16:18 18:1,2 26:2,11 29:21 41:16 42:18,19 43:6,15,16 44:18 46:5,6 52:18 57:23,24 60:23 65:3,10,11 66:6,11,15,24 67:12 69:6 81:3,4 83:12,24 84:1

**correction** 57:11

**correctly** 23:20 33:20 39:10 82:19

**counsel** 6:16 7:2 9:9,21 10:2,7 12:12 15:6,13,14,17,19 34:18 63:18 71:2,3, 4

**counsel/lawyers** 13:9

**country** 10:15

**couple** 77:6 86:19

**court** 6:8 7:6,8 17:23 37:16 38:15

**coverage** 74:17,20,24

**covered** 31:11 86:21

**created** 15:4,12 30:3,6,7

**current** 11:12

                    **D**

**date** 6:3 14:2 30:11 67:2

**dated** 70:20 83:2

**David** 72:4 73:2,4,8,12,16 79:9 82:10

**day** 58:12 59:22 85:21

**days** 59:8,23 84:20

**deal** 60:9 66:13 67:2,6,9,13,23 69:4,5

74:12 79:14,16 86:12

**dealing** 71:19

**December** 66:21 67:18 68:13 71:15, 23,24 73:13,22 74:22 77:5 79:20 82:2,10 83:8

**decide** 64:22

**decided** 41:1

**declared** 63:14

**defendant** 6:21 7:5,19

**define** 13:2 20:19 24:20

**definition** 28:14

**Delaware** 39:6

**Delfine** 12:17

**demanding** 73:14

**denied** 75:16 85:6

**department** 79:12

**deposed** 10:23 48:24

**deposition** 6:5,11 8:7,8,9,10,12 9:5, 8,14 10:3,18 11:2 31:24 49:3 54:10, 17 55:17,21 89:11,15

**description** 47:13

**desist** 70:23

**detail** 33:4 61:13

**details** 19:3,4

**development** 67:17

**Diem** 7:5

**difference** 29:5

**difficult** 64:3

**diligence** 18:10,12

**direct** 9:23 27:6,11 63:9,14,18,21 68:3,23 74:21

**disagree** 75:19

**disagreed** 75:20,21,23 86:7

**disclosed** 78:13

**discloses** 28:7

**discovered** 77:5

**discovery** 62:2 82:3,5

**discuss** 18:15 52:13 80:10,11

**discussed** 74:13 83:14

**discussing** 44:3

**dishonest** 85:3

**dispute** 11:7 36:16,22 37:2,5,8 38:2, 13,16,23 39:2,7

**disputes** 36:17 38:7

**District** 6:8,9

**Division** 6:9

**document** 13:24 35:6,15 40:2 43:11, 13,18,20 62:3

**documents** 35:5 53:9 54:3 58:22 62:14,18

**dollar** 56:15

**Dominion** 22:18 42:14

**dot** 85:16

**dots** 85:15,17

**draft** 15:4 40:21

**drafted** 40:18

**dramatically** 17:17

**due** 18:10,12 22:24 63:10

**duly** 7:11

**duty** 18:9 81:12

**E**

**e-mail** 43:21 49:21 52:12 56:18 57:22 58:1,10,13,14,19,23 59:7,24 60:1,6,19 61:3 65:22,24 66:3,9 70:16 80:20 83:1,22 84:6,19

**e-mailed** 57:20

**e-mails** 17:1 26:24 65:23 69:4 72:22 84:7

**earlier** 19:20 27:16 50:6 67:24 69:23 77:4 82:13

**early** 17:13 68:12 82:2 84:17

**earn** 16:4

**eastern** 6:4 89:12

**effective** 63:15,19 68:4,21

**elaborate** 63:2

**electronic** 30:15,19,21

**emphasize** 28:3

**employee** 12:21

**employees** 12:8,13

**enclosed** 44:1

**encountered** 36:16

**end** 14:12,13 40:22 43:5 44:20 45:16 68:7 76:16 78:14 80:24

**ends** 39:16 45:5

**Energy** 11:5

**engage** 36:10

**engaged** 33:1

**engagement** 44:7,16 48:11 54:23 67:5 68:2

**enlarge** 40:7 57:17 60:18

**enter** 45:24

**entities** 16:17 35:22

**entitled** 23:16

**entity** 62:16 77:1 80:3 82:17

**entries** 41:5 81:3

**Equity** 64:1

**essentially** 42:17

**establishment** 30:5

**eventually** 52:22

**evidence** 76:19 82:3

**exact** 20:20

**EXAMINATION** 7:15

**examined** 7:12

**exchange** 10:22,24 87:1

**exchanged** 72:22

**excludeing** 36:15

**exclusive** 14:4 16:5,8 25:6,7,21 73:7,10

**Exhibit-1** 8:9

**Exhibit-10** 80:13

**Exhibit-11** 83:1

**Exhibit-2** 13:22 41:21

**Exhibit-3** 39:15 40:2 44:3

**Exhibit-4** 43:17,18

**Exhibit-5** 57:16

**Exhibit-6** 60:18

**Exhibit-7** 60:24 61:1

**Exhibit-8** 65:21,22 66:20

**Exhibit-9** 70:14,15 76:13

**Exhibit-a** 40:5

**existence** 46:11

**existing** 55:3

**expectation** 64:11

**expiration** 40:15 59:17

**expired** 44:16 51:13 52:22 59:12 67:6 79:17

**explain** 21:14,19

**explore** 68:5

**exploring** 18:18

**express** 18:21 19:6,11,19 73:21

**expressed** 20:6 65:17

**extension** 44:6,15

**F**

**F3** 68:11,15,21

**facilitate** 18:23 72:17

**fact** 63:16 71:14 73:12,14 77:6

**fair** 21:3 41:1 48:6 69:17 70:10

**familiar** 70:3,7

**fault** 72:16

**FCC** 31:5,14 35:3,14,16,18 63:11 68:15

**February** 83:3,9 85:19

**fee** 16:4 23:16 38:19,21

**feel** 71:17

**file** 35:10

**filed** 6:7 34:23 35:1,3,6,9,13,15 37:9 38:13 75:10 78:7,24 79:5 83:11 85:22

**filing** 59:1

**fill** 18:5

**final** 64:21

**finally** 68:13,21

**financial** 18:14

**financing** 16:7 23:18,23 35:7 36:24 37:6

**find** 37:22 81:23

**finish** 41:7

**FINRA** 31:5,14 34:23 35:2,4,13,16,18

**Fintech** 6:7,21 7:20 14:5,21 16:6,15, 21 17:5 18:11,23 19:7,19 20:7,16,22 21:1,13,23 22:12,22 23:3,5 24:14,16

25:7,12,15,20,21,23 26:4,7,9,11,14,
18,21 27:2,8,13 33:23 35:22 39:23
40:14 41:11 43:22 48:12,21 49:12,18
50:11 51:5,7,12,20 52:17,22 53:2,4,6,
10,12,16,20 54:4,8 55:2 56:5,10,14
58:21 59:2,9 61:14,17,21 62:5,11,22,
24 63:8 64:7,10 68:1 69:11 70:5
71:12,19 72:13,18 75:14 77:15 79:10,
16 80:4,8 82:22 83:19,23 84:4,13
86:11 88:8

**Fintech's** 17:8 18:13 55:14 62:7
63:10 64:16

**firm** 15:18 52:24

**firms** 15:24

**five-minute** 46:23 88:14

**five-year** 36:13,19 38:5

**Fleming** 6:22 32:1 37:13,21 38:22
89:4

**flow** 79:16

**flows** 79:14

**folks** 77:19

**follow** 31:17

**follow-up** 86:19

**Forgive** 72:7

**forgot** 42:10 49:24

**form** 15:7,8,12 19:21 30:15,17,19
36:7,9 40:23 85:24

**formulate** 18:16

**Fortunately** 68:12

**four/five** 39:3

**front** 9:22 23:13 32:6

**FT** 6:6 8:18,23 9:20 11:10,12,14,16,
18,22,24 12:1,5,8,13,19,22 13:1,5,13,
23 16:3,9,21 18:5 22:22,24 24:24
25:10 26:5 28:6,14 29:6,11,15 31:8,
17 34:18 36:16 38:6,8,22 39:22 40:3,
14 42:6,24 43:18 44:14,19 45:8,17,24
46:7,12,16 47:14 48:3,12,19 51:11,
18,19,24 52:1,3,16 55:2,6,24 56:4,9,
21 57:8,10 62:21 65:12 69:8 70:11,16
71:9,22 72:2,10 73:1,5,16,21 74:1
76:22 78:11,24 82:7

**FTFT** 43:1 57:23 60:21

**FTFT's** 76:20

**full** 47:13

**fund** 76:23,24

**Fund's** 54:16

**funding** 64:4

**funds** 48:13,14,19,24 49:9,20 54:9
62:23 64:24 65:7 83:2,24 84:3

**future** 6:7,21 7:20 14:5,21 16:6,15,21
17:5,8,18 18:11,13,23 19:7,19 20:7,
16,22 21:1,13,23 22:12,22 23:3,5
24:13,16 25:7,12,15,19,20,22 26:4,7,
9,11,14,18,21 27:1,7,12 33:23 35:22
39:22 40:14 41:11 43:22 48:11,21
49:11,18 50:10 51:5,7,12,20 52:17,21
53:2,4,6,9,12,16,20 54:4,7 55:2,14
56:5,10,14 58:21 59:1,9 61:14,17,21
62:5,7,10,22,24 63:7,10 64:7,9,16
68:1 69:10 70:5 71:12,19 72:13,18
75:14 77:15 79:10,16 80:4,8 82:22
83:19,23 84:4,13 86:10 88:7

**G**

**GA-2388** 43:19

**GA-2397** 40:3

**gave** 10:17 21:8 78:9

**general** 9:20 12:12 30:22 35:20 51:6

**generally** 21:21 28:6 32:21 50:12

**gentleman** 55:15

**George** 55:15 57:1,20 60:20 62:19

**Georgia** 6:9

**give** 19:2,24 32:22 36:2 47:22 50:14
67:19 74:23 85:17

**giving** 33:17

**glance** 49:5 54:21 55:22

**global** 6:6 8:18,23 11:10,13,14,16,
18,22 12:5,6,8,13,19,22 13:1,5,13,23
16:3,9,21 18:5 22:24 24:24 25:10
26:5 28:7,14 29:11,16 31:17 34:18
36:16 38:6 39:22 40:3,14 42:6,24
43:19 44:14,19 45:9,17,24 46:7,12,16
47:14 48:3,12,19 51:11,18,24 52:1,4
55:2,6,24 56:4,9,21 57:9,10 62:21
69:8 70:1,3,8,10,11,16,17 71:22 72:2,
10 73:2,5,17,21 74:1 78:12,24

**global's** 9:20 22:22 29:6 31:8 38:8,
22 51:19 52:16 65:12 71:9 76:22 82:7

**good** 7:18,22,24 32:22 79:21

**great** 31:4

**group** 6:7 14:6 41:13

**Group's** 14:21

**Grundstein** 66:7 67:1,9

**guess** 30:24 36:11 46:19 55:11
58:11 70:12 73:19 89:5

**guys** 80:10 83:7

**H**

**H-U-A-N-G** 17:24 84:14

**half-a-dozen** 19:13

**happen** 22:14 59:22 64:14

**happened** 67:20 85:5,9,24

**happy** 32:15 47:16 63:2 73:13

**hardcore** 82:3

**Hardin** 15:22 71:5

**head** 72:3

**header** 13:24

**hear** 7:21 21:16

**helpful** 21:20

**higher** 36:11

**highlighting** 76:17

**hire** 17:5

**hired** 25:7

**Hold** 23:11

**honest** 84:22 85:1

**Honestly** 28:2

**honesty** 84:24

**hour** 46:23

**hours** 58:12

**Huang** 17:14,24 74:4,7 75:11 76:10
78:5,8,9 84:12,14,15 87:5,6,21 88:1,5

**Hudson** 20:11 44:10,13 55:3,5,12,
13,18 56:1,5,10,24 57:12 59:17 60:2
61:17,22,23 62:5,10,13,15 65:13,14

**hunch** 82:1

**hyperlinks** 58:23

**I**

**identified** 76:21

**identify** 6:17

**identity** 78:16

**importantly** 64:9

**in-house** 7:2 9:9 34:18

**inception** 11:23 38:6 46:16

**incident** 79:20

**include** 31:8 41:15,18 44:9,12 61:6

**included** 46:1 56:15 81:7 84:6

**includes** 47:24 60:21 81:2

**including** 20:15

**incorporated** 11:18

**indemnification** 15:1

**independent** 12:24 13:3,12,13

**independently** 10:2

**indication** 19:15,22 20:3,24 21:8,11 22:2

**individuals** 43:21

**industry** 28:3,14,19 34:7 81:12

**inform** 85:18,19

**information** 18:14 28:7,21,23,24 29:1,7,8 31:11 33:6,10,18,22 34:9,14 50:9,17 55:24 56:4,9,13,17,21 58:15, 18,24 59:2 61:6,7,11 78:1,11,13

**informed** 77:13 82:15

**initially** 72:12

**initiated** 38:2

**inquiry** 10:21

**inside** 29:15

**instance** 86:10 87:2

**institution** 18:18,20

**institutional** 16:19 19:6,18 47:18 48:5

**Intercoastal** 20:13 77:12

**interest** 18:21 19:7,11,16,19,23 20:4, 24 21:8,11 22:2 65:17

**interested** 19:13 20:7 22:6,20 33:4 47:20 60:7 64:22

**internal** 49:19 63:11

**internally** 60:4

**internet** 37:23

**interrupt** 21:18

**introduce** 24:24 26:6,7,9,13 41:11

**introduced** 24:1,4,7,12,18 25:4,12, 17 26:1,5 39:19 42:24 43:14 85:11

**introducing** 25:14 26:10 29:12 33:22

**introduction** 25:19 32:8,9,20

**introductions** 32:12

**invest** 20:16,22 21:1,4,13 22:12,21 23:4 53:20 62:10 80:3,8 81:16 82:22

**invested** 52:17 61:17 75:5,14

**investigating** 11:8

**investigation** 63:12

**investing** 19:7 20:7 49:18 62:6 78:15 83:18

**investment** 28:19 38:19,21 45:10 46:8 48:20 49:12 51:17 52:20,21 53:5,11,16 56:6,11 59:16 61:21 62:22 64:1 65:13 72:4 79:12 83:23 85:14 86:9

**investments** 51:10 55:5 70:5 84:3,4

**investor** 18:18,20,24 19:6,18 20:6, 15 21:24 22:1,7,10,21 23:2,4 25:1,9, 11,16,22 26:8,10,11,14,16,21 27:7,12 33:2,4,8,18,23 34:2,3,9,14 40:13,18, 24 41:11 42:7,20,22 44:20 45:9,18 47:15,18 50:1,4,13 54:2 62:24 64:3,6 68:9,20 71:13 74:11,16,19,24 75:3,4, 13 76:3,7,10,22 77:14,22 78:14 80:18 81:8,14,17,24 82:8 85:10,24 86:16

**investors** 16:18,20 20:23 21:7,24 22:3,4,15 23:24 24:8,14 27:1,17 29:12 32:13 35:23 39:18 40:5 41:10, 16 42:5,6,23 48:5 64:19 75:12,17 76:20 77:7,10 80:2,7,22 81:7,13,16 82:14,20 85:13 86:2,6,11 88:7

**involved** 17:20

**involvement** 70:4

**issue** 11:7 13:18 45:18 72:13 86:2

**issued** 44:19 78:17

**issues** 50:24 63:11

### J

**Jacqueline** 6:24

**January** 70:20,24 71:11 77:3

**join** 79:14,15

**Juice** 17:9

**July** 14:3 23:2 55:9 63:6

**jurisdiction** 37:17 39:4

### K

**Kaelber** 7:4,5

**Kathryn** 7:7

**key** 18:8

**kindly** 87:6

**knew** 73:8,12,13 77:20,24 85:5,8

**knowing** 17:4 80:24

**knowledge** 57:8,10 66:18

**Ko** 6:5 7:11,18 13:19 32:7 40:4 43:20 65:22 70:15 88:24 89:5,11

### L

**L1** 64:24 65:2

**labelled** 40:3 43:18

**language** 26:1,6 32:14

**large** 17:14

**law** 15:18,24

**lawsuit** 37:8,12,14,16,17 38:13 75:10 78:6 79:5 83:10 85:22,23 86:23 87:4,20 88:1,2,4

**lawyer** 86:16,17

**lawyers** 31:4

**lead** 21:24 22:7

**left** 42:7,9 59:8

**legal** 32:22 71:2,3,4

**legally** 29:4

**letter** 70:22,23 71:1,6 77:3 78:17,20

**Lexitas** 6:15 7:8

**limited** 38:4

**lines** 12:18

**list** 39:18,23 40:5,13,19,24 41:2 42:7, 11,20,22,23 44:1,20 45:5,9,12,19 54:2 66:23 71:13 74:10,11 75:4,13,18 76:3,22 77:9,14 78:9,10 80:18,24 81:2,8,14,17,19,24 82:8,12,14,15,16, 21 85:14,17 86:6

**Literally** 73:23

**litigation** 9:21 83:15

**located** 8:15

**logistic** 50:24

**long** 11:16,21 42:1 55:22 59:4,5 68:7 70:7 84:12

**longer** 64:9

**losing** 8:1

**lot** 18:7

**lucky** 36:10

---

**M**

**Ma** 6:24

**made** 42:10 55:6

**main** 16:14 19:1 41:12 51:1 64:13 68:20 74:8

**make** 14:10 30:24 46:19 81:6,18 86:20

**making** 47:18 54:13

**man** 84:23

**management** 18:15 20:12 48:13 66:1,4,8,16 74:3

**manual** 29:15

**mark-ups** 65:6

**marked** 13:21 40:2 57:16 82:24

**market** 64:12

**marking** 8:8 60:17 65:20

**material** 18:14 28:24 29:1,8 34:13 61:6,10

**materials** 9:13,16

**matter** 6:6 11:3 45:18 63:16 71:14 86:5

**matters** 51:2

**meaning** 24:3 79:15

**means** 24:13 25:4 28:5,6,16 33:15, 17,21

**mediation** 39:12,13

**meeting** 26:20

**meetings** 9:12

**memory** 38:11

**mentioned** 38:12 69:8 72:18

**message** 9:22 86:23,24 87:5

**messages** 9:23 87:2,24

**met** 17:7,11

**method** 9:19

**methods** 18:19

**Miami** 8:17,19

**middle** 17:13 84:17

**million** 85:10

**mindful** 74:9

**minute** 69:22

**minutes** 19:2 83:5

**mistake** 42:10

**MNPI** 61:15

**model** 17:17

**moment** 85:1

**money** 62:8 63:23 85:13

**month's** 63:17

**months** 38:3

**morning** 7:18,22

**move** 30:19 60:24

**Mullin** 15:23

---

**N**

**names** 41:2 42:11,12 80:3,7 82:21

**Nathoo** 50:21,24 51:4,23 52:12 83:2, 17

**necessarily** 21:6 33:9

**needed** 16:3

**negotiate** 22:5

**negotiating** 64:23 68:9

**negotiation** 18:23 64:8 65:5

**noncompliance** 63:12

**nondisclosure** 34:4,11,16

**nonpublic** 28:24 29:1,8 34:13 61:6, 10

**normal** 59:21

**Northern** 6:8

**notice** 8:7,9,13

**number** 36:11,15 46:18 55:7

**numerous** 44:7

---

**O**

**oath** 7:9

**obtained** 76:19 82:11

**occasion** 13:7

**occasions** 79:11

**occurred** 46:8,12 55:9 58:8

**October** 23:2 44:17 57:21 59:13 66:7,12 68:7

**offer** 59:22 64:6 74:16

**offered** 21:19 75:1

**offering** 23:18 63:9,14,18,21 68:3,23 69:3 74:19,22

**office** 8:19 30:17

**officer** 30:9

**Olvera** 6:14

**ongoing** 37:14

**operates** 28:15

**operations** 29:15

**opinion** 64:10 65:12

**opportunity** 14:9 49:12 50:11 56:6, 11

**option** 63:7 68:6,17

**options** 68:5

**order** 16:4 18:22

**organization** 71:7 76:19

**Orudjev** 7:1

**Osprey** 22:19 42:14

**out-of-court** 39:9

**over-the-wall** 57:22 59:23 66:5

**overseas** 87:9

**owe** 85:5

---

**P**

**p.m.** 88:17,23 89:12,16

**pages** 30:23 31:1,3

**paid** 13:11

**paper** 30:17,20

**paragraph** 76:14,15,18

**part** 10:21 69:14,17 84:17

**participants** 6:12

**participate** 74:11 77:7,16 82:15,18

**participating** 76:4

**parties** 19:13

**Partners** 70:1,4,8,11,18

**party** 39:11

**pass** 89:1

**past** 84:4

**Patrick** 6:5 7:11 89:11

**pausing** 30:18

**pay** 85:6

**payment** 73:14

**pending** 63:11 68:4

**people** 17:9 31:12 87:8

**percent** 74:20,24

**period** 23:19 36:14 38:5,6 40:6 42:20 44:1 45:6,11,20 46:2,5,9,13 67:21 82:3

**periods** 36:13

**person** 50:18

**persons** 65:24 80:1

**phone** 9:11 16:24 33:2 51:3,9,22,23 52:3,6,10,13 56:18,20 58:5,7,11 59:3,5 60:13,14 72:23 75:11,15 76:8 78:6 84:19

**phoned** 74:3

**phrase** 32:23

**physically** 8:15

**pick** 47:11

**PIPE** 56:14 58:20 63:1,24 64:2,13 67:15 68:6,8,16,19 69:3,7 74:15

**place** 6:11 29:18 35:8

**placement** 13:17,19,21 14:5 16:5,8 17:6,22 18:4 19:8 20:17 21:22 22:9, 23 23:1,13,15,16 24:1,9,13 25:6 26:17,22 27:2,8,13,19,20 28:20 29:10 30:12 31:19 33:15 34:19,22 35:21 36:17 38:8,17 39:17,18 40:16 41:14 44:21 45:11,13,16,21,24 51:11,12,18 52:19 53:1 55:1,6 59:8,18 73:10 76:21 79:17 81:5,11,12,18 85:6

**places** 29:17

**plaintiff** 6:23 7:1,2

**plan** 17:19

**player** 48:15

**point** 8:3 11:10 15:15,20 29:2 48:3, 18 50:16 79:22 83:18

**points** 18:8

**position** 11:12

**possibly** 76:4

**posted** 66:14

**potential** 18:17,24 20:15 21:23 22:15 24:14 25:16 26:21 27:1,7,12 32:12 33:2 34:1,2,9,14 36:9 42:5,23 47:15,17,21 48:20 50:1,4,16 56:14 58:20 76:20 82:20 88:6

**potentially** 51:22

**practice** 21:15,20 28:3 32:23 34:7 41:6 48:3

**preexisting** 48:7,10,12

**prefer** 32:24

**prepare** 9:4,7,14

**prepared** 16:1

**present** 7:4 36:4

**president** 11:14,21 30:8

**previous** 17:8

**primary** 88:3

**principals** 62:15,17

**printed** 30:16

**prior** 16:22 17:10 38:5

**private** 23:17 64:1

**procedure** 29:12,14,19 31:8,16 32:11,12 49:19 86:13

**procedures** 29:20,23 30:3,14,23 31:8,15,17,22 32:8,9,17 33:13 52:9

**proceeds** 20:2

**process** 9:10 18:12 39:14 62:2 63:6, 22

**production** 62:3

**professional** 86:17

**pronounce** 72:8

**proposed** 21:2 39:11 47:23 50:15

**propriety** 78:11

**protected** 40:13,18 42:7,21 44:1,20 45:5,9,12,18 54:2 71:13 74:10,11 75:4,13,18 76:3,22 77:8,14 80:17,22 81:7,14,17,24 82:7 85:14,17

**provide** 20:24 21:7,10 22:1 31:23

32:2 34:8,13 39:17,22 47:13 56:1,4,9, 12 66:16

**provided** 13:4 21:4 23:24 31:22 40:14 50:10 51:10,18 56:17 65:2,4,7 80:19 87:12,17

**providers** 13:8

**providing** 64:20

**provision** 33:21

**provisions** 15:1

**public** 11:4 23:17 59:1,2 61:13 64:1

**public/private** 16:6

**purposes** 16:14 17:23

**pursuant** 8:12 13:6

**put** 42:11

---

## Q

**question** 17:2 19:5 23:9 24:6,20 25:13 26:12 27:10 28:11 34:12 40:11 41:8 50:3 52:2 53:7 54:12,14 61:19 69:2 79:2 81:9,20,21,22 87:22

**questioning** 6:18 10:4,6

**questions** 23:6 32:7 86:19 89:4

**quick** 54:21 55:22

**quickly** 37:22

**quotes** 27:18,22,24

---

## R

**raising** 16:16 18:16,19 23:19 24:15 25:23 33:19 45:3 47:21

**re-ask** 40:11

**reach** 21:23 23:3 24:14,24 25:8 47:17 48:19 72:10

**reached** 68:14 71:14,22 72:2 79:12

**reaches** 25:11

**reaching** 72:11

**read** 40:8 49:2,4,5,6 54:20 55:20 56:3 57:18 65:15

**reading** 54:22

**ready** 86:12

**reason** 36:22 64:13 68:18,21 73:19

**reasonable** 59:15

**reasons** 68:18 74:14 79:23

**recall** 13:7 15:18,21 16:1 20:5,11 22:14 26:19,23 27:5 30:10 32:10,14, 15 35:1,12,17 38:20 39:4,10 42:12 46:3 49:9,13 50:9,20 51:8,21 53:14 54:17 57:3 58:7 59:4,6,11,12,20 67:24 73:4 78:19 83:13,20 84:2 86:4 87:3 88:2,3

**receive** 78:18

**received** 46:7 61:21 82:7 86:15

**receiving** 35:17 78:19

**recent** 17:11 30:18 58:2,3,5 66:3 76:21

**recognize** 14:4,17,20 61:1

**recollection** 67:20

**recommendation** 63:7

**record** 6:3 47:3,9 52:9 88:17,23 89:12

**recorded** 51:24 52:3,7 60:15

**refer** 40:1 48:15 58:3

**reference** 43:6,9,11

**referred** 39:8 69:23 80:14

**referring** 13:10 17:22 23:12 36:23,24 39:15 44:2,12 58:5 69:9

**refers** 23:15 43:24 66:3

**refresh** 8:3

**regard** 16:6 24:15 25:23 28:21 33:19 49:17 51:5,7

**register** 68:16 74:21

**registered** 11:19 18:9 59:22 63:9,14, 21 64:5 68:3,22

**registers** 64:6

**registration** 63:13,19 68:4,10

**regular** 79:8

**related** 11:4

**relationship** 48:7,10,13 55:3 72:17

**relative** 84:24

**rely** 24:17,21 25:5

**relying** 25:2 28:9

**remember** 20:10,14 22:18 30:13 38:12 58:9 72:5 73:11 74:8 75:6,8 76:11 83:8

**remotely** 6:13

**repeat** 27:10 53:7 56:7 61:19 81:9 87:22

**rephrase** 54:14,24 56:2

**reported** 57:6

**reporter** 7:7,8

**reporter's** 17:23

**represent** 6:18 7:19

**representative** 8:22 14:21 48:23 49:10 78:12

**representative's** 49:3 54:9,16

**representing** 6:14,24 7:7

**request** 20:3

**requested** 76:20

**require** 34:2,10,15 45:13

**requirements** 31:5,6

**requires** 25:15

**resolved** 39:2,8

**respect** 23:17 31:18 32:17 48:20 49:11 50:10

**respond** 66:12,21 67:5

**responded** 67:10

**response** 60:1,5 66:8 78:18,20

**responsibilities** 16:9 18:6

**responsibility** 16:11 81:6,13

**restricted** 66:9,23

**result** 37:8

**review** 9:13 18:13

**reviewed** 53:9

**Rick** 55:16 57:1,20 58:1 60:20

**Robert** 66:7 67:1

**role** 16:10

**room** 9:1,17

**Rose** 7:7

**roughly** 45:23

**S**

**Sabby** 20:12 65:24 66:4,8,16,22 67:1

**sample** 60:21 61:2,5 65:16

**Saturday** 83:3

**Savings** 11:5

**scan** 14:9

**Schiff** 15:22 71:4

**screen** 8:6 13:17 23:8 46:22 57:16 65:23 69:21 70:13,16

**screw** 12:17

**scroll** 14:8

**scrolling** 66:19 76:13

**section** 23:7,11,12,15 37:1 39:16 41:21,24

**secure** 62:21 65:13

**Security** 10:22,24

**seek** 18:21

**send** 36:8 45:5 49:20 52:12 58:10

**sending** 43:24

**sends** 45:9

**sentence** 23:23 24:5,7 27:17 42:1,2, 22 43:3 44:5 76:17

**service** 13:8

**services** 13:5

**set** 26:20

**settled** 38:14 39:13

**settlement** 39:9

**share** 8:6 13:16 31:11 32:15 33:5 47:16 64:4 79:13 80:23

**shared** 23:8,13 77:15

**shareholder** 17:14

**sharing** 46:22 57:15 69:21 70:13

**sheet** 18:22 19:15,22 20:3 21:7,10 44:11 60:21 61:2,5,9 65:8,16 66:17 74:18

**sheets** 21:5 44:8,9 64:20,24 65:3,5

**Sheppard** 15:23

**short** 68:7

**shortly** 58:10

**show** 8:7 13:16 24:11 31:15 43:17 54:4 57:15 60:17 65:20 70:14 80:13 82:24

**showed** 65:16

**showing** 13:19

**shows** 53:3,9 61:16,20 62:4

**side** 71:20

**sign** 34:3,10,15

**signature** 14:15,17,20 86:16

**signatures** 14:16

**signed** 16:12 18:5 25:5 36:7 62:14, 18 86:12

**similar** 75:15

**simply** 22:3 33:22 42:10 64:3,20 68:3 71:17,20 72:11,15 85:6

**sir** 7:24 10:10 12:2 14:1,11 18:3 26:3 29:9

**situation** 36:21

**size** 47:24 50:15

**Sky** 17:9

**slight** 29:4

**solicitation** 69:10,14,20

**Sounds** 59:14

**source** 25:2 28:9,12

**sources** 48:16

**speak** 26:17

**speaking** 21:21 32:21 45:23 50:12

**specific** 29:2 32:14 33:17 38:4 50:3 52:2 69:2 81:22

**specifically** 16:19 23:22 38:17 53:17 76:18 80:15,16 85:22

**spell** 72:5

**spelled** 17:24

**spending** 63:16

**spent** 9:10

**spoke** 84:20 87:6

**stand** 11:24 22:4

**standard** 15:7,8,12 40:23

**stands** 12:1,2 63:24

**start** 18:10 45:1 63:22

**started** 63:5

**starts** 58:1 71:6

**state** 6:17

**stated** 24:23 61:12 77:4 82:13

**statement** 39:16 46:6 54:13 68:10 81:20

**states** 6:8 10:14 42:22 76:18

**stay** 80:22 81:13

**stop** 33:10 46:21 69:21 71:20

**story** 68:7

**strategy** 68:1

**structure** 56:16

**subject** 11:3 57:22 75:16 83:4

**subjects** 74:8 75:2

**submit** 19:21

**Subsection** 41:22

**successful** 45:14,15 68:14

**successfully** 45:2

**sufficient** 57:18

**suit** 79:1

**summarize** 18:8

**summarized** 23:20

**summary** 20:1

**supervision** 29:18,20,23 30:2,14 31:7 32:11

**supposed** 78:10

**sworn** 7:12

**syndicate** 22:3 64:19

**T**

**tail** 23:19 36:23 37:6 40:6 42:20 44:1 45:6,12,20 46:1,4,9

**taking** 6:11

**talk** 37:20 50:22 80:15 83:7

**talked** 38:8 50:23 53:15 75:2 78:23 79:4 84:18

**talking** 17:18 36:18 56:8 63:6 67:18 74:22 84:2

**task** 19:1

**tasks** 18:7

**team** 86:17

**telephone** 16:24 33:2 47:19 87:7,14

**telling** 82:20

**tend** 64:2

**term** 18:22 19:8,14,22 20:3,17 21:5, 7,10 22:9,22 24:8 26:16,22 27:2,8 28:18 29:2 34:19 39:20 40:15,22 43:2 44:8,9,11 45:5 51:19 52:22 59:9,20

60:21 61:2,5,9 63:1 64:20,21,24 65:3, 4,7,16,18 66:16 74:18 84:24

**terminated** 68:8

**terms** 19:14 20:1 21:2 22:1,5,6,24 32:22 44:17 47:23 48:1 50:16 64:12, 17,18 68:19 74:13

**testified** 7:12 10:8 49:10

**testify** 8:22 10:11 54:10

**testimony** 49:3 54:10,17

**text** 9:22 84:19 86:23,24 87:1,5,10

**texted** 86:22

**theory** 53:22,24 54:1

**thing** 33:3 86:15

**things** 71:18

**Thirdly** 18:17,20

**Thomas** 6:22

**thought** 54:20 67:23

**three-month** 20:17

**time** 6:4 9:10 15:24 17:16 27:13 29:10 30:10 36:5,14 38:4,5 44:4 46:4 47:6 59:7 63:17 67:3,10 68:13 76:6,9 83:10 84:18 88:20 89:1,13

**timeframe** 36:2,19 39:1 44:23

**times** 36:1,8,12,13,15 44:19 45:7,24 46:11,17 51:15 61:12 62:10

**timing** 48:2 50:15

**today** 7:7 8:3,11,21 9:5,6,14 61:24 84:21 89:1

**today's** 6:3 8:7,10

**told** 53:4,10 54:5,6,10,18,20 73:11,20 75:12 76:2 77:13,16 82:23 86:1

**Tom** 37:19,20

**totally** 75:20

**tough** 46:18

**trading** 11:5

**transaction** 16:16 23:19 24:15 25:24 28:22 33:5,6,18 35:5,7 45:14, 16 47:21,24 48:2,17 50:14,15 51:1 53:18 56:14 58:20 59:21 60:8 61:13 62:9 63:2,8,24 64:14 67:15 68:19 71:15 72:1,21 73:13,18,22 74:15 76:4,23,24 77:8,17 82:11 85:18 86:14

**transactions** 36:7 45:4 55:8 64:2 71:13 85:20

**transcript** 49:2 55:20

**transcripts** 55:23 87:13,16,19,23

**traveling** 87:9

**treat** 29:3

**trial** 10:19,20 39:11

**trip** 17:12

**true** 25:10 86:9

**Trust** 12:1,3,4,5

**turn** 64:6

**turned** 29:23

**type** 35:20

**typically** 51:24

**U**

**UCO** 17:14

**Uh-huh** 15:9

**unable** 62:21 64:17 65:13

**understand** 8:21 20:2 22:6 24:3
25:13 26:12 33:20 69:1,24 72:12
80:17 82:19 87:9

**understanding** 16:2 24:18,23 25:3,
18 26:13 28:4,10,15 29:6 30:22 33:14
47:14 78:24

**understood** 21:12 28:13 32:4 69:4

**unethical** 71:18

**unhappy** 73:17,22

**uninterested** 22:11 42:17

**United** 6:8 10:14

**unrealistic** 64:11

**upcoming** 84:3

**update** 30:9

**updated** 30:11

**updating** 40:23

**usage** 24:18

**usual** 48:2 56:12

**V**

**vaguely** 80:15

**verbal** 20:1 21:9 50:7

**verbally** 20:6

**versus** 6:6

**video** 6:5 89:11

**videoconference** 6:12

**view** 29:3 48:4

**vividly** 22:17

**voice** 8:1,3

**W**

**waiting** 63:20

**walk** 9:10

**wall-cross** 27:18,21,24 28:5,6,16,18
32:8 33:15,17 34:1 43:2,6,9,11,12

**wall-crossed** 24:9 39:19 49:11,21
50:5 57:13

**wall-crossing** 31:9 32:17,20 33:21
47:12,15 48:3 50:13 52:10

**wanted** 27:16 60:8 64:21 82:22

**warrant** 69:9,10,13,19 74:16,20,24

**web** 6:12

**website** 72:9

**Weechat** 87:7,10,11,12,16,19,23
88:7,11

**week** 59:10

**weeks** 66:10 84:21

**william** 6:20 7:19

**word** 32:24 39:12 41:15 42:2 82:2

**wording** 43:12

**words** 72:12 82:5

**work** 24:12

**worked** 12:18 13:1 15:19

**working** 68:10

**worse** 74:24

**wrap** 88:15

**write** 31:2 70:22

**writing** 31:13

**written** 9:13,16 19:14,21,22 20:3
21:8,11 29:11,14,18,20,22 30:2,14,23
31:7,21 32:10,11 33:13 39:18,23
44:11 77:3

**wrong** 23:10 77:12 85:21

**wrote** 71:1

**WSP** 29:19

**Y**

**year** 30:9 36:7

**years** 10:13 15:16 17:11 22:16 30:18
36:3 38:11 39:3 70:9