UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FT GLOBAL CAPITAL, INC.,

        Plaintiff,

v.

FUTURE FINTECH GROUP, INC.,

        Defendant.

CIVIL ACTION NO.
1:21-CV-00594-JPB

## ORDER

This matter comes before the Court on Future Fintech Group, Inc.'s ("Defendant") Motion for Summary Judgment [Doc. 34]. This Court finds as follows:

## PROCEDURAL HISTORY

FT Global Capital, Inc. ("Plaintiff") is a corporation that offers financial services, primarily to raise capital, for publicly-traded companies. Defendant is a technology application company that is publicly traded on NASDAQ. This case arises from a dispute over the terms of an agreement between the parties.

Plaintiff filed this action against Defendant in the Fulton County Superior Court on January 14, 2021, bringing four claims: breach of contract; breach of the covenant of good faith and fair dealing; fraud; and attorney's fees under O.C.G.A.

§ 13-6-11.  [Doc. 1-1].  Defendant removed the case to this Court on February 9, 2021, on the basis of diversity jurisdiction.[1]  [Doc. 1, p. 3].

Defendant moved to dismiss Plaintiff's claims on March 9, 2021.  [Doc. 5]. The Court granted in part and denied in part the motion to dismiss on November 10, 2021.  [Doc. 18-1].  Specifically, the Court dismissed part of Plaintiff's breach of contract claim and Plaintiff's fraud claim in its entirety.  Defendant moved for summary judgment on October 12, 2022, seeking summary judgment on all of Plaintiff's remaining claims.  [Doc. 34].

## FACTUAL HISTORY

The Court derives the facts of this case from Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment [Doc. 34-1]; Plaintiff's Response to Defendant's Statement of Undisputed Facts and Statement of Additional Facts [Doc. 37]; and Defendant's Response and Objections to Plaintiff's Statement of Additional Facts [Doc. 42-1].  The Court also conducted its own review of the record.  For the purpose of adjudicating the instant motion, the facts of this case are as follows.

On July 28, 2020, Plaintiff and Defendant executed a Placement Agent Agreement (the "PAA").  [Doc. 37, p. 2].  Under the PAA, Plaintiff agreed to serve

---

[1] The parties agree that Georgia law applies to this action.  [Doc. 34, p. 11 n.2].

as Defendant's "Executive Placement Agent" "in connection with public or private offering[s] or other financing or capital-raising transaction[s] . . . of unregistered or registered securities." [Doc. 1-1, p. 17]. As Defendant's Executive Placement Agent, Plaintiff's principal responsibility was to raise capital for Defendant using Plaintiff's network of institutional investors. [Doc. 42-1, p. 5]. The PAA specified that the terms of any transaction[2] would be "mutually agreed upon by [Defendant] and the investors (each, an 'Investor' and collectively, the 'Investors')." [Doc. 1-1, p. 17].

The PAA stated that it "embodie[d] the entire agreement and understanding between the parties" and that it "may not be amended or otherwise modified or waived except by an instrument in writing signed by each" party. Id. at 20. The PAA's term was for three months or upon the completion of a transaction, whichever was earlier. Id. at 19.

The PAA contained terms about Plaintiff's compensation as Executive Placement Agent. Under the PAA, Defendant would compensate Plaintiff with a

---

[2] The PAA uses the word "Placement," which it defines elsewhere as "public or private offering or other financing or capital-raising transaction." [Doc. 1-1, p. 17]. The Court uses "transaction" for simplicity.

"Placement Agent Fee"[3] if Defendant closed a transaction facilitated by Plaintiff.

Id. at 18.  Under certain circumstances, Plaintiff was entitled to a Placement Agent

Fee even after the expiration of the PAA.  The terms governing those

circumstances are at the center of the parties' dispute.  Broadly, Defendant was

obliged to pay the Placement Agent Fee if, during the twelve months following the

PAA's termination (the "Tail Period"), Defendant entered into a transaction with

an investor to which Plaintiff had introduced or "wall-crossed" to Defendant.  Id.

Because the parties dispute this language, the Court reproduces it below:

> The Placement Agent shall be entitled to a Placement Agent
> Fee . . . with respect to any public or private offering or other
> financing or capital-raising transaction of any kind ("Tail
> Financing") to the extent that such financing or capital is
> provided to the Company by investors whom the Placement
> Agent had introduced to the Company during the Term or
> investors "wall-crossed" by the Placement Agent in connection
> with the Placement, if such Tail Financing is consummated at
> any time within the 12-month period following the termination
> of this Agreement (the "Tail Period"), provided that, at the
> request of the Company or within 10 days after termination of
> this Agreement[,] the Placement Agent shall provide a written
> list of such investors the Placement Agent had introduced or
> "wall-crossed" to the Company during the Term.

---

[3] The Placement Agent Fee was calculated as "ten percent . . . of the aggregate offering
price of the total amount of capital received by [Defendant] from the sale of its Securities
during the term" of the PAA.  [Doc. 1-1, p. 18].

Id.  Under the PAA, the "Company" refers to Defendant, and the "Placement Agent" refers to Plaintiff.  See id. at 17.

Plaintiff asserts that "introduce" and "wall-cross" have specific meanings in the securities placement industry.  Plaintiff defines "introduce" as "to show a company seeking an investment to a potential investor" and "wall-cross" as "to share material non-public information about a company . . . with an investor, as a result of which the investor becomes unable to buy and sell shares of that company in the public markets before the transaction becomes public."  [Doc. 37, p. 15].

It is undisputed that during the PAA, Plaintiff brought Defendant to the attention of both Amin Nathoo, of Anson Advisors and Anson Funds Management LP ("Anson"),[4] and Richard Allison, of Hudson Bay Capital Management ("Hudson Bay").  [Doc. 42-1, p. 10].  In August 2020, Patrick Ko, Plaintiff's owner and sole principal, contacted Nathoo about Defendant's business.  [Doc. 36-8, p. 4].  Plaintiff asserts that Ko sought to wall-cross Nathoo in this conversation.  [Doc. 37-1, p. 22].  Similarly, in October 2020, Ko exchanged emails with Allison,

---

[4] In his deposition, Nathoo explained that Anson Advisors serves as an advisor to Anson Investments Master Fund LP, which is the "flagship fund."  [Doc. 41, pp. 8–9].  At least three entities bearing some affiliation to "Anson" appear in the record:  Anson Advisors, Nathoo's employer; Anson Investments Master Fund LP, the flagship fund; and Anson Funds Management LP.  The relationship among these entities is not entirely clear.  Plaintiff uses "Anson" to refer to "Anson Funds Management LP," and this Court does the same.  See [Doc. 37, p. 16].

the director and senior counsel for Hudson Bay.  <u>See</u> [Doc. 36-11, p. 2]; [Doc. 36-10].  In an October 24, 2020 email, Ko wrote that Allison was "officially 'over-the-wall' with regards to a potential PIPE transaction for [Defendant]."[5]  [Doc. 36-10, p. 3].  It does not appear, however, that either Anson or Hudson Bay ever executed a transaction with Defendant during the term of the PAA.

The PAA ultimately expired on October 28, 2020.  [Doc. 37, p. 3].  On November 2, 2020, Ko emailed a "Tail List"[6] to Shanchun Huang, Defendant's Chief Executive Officer, identifying twelve entities and their affiliates that Plaintiff claimed to have introduced or contacted on behalf of Defendant.  <u>Id.</u> at 4.  The Tail List named the following:

- Anson Funds Management LP and its affiliates
- Ayrton Capital, Altos Opportunity Fund and their affiliates
- Crede Capital Group, Acquitas Capital and its affiliates
- CVI Investment, Heights Management, SIG and their affiliates
- Connective Capital and its affiliates
- Empery Asset Management and its affiliates
- Intracoastal Capital LP and its affiliates
- Hudson Bay Capital Management and its affiliates

_____

[5] Private Investment in Public Equity, or "PIPE," financing refers to a transaction in which investment funds buy unregistered securities (i.e., shares that cannot be sold in the public markets) with the expectation that the company will later register them.  [Doc. 42-1, p. 3].

[6] The parties use this term in their briefing; it is not included in the PAA.

- Ionic Venture LLC and its affiliates
- Lind Partners and its affiliates
- Li Capital Global Opportunities Master Fund and their affiliates
- Sabby Management LLC and its affiliates

[Doc. 34-4, p. 10].  According to Plaintiff, the Tail List identified investors by reference to an investment manager and its "affiliates," i.e., the family of investment vehicles that it managed.  [Doc. 37, p. 17].  Plaintiff further asserts that many of the potential investors that it contacted on behalf of Defendant operate as a family of hedge funds, all managed by the same investment advisor.  Id.  Defendant never informed Plaintiff that it did not accept the Tail List.  [Doc. 35-10, p. 13].

Defendant did not engage a placement agent between October 28, 2020, and December 13, 2020.  [Doc. 37, p. 6].  On December 13, 2020, Defendant negotiated a new placement agent agreement with Alliance Global Partners ("AGP").  Id.  That same day, Defendant emailed AGP the Tail List and asked to confirm that the placement agent agreement "will not involve any of the investors on the [T]ail [L]ist below."  [Doc. 34-5, p. 1].  AGP responded "confirmed."  [Doc. 37, p. 6].

AGP ultimately solicited three potential investors for Defendant.  [Doc. 42-1, p. 14].  Two of those investors were A&T SPV, LLC and Tech Opportunities,

LLC.  [Doc. 37, p. 7].  With AGP acting as the placement agent, Defendant

executed a securities purchase agreement with these investors on December 24,

2020.  [Doc. 42-1, p. 15].  Defendant did not learn the names of the investors until

shortly before the securities purchase agreement was signed.  [Doc. 37, p. 11].  The

transaction was announced on December 28, 2020, on a Form 8-k filed with the

Securities and Exchange Commission, but the names of the investors were not

disclosed on that form or elsewhere.  [Doc. 42-1, p. 15].  Defendant closed

additional transactions with A&T SPV and Tech Opportunities on January 14,

2021; February 11, 2021; and April 1, 2021.  Id. at 16.  Likewise, the names of the

investors in those transactions were not publicly disclosed.  Id.

     Central to this case and disputed by the parties is whether A&T SPV and

Tech Opportunities were identified on the Tail List.  Defendant asserts that they

were not.  Plaintiff, on the other hand, contends that A&T SPV and Tech

Opportunities are "affiliates" of, respectively, Anson and Hudson Bay.  As to A&T

SPV, the parties do not dispute that A&T SPV shares an address with Anson; the

signatory for the agreement with A&T SPV was Bruce Winson, the founder and

chairman of Anson, and the contact email provided was Nathoo's, who appears as

a "principal" on Anson's webpage; and Nathoo and Winson made the decision for

A&T SPV to invest in Defendant.  See [Doc. 42-1, p. 16].  Nathoo testified that the

Anson flagship fund "is the sole member of A&T SPV." [Doc. 35-5, p. 6]. Nathoo also testified that there was a discussion with an individual at AGP about not having the name "Anson" appear in print or in connection with the transaction. Id. at 19–20.

As to Tech Opportunities, it is undisputed that George Antonopoulous, a managing partner and portfolio manager at Hudson Bay, was the signatory for the securities purchase agreement between Defendant and Tech Opportunities, and the address for Tech Opportunities is also the address for Hudson Bay's New York City office. [Doc. 42-1, pp. 16–17]. Carmelo Cataudella, the Vice President of Investment Banking at AGP, testified that AGP personnel reached out to Allison, who used his Hudson Bay email in their correspondence, and that AGP had previously done business with Allison and with Hudson Bay. [Doc. 38, p. 71]. Allison testified that Hudson Bay makes decisions for Tech Opportunities. [Doc. 35-1, pp. 18–19]. When asked during his deposition if Hudson Bay "or an affiliate" participated in transactions with Defendant, Allison answered "yes." Id. at 13–14. Allison further testified that AGP requested that Hudson Bay use an entity other than the Hudson Bay master fund when investing in Defendant and that they did not want the deal to "include the words[] Hudson Bay." Id. at 20.

The record is unclear as to when Plaintiff learned that Defendant executed transactions with A&T SPV and Tech Opportunities.  As previously stated, the entities involved in the disputed transactions were not publicly disclosed.  Ko (Plaintiff's owner) asserts that he learned "through contacts in the industry that investors on the Tail List were subscribing for [Defendant's] shares using named which disguised their affiliation with their investment manager."  [Doc. 36, p. 10]. However, Ko also claims that he did not learn that the transactions involved A&T SPV and Tech Opportunities until discovery in this action and that it was "immediately obvious" that these entities were affiliates of Anson and Hudson Bay.  Id. at 9.

In any event, on December 29, 2020, the day after the first transaction was announced, Ko sent Huang (Defendant's CEO) an email alleging that the securities purchase agreement had been consummated as a result of Plaintiff's services.  See [Doc. 36-19, p. 2].  In the email, Ko stated that the securities purchase agreement qualified as "Tail Financing" under the PAA and that the purchasers in the transaction were "explicitly identified" on the Tail List.  Id.  Ko thus demanded payment under the PAA in the amount of $880,000.  Id.  Defendant rejected the demand.  [Doc. 37, p. 8].  Ko later called Huang and informed him that certain investors in the recent transaction had been on the Tail List.  [Doc. 42-1, p. 19].

On January 12, 2021, Ko sent AGP a cease and desist letter.  Id.  The letter stated that Defendant "deliberately conspired to undertake surreptitious measures to purposefully conceal the fact that [Defendant] was consummating the subject transactions with protected investors in a bad faith and fraudulent effort to circumvent [its] contractual duty to pay [Plaintiff] the Placement Agent Fee due under the Agreement."  [Doc. 36-20, p. 5].  Defendant was aware of the letter through its attorneys.  [Doc. 42-1, p. 19].  This lawsuit followed.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law.'" <u>Allen</u>, 121 F.3d at

646 (quoting <u>Anderson</u>, 477 U.S. at 251).

The party moving for summary judgment bears the initial burden of showing

that no genuine issue exists as to any material fact, "and in deciding whether the

movant has met this burden the court must view the movant's evidence and all

factual inferences arising from it in the light most favorable to the nonmoving

party." <u>Id.</u>  After the movant satisfies this initial burden, the nonmovant bears the

burden of showing specific facts indicating that summary judgment is improper

because a material issue of fact does exist.  <u>Id.</u>  However, "[a] mere 'scintilla' of

evidence supporting the opposing party's position will not suffice; there must be

enough of a showing that the jury could reasonably find for that party."  <u>Walker v.</u>

<u>Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting <u>Anderson</u>, 477 U.S. at 251).

If the record taken as a whole cannot lead "a rational trier of fact to find for the

non-moving party, there is 'no genuine issue for trial.'"  <u>Matsushita Elec. Indus.</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l Bank of</u>

<u>Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288 (1968)).

# ANALYSIS

## A.    Breach of Contract

Plaintiff asserts that Defendant breached the PAA by executing transactions with investors identified on the Tail List (i.e., A&T SPV and Tech Opportunities, as "affiliates" of Anson and Hudson Bay, respectively) during the Tail Period and refusing to pay Plaintiff the Placement Agent Fee.  "The elements for a breach of contract claim in Georgia are the (1) breach and (2) the resultant damages (3) to the party who has the right to complain about the contract being broken."  Kuritzky v. Emory Univ., 669 S.E.2d 179, 181 (Ga. Ct. App. 2008).  "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible."  UWork.com, Inc. v. Paragon Techs., Inc., 740 S.E.2d 887, 893 (Ga. Ct. App. 2013).

Defendant argues that it is entitled to summary judgment on the breach-of-contract claim because the Tail List contemplated only a list of "investors," not "investors" and their "affiliates."  See [Doc. 34, pp. 12–13].  According to Defendant, because the Tail List did not explicitly name A&T SPV or Tech Opportunities, Defendant does not owe Plaintiff a Placement Agent Fee and thus

did not breach the agreement.  To determine if Defendant is entitled to summary judgment, the Court must analyze whether the Tail List complied with the PAA.

"When a court construes contractual terms to determine if a breach has occurred, 'the cardinal rule of contract construction is to ascertain the intention of the parties.'" UWork.com, 740 S.E.2d at 893 (quoting Board of Comm'rs of Crisp Cnty. v. City Comm'rs of City of Cordele, 727 S.E.2d 524, 527 (Ga. Ct. App. 2012)).  If the language of a contract is clear and unambiguous, the Court "looks only to the contract itself to determine the parties' intent." Unified Gov't of Athens-Clarke Cnty. v. Stiles Apartments, Inc., 764 S.E.2d 403, 407 (Ga. 2014).

The PAA required a Tail List of "investors [Plaintiff] had introduced or 'wall-crossed' to [Defendant]" during the duration of the PAA.  [Doc. 1-1, p. 18]. The parties argue that the term "investor" means different things.  Defendant contends that "investor" refers to a single entity and excludes from that definition any "affiliates" of that entity.  Plaintiff claims that "investor" encompasses an "investor" and any of its "affiliates."

Beginning with the plain language of the PAA, the agreement required a Tail List of "investors" to which Plaintiff introduced or wall-crossed Defendant during the agreement's term.  Plaintiff provided a Tail List that named, among others,

Anson, Hudson Bay and their respective affiliates.  Consequently, the "investors"[7] to which Plaintiff claims to have introduced or wall-crossed to Defendant included Anson, Hudson Bay and their respective affiliates.

Defendant claims that including "affiliates" on the Tail List constitutes an unauthorized modification of the parties' agreement.  The Court disagrees. Nothing in the PAA limits who may be an "investor" other than that such investors must be those whom Plaintiff "had introduced or 'wall-crossed' to [Defendant]" during the agreement.  [Doc. 1-1, p. 18].  So long as Plaintiff introduced or wall-crossed an investor's affiliate to Defendant during the term of the PAA, that entity belonged on the Tail List.  Notably, Defendant did not object to the contents of the Tail List upon its receipt, even sharing it (without comment or reservation) with AGP, its subsequent placement agent.  See Vernon v. Assurance Forensic Acct., LLC, 774 S.E.2d 197, 205–06 (Ga. Ct. App. 2015) ("[W]here a letter from one party to a contract to the other party showed that the writer placed a different

---

[7] To the extent that the parties dispute the meaning of the word "investor," the Court finds that its plain and ordinary meaning is unambiguous.  Georgia law recognizes that "dictionaries may supply the plain and ordinary sense of a word."  Megel v. Donaldson, 654 S.E.2d 656, 660 (Ga. Ct. App. 2007).  Black's Law Dictionary defines "investor" as "[a] buyer of a security or other property who seeks to profit from it without exhausting the principal" or as "[b]roadly, a person who spends money with an expectation of earning a profit."  Investor, Black's Law Dictionary (11th ed. 2019).  The plain and ordinary sense of the word "investor" is, in short, a "buyer of a security."  This meaning comports with the PAA, which itself concerned securities transactions.

construction on a contract than did the other party, the latter's silence was acquiescence in such construction." (quoting Jerkins v. Jerkins, 686 S.E.2d 324 (Ga. Ct. App. 2009))).  The Court is therefore unpersuaded by Defendant's interpretation of the PAA.  At the very least, the Court cannot find as a matter of law that Defendant's conduct—executing transactions during the Tail Period with entities that are ostensibly named on the Tail List and declining to pay the Placement Agent Fee—complied with the terms of the parties' agreement.

Defendant argues that even if the Tail List as written complied with the PAA, Plaintiff's breach-of-contract claim still fails because Plaintiff did not "introduce" or "wall-cross" A&T SPV or Tech Opportunities.[8]  This argument seems to have two components, which the Court will address in turn.

---

[8] Defendant briefly argues that Plaintiff did not plead its breach-of-contract claim to include "wall-crossing," instead premising that claim only on "introducing."  [Doc. 34, pp. 18–19].  The Court is not persuaded by this argument.  The Complaint alleges that Defendant "consummated a securities purchase agreement with two investors that were identified in Plaintiff's Protected Investors List and to whom Plaintiff introduced [Defendant], or brought 'Over-the-wall' during the term of the Agreement."  [Doc. 1-1, p. 7].  Plaintiff further alleges that it suffered damages "[a]s a direct result of [Defendant's] various material breaches" of the PAA, including Defendant's "refusal to pay the Placement Agent Fee."  Id. at 8–9.  The Court finds that these allegations provide sufficient notice of Plaintiff's claim.  Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1221 (11th Cir. 2016) ("At the pleading stage, the relevant question is whether the complaint provides 'a short and plain statement of the claim' that 'give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (alteration in original) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).

First, Defendant asserts that "introducing" or "wall-crossing" an investor under the PAA required Plaintiff to personally introduce Defendant to the investor. See [Doc. 34, pp. 20–21]. Defendant claims that Plaintiff never personally introduced it to Anson, Hudson Bay, A&T SPV or Tech Opportunities and thus did not perform a necessary step under the PAA to be entitled to the Placement Agent Fee. Plaintiff, however, asserts that neither term requires personal contact between Defendant and an investor. See [Doc. 36, p. 5].

Essentially, the parties claim that these terms "may be fairly understood in more than one way." Snipes v. Marcene P. Powell & Assocs., Inc., 616 S.E.2d 152, 155 (Ga. Ct. App. 2005). In this circumstance, when words in a contract are "open to various interpretations," the contract may be ambiguous. Cap. Color Printing, Inc. v. Ahern, 661 S.E.2d 578, 583 (Ga. Ct. App. 2008) (quoting Inv. Props. Co. v. Watson, 682 S.E.2d 155, 159 (Ga. Ct. App. 2006)). Whether a contract is ambiguous is a question of law for the Court. Michna v. Blue Cross & Blue Shield of Ga., Inc., 653 S.E.2d 377, 379 (Ga. Ct. App. 2007). If the Court cannot resolve the ambiguities by relying on the rules of construction, "'the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.'" City of Baldwin v. Woodard & Curran, Inc., 743 S.E.2d 381,

389 (Ga. 2013) (quoting <u>Rec. Town, Inc. v. Sugarloaf Mills Ltd. P'ship of Ga.</u>, 687 S.E.2d 640, 642 (Ga. Ct. App. 2009)).

To find that Defendant is entitled to summary judgment on this basis, the Court would need to resolve any ambiguity in the terms "introduce" and "wall-cross" in Defendant's favor.  In other words, the Court would need to conclude that Defendant's proposed interpretation of these terms—as necessitating personal contact between Defendant and the investor—is correct as a matter of law.  This, the Court cannot do, for the reasons explained below.

Defendant asserts that "introduce" must mean "introduce" "to the Company," not that Plaintiff may "'introduce' the identity of the Company to anyone it chooses."  [Doc. 42, p. 14].  Defendant relies partly on the "last antecedent rule" to claim that the PAA's language necessarily contemplated an introduction or wall-crossing *to Defendant*.

To restate once more the terms at issue, the PAA required a Tail List of "investors [Plaintiff] had introduced or 'wall-crossed' to [Defendant]."  [Doc. 1-1, p. 18].  The last antecedent rule provides that "'a qualifying phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"  <u>Thornton v. State</u>, 851 S.E.2d 564, 570 (Ga. 2020) (quoting <u>Scott v. State</u>, 788 S.E.2d 468, 472 (Ga. 2016)).  Applying the last antecedent rule suggests

that "to Defendant" modifies "introduced" and "wall-crossed."  However, even

under this construction, an introduction to Defendant does not necessarily entail

personal contact; this phrase could easily be interpreted to mean an introduction to

Defendant's *business* alone.

Moreover, Plaintiff contends that "introduce" is a term of art in the

investment industry that means "to show a company seeking an investment to a

potential investor."  [Doc. 37, p. 15].  Plaintiff thus interprets "introduce" as a

technical term that entails "showing" a company to a prospective investor and not a

term that anticipates personal contact.  The rules of interpretation provide that

"technical words, words of art, or words used in a particular trade or business will

be construed, generally, to be used in reference to this peculiar meaning."

O.C.G.A. § 13-2-2(2).  Applying this rule of construction suggests that this Court

should interpret "introduce" in keeping with Plaintiff's proposal.

To the extent that "introduce" is not interpreted as a term of art, its ordinary

meaning does not seem to require personal contact, either.  The Georgia Court of

Appeals has defined "introduce" as "'to present to the public for the first time,' 'to

bring forward for consideration,' or 'to provide someone with a beginning

knowledge or first experience of something.'"  Snipes v. Marcene P. Powell &

Assocs., Inc., 616 S.E.2d 152, 156 (Ga. Ct. App. 2005) (quoting American

Heritage Dictionary of the English Language (3d ed.)).  Accordingly, Plaintiff has

shown that whether construed as a technical term or in its plain and ordinary sense,

the term "introduce" does not necessitate personal contact between Defendant and

an investor.  The rules of construction prevent this Court from holding that

Defendant's proposed interpretation prevails as a matter of law.

As to "wall-crossing," Defendant does not propose a particular reading of

this term other than generally asserting, as it did with respect to "introduce," that

any "wall-crossing" must personally involve Defendant.  Plaintiff, on the other

hand, states that this term as used in the PAA "means to provide [material non-

public information] regarding a potential investment in [Defendant], as a result of

which the potential investor commits not to trade in [Defendant's] securities."

[Doc. 37, p. 16].  As stated previously, this Court must generally construe technical

terms and words of art in keeping with their particular meaning.  See O.C.G.A. §

13-2-2(2).  Additionally, "[p]arol evidence is admissible to explain the meaning of

technical terms employed in written contracts."  May v. S.E. GA Ford, Inc., 811

S.E.2d 14, 17 (2018) (quoting Southland Dev. Corp. v. Battle, 612 S.E.2d 12, 15

(Ga. Ct. App. 2005)).  Plaintiff's definition of "wall-crossing" finds support in

relevant literature.  See, e.g., Wall-crossed offerings, 3A Sec. & Fed. Corp. Law §

8:152 (2d ed.) ("The process by which an investment banking firm secures a

prospective investor's agreement to keep non-public offering information confidential and, in exchange, provides that information to the prospective investor is commonly known as bringing the prospective investor 'over the wall' or 'wall-crossing.'").  Under the rules of interpretation, "wall-crossing" is a technical term that means providing information to a prospective investor with the understanding that the investor will keep the information confidential.  This term, then, does not appear to require a personal introduction between a company and a potential investor.  Having analyzed this language under the applicable rules of construction, the Court cannot hold as a matter of law that Defendant's reading of the PAA's Tail List requirement is correct.

Second, Defendant claims that introducing or wall-crossing Anson and Hudson Bay does not equate to introducing or wall-crossing A&T SPV and Tech Opportunities.  In other words, Defendant claims that "there is no match between who was 'wall-crossed' . . . and who invested."  [Doc. 34, p. 4].  However, it is undisputed in this case that Plaintiff introduced Defendant's business to Anson and Hudson Bay during the term of the PAA.  Plaintiff contends that "[w]all-crossing a fund manager also means its affiliates are wall-crossed."  [Doc. 35, p. 24].  Insofar as Defendant disputes the assertion that introducing it to Anson also introduced it to Anson's affiliates, or that wall-crossing Hudson Bay also wall-crossed its

affiliates, that dispute raises a genuine issue of material fact for resolution by the factfinder.

In sum, Defendant seeks summary judgment on the grounds that the Tail List included entities—the investors' affiliates—outside the scope of what the PAA required or contemplated. Defendant thus claims that it does not owe Plaintiff a Placement Agent Fee for transactions executed during the Tail Period with these affiliates. However, after reviewing in full the terms of the PAA, the parties' arguments and the record in this case, the Court concludes that a jury question remains about whether Defendant's conduct constituted a breach of the parties' agreement. As a result, Defendant's motion for summary judgment on Plaintiff's claim for breach of contract is **DENIED**.

## B.    Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff claims that Defendant breached the covenant of good faith and fair dealing by concealing the entities with which it engaged in transactions during the Tail Period. According to Plaintiff, Defendant "deliberately undertook surreptitious measures," including directing the investors to use a different business entity or different fund name, in a "bad faith effort" to avoid paying the Placement Agent Fee. [Doc. 1-1, p. 10].

"Every contract implies a covenant of good faith and fair dealing in the performance of the terms of the agreement." <u>Camp v. Peetluk</u>, 585 S.E.2d 704, 708 (Ga. Ct. App. 2003). "This implied duty 'requires both parties to a contract to perform their promises and provide such cooperation as is required for the other party's performance.'" <u>Physician Specialists in Anesthesia, P.C. v. MacNeill</u>, 539 S.E.2d 216, 224 (Ga. Ct. App. 2000) (quoting <u>Ihesiaba v. Pelletier</u>, 448 S.E.2d 920, 923 (Ga. Ct. App. 1994)). If the manner of performance is left to a party's discretion, that party "'is bound to the exercise of good faith.'" <u>Camp</u>, 585 S.E.2d at 708 (quoting <u>Rogers v. Farmers & Merchants Bank</u>, 545 S.E.2d 51, 53 (Ga. Ct. App. 2001)).

Defendant seeks summary judgment on the basis that Plaintiff's claim lacks supporting evidence. In particular, Defendant argues that Plaintiff never asked Defendant for the investors' names and that, absent a request from Plaintiff, Defendant had no obligation to disclose the identities of the investors. Whether Plaintiff asked for the names of the investors and whether Defendant was obliged to disclose them does not, however, show as a matter of law that Defendant's performance during the Tail Period was in good faith. Additionally, the record shows that AGP asked both Anson and Hudson Bay to use other entities when investing in Defendant and to avoid disclosing the names "Anson" and "Hudson

Bay" during the transaction.  The record also contains evidence from which a reasonable jury could find that Defendant was on notice that A&T SPV and Tech Opportunities were affiliates of Anson and Hudson Bay.  Importantly, "[w]hat constitutes good faith is a question for the finder of fact."  Hunting Aircraft, Inc. v. Peachtree City Airport Auth., 636 S.E.2d 139, 141 (Ga. Ct. App. 2006).  Consequently, Defendant's motion for summary judgment on this claim is **DENIED**.

## C.    Attorney's Fees

Plaintiff seeks attorney's fees under O.C.G.A. § 13-6-11.  This provision allows a plaintiff to recover attorney's fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."  O.C.G.A. § 13-6-11.  Plaintiff requests attorney's fees on all three grounds.  Defendant argues that summary judgment is warranted because a bona fide controversy exists.

Ordinarily, "[w]hen a bona fide controversy exists between the parties, a plaintiff cannot cite stubborn litigiousness or unnecessary trouble and expense as proper grounds for awarding attorney fees."  Marshall v. King & Morgenstern, 613 S.E.2d 7, 13 (Ga. Ct. App. 2005).  A "bona fide controversy" is a "'genuine dispute' of law or fact."  Zedan v. Bailey, 522 F. Supp. 3d 1363, 1381 (quoting

24

Dimambro Northend Assocs. v. Williams, 312 S.E.2d 386, 392 (Ga. Ct. App. 1983)).  However, "'[i]f there is bad faith in the making *or performance* under [a] contract, attorney fees are authorized regardless of whether a bona fide controversy otherwise existed between the parties.'"  Robert E. Canty Bldg. Contractors, Inc. v. Garrett Mach. & Constr., Inc., 608 S.E.2d 280, 282 (Ga. Ct. App. 2004) (quoting Ryland Grp. v. Daley, 537 S.E.2d 732, 737 (Ga. Ct. App. 2000)).  Whether a party "'acted in bad faith in its contractual relations is an issue for the jury to determine.'"  Id. (quoting Ryland Grp., 537 S.E.2d at 737).

This Court determined above that a jury issue remains on Plaintiff's claim for breach of the covenant of good faith and fair dealing, specifically regarding whether Defendant's performance during the Tail Period was in good faith.  This finding correlates to the question of whether Defendant is entitled to summary judgment on Plaintiff's claim for attorney's fees.  Because this case presents a dispute of fact as to bad faith in the performance of a contract, summary judgment on the claim for attorney's fees under O.C.G.A. § 13-6-11 is not appropriate.  Defendant's motion is therefore **DENIED**.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. 34] is **DENIED** in its entirety.  The parties are **HEREBY ORDERED** to

file the consolidated pretrial order required by Local Rule 16.4 no later than twenty-one days from the entry of this Order.  The parties are notified that a failure to comply with this Order may result in sanctions, including dismissal of the case or entry of default judgment.  In the event a consolidated pretrial order is not filed, the Clerk is **DIRECTED** to submit the case at the expiration of the applicable time period.

If the parties would like a stay of this deadline to allow them to conduct mediation, they may file a motion to that effect.  The parties are reminded that the Court can refer this case to mediation before a Magistrate Judge at no cost.  If the parties would like such a referral, they may make such a request by filing a motion.

**SO ORDERED** this 31st day of August, 2023.

J. P. BOULEE
United States District Judge